**K&L GATES LLP**
10100 Santa Monica Boulevard
Seventh Floor
Los Angeles, California  90067
Telephone: 310.552.5000
Facsimile: 310.552.5001

Michael J. Quinn (SBN 198349)
  *michael.quinn@klgates.com*
Kevin S. Asfour (SBN 228993)
  *kevin.asfour@klgates.com*

Attorneys for Defendants Causeway
Capital Management LLC, Sarah H.
Ketterer, Harry W. Hartford, James A.
Doyle, Jonathan P. Eng, Kevin Durkin,
Turner Swan, Gracie V. Fermelia and
Mark Cone

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN H. WODKA, individually, derivatively and on behalf of all others similarly situated, | Case No. CV09-02625 R (RCx) |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO DISMISS OF CAUSEWAY CAPITAL MANAGEMENT LLC, SARAH H. KETTERER, HARRY W. HARTFORD, JAMES A. DOYLE, JONATHAN P. ENG, KEVIN DURKIN, TURNER SWAN, GRACIE V. FERMELIA AND MARK CONE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| - against - | |
| CAUSEWAY CAPITAL MANAGEMENT LLC, SARAH H. KETTERER, HARRY W. HARTFORD, JAMES A. DOYLE, JONATHAN P. ENG, KEVIN DURKIN, TURNER SWAN, GRACIE V. FERMELIA, MARK CONE, JOHN A. G. GAVIN, and ERIC H. SUSSMAN, | |
| Defendants. | ***[Filed concurrently with Request for Judicial Notice]*** |
| - and - | Date:          September 21, 2009 Time:          10:00 a.m. Courtroom:   8 |
| CAUSEWAY CAPITAL MANAGEMENT TRUST, doing business as CAUSEWAY INTERNATIONAL VALUE FUND, | Assigned to Hon. Manuel L. Real |
| Nominal Defendant. | |

1

TABLE OF CONTENTS

2

Page

PRELIMINARY STATEMENT...............................................................................1

BACKGROUND.....................................................................................................4

ARGUMENT ..........................................................................................................8

I.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER RICO .............8

        A.      The Complaint Does Not Allege an Injury "By Reason Of" the
                Alleged RICO Violations and Therefore Fails to State a Claim...........9

                1.      Any Injuries Resulted from Independent Intervening Acts
                        of Third Parties, and Not Defendants' Investment
                        Decisions ..................................................................................9

                2.      Neither Plaintiff Nor the Trust Was a Target or Victim of
                        the Alleged Predicate Acts or RICO Violations ......................12

        B.      Plaintiff Has Failed to Plead RICO Predicate Acts.............................13

        C.      The Complaint Fails to Allege That Defendants Conducted the
                Affairs of the Trust Through a "Pattern of Racketeering
                Activity" ..............................................................................................17

II.     PLAINTIFF'S CLAIMS ARE DERIVATIVE AND MUST BE
        DISMISSED FOR FAILURE TO PLEAD DEMAND FUTILITY .............19

CONCLUSION ......................................................................................................19

1

TABLE OF AUTHORITIES

2

Page

**Cases**

3

4

*Allwaste, Inc. v. Hecht*,
    65 F.3d 1523 (9th Cir. 1995) ........................................................................18

5

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006).......................................................................... passim

6

*Ashcroft v. Iqbal*,
    --- U.S. ---, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ........................ 8, 14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955, 1965, 147 L. Ed. 2d 929 (2007) ............ 8, 14

7

*Canyon County v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ................................................................. 8, 9, 11

8

*Durning v. Citibank, Int'l.*,
    990 F.2d 1133 (9th Cir. 1993) ............................................................... 17, 18

9

*Gamoran v. Neuberger Berman Mgmt. LLC*, Stipulation and Order of
    Dismissal filed May 19, 2009, No. 08-10807 (DLC) (S.D.N.Y.) ..................1

10

*H. J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989).......................................................................... 3, 17, 18

11

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992).......................................................................... passim

12

*In re Am. Express Co. S'holder Litig.*,
    39 F.3d 395 (2d Cir. 1994) ........................................................................10

13

*In re Mastercard Internet Gambling Litig.*,
    313 F.3d 257 (5th Cir. 2002) ................................................................. 5, 14

14

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003) ........................................................................12

15

*Marina Point Dev. Assoc. v. United States*,
    364 F. Supp. 2d 1144 ............................................................... 9, 11, 19

16

*McBready v. Vanguard Group, Inc.*,
    No. 08-7650, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009) ................... passim

17

*Metzler Invest. GMBH v. Corinthian Coll., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .....................................................................4

18

*Religious Tech. Ctr. v. Wollersheim*,
    971 F.2d 364 (9th Cir. 1992) ......................................................................18

19

*Sanabria v. United States*,
    437 U.S. 53 (1978)......................................................................................16

20

*Seidl v. Am. Century Cos., Inc.*,
    No. 08-8857 (DLC) (S.D.N.Y.) ....................................................................1

21

*Smith v. Hurd*,
    12 Metc. 371, 46 Am. Dec. 690 (Mass. 1847) ...........................................16

22

*Steam Press Holdings, Inc. v. Haw. Teamsters & Allied Workers Union Local 996*,
    302 F.3d 998 (9th Cir. 2002) ......................................................................17

23

24

*Sybersound Records, Inc. v. UAV Corporation*,
    517 F.3d 1137 (9th Cir. 2008) ............................................................. 12, 13

25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 322 S. Ct. 2499 (2007) .........................................................4

26

*United States v. Bala*,
    489 F.3d 334 (8th Cir. 2007) ......................................................................13

27

*United States v. Sacco*,
    491 F.2d 995 (9th Cir. 1974) ......................................................................16

28

*Wisdom v. First Midwest Bank*,
    167 F.3d 402 (8th Cir. 1999) ......................................................................18

ii

**State Statutes**

Del. Code Ann. tit. 8, § 159 (2009)................................................................15

**Codes**

15 U.S.C. § 80a-2(a)(19)..........................................................................5
18 U.S.C. § 1511......................................................................................16
18 U.S.C. § 1955......................................................................................13
18 U.S.C. § 1955(a)..................................................................................15
18 U.S.C. § 1955(b)(1)(i)......................................................................2, 13
18 U.S.C. § 1961........................................................................................1
18 U.S.C. § 1962(c)...................................................................................8
18 U.S.C. § 1964(c)...................................................................................9
28 U.S.C. § 1367(c)..................................................................................19
28 U.S.C. § 1962(c)...................................................................................7
31 U.S.C. § 5361........................................................................................6
31 U.S.C. § 5361(b)..................................................................................6
31 U.S.C. § 5364........................................................................................6

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ..........................................1, 8
Federal Rule of Civil Procedure 23.1................................................1

P:\FIRM\FIRM_1N6

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on September 21, 2009, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 8 of the above-captioned court located at 312 N Spring St., Los Angeles, California, 90012, Defendants Causeway Capital Management LLC, Sarah H. Ketterer, Harry W. Hartford, James A. Doyle, Jonathan P. Eng, Kevin Durkin, Turner Swan, Gracie V. Fermelia and Mark Cone will and hereby do move the Court to dismiss the Complaint of Steven H. Wodka pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure, on the ground that Plaintiff has failed to state a claim upon which relief may be granted, and on the further, independent ground that Plaintiff has not pleaded particularized facts sufficient to excuse pre-suit demand on the Causeway Capital Management Trust ("Trust") Board of Trustees.

The motion will be based on this notice; the Memorandum of Points and Authorities attached hereto; the Declaration of Kevin S. Asfour attached hereto and all exhibits thereto; all pleadings, papers and records on file with the Court in this action; and all other such argument and evidence as may be presented to the Court in connection with the motion.

K&L GATES LLP

Dated: June 26, 2009          By:  /s/ Kevin S. Asfour
                                   Michael J. Quinn
                                   Kevin S. Asfour
                                   Attorneys for Defendants Causeway
                                   Capital Management LLC, Sarah H.
                                   Ketterer, Harry W. Hartford, James A.
                                   Doyle, Jonathan P. Eng, Kevin Durkin,
                                   Turner Swan, Gracie V. Fermelia and
                                   Mark Cone

1

# PRELIMINARY STATEMENT

Defendants Causeway Capital Management LLC ("CCM"), Sarah H. Ketterer, Harry W. Hartford, James A. Doyle, Jonathan P. Eng, Kevin Durkin, Turner Swan, Gracie V. Fermelia and Mark Cone (collectively, "CCM Defendants") respectfully submit this Memorandum in support of their Motion to Dismiss.

The Complaint in this case attempts to spin legitimate investment decisions made by the managers of a mutual fund into a claim under the Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* (2006) ("RICO").  Plaintiff alleges that he owns an unspecified number of shares in the Causeway International Value Fund ("Fund"), a series of the Causeway Capital Management Trust ("Trust"). He alleges that both he and the Trust were injured by the Fund's purchase of shares in two publicly traded foreign companies, PartyGaming Plc and NETeller, Plc, engaged in the online gambling business.  In making the decision to invest in these securities, Defendants were allegedly causing the Trust to violate a federal statute that prohibits conducting, financing, managing, supervising, directing or owning an "illegal gambling business."  18 U.S.C. § 1955.  Since the Fund purchased the securities on more than one occasion, Plaintiff converts the investment decisions into a "pattern of racketeering activity" under RICO and claims that he and the Fund were injured "by reason of" the Defendants' conduct when the price of the shares dropped in the wake of publicity concerning government actions against other online gaming companies. Based on these allegations, Plaintiff also asserts various state law claims.

Plaintiff's case is audacious – and meritless.  Not surprisingly, Plaintiff's RICO claim has been rejected by another federal court on indistinguishable facts.  *McBready v. Vanguard Group, Inc.*, No. 08-7650, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), appeal docketed, No. 09-1445 (2d Cir. Apr. 8, 2009) ("*Vanguard*").[1]  In *Vanguard*, the

---

[1]     In addition to this case and *Vanguard*, shareholders in other mutual funds have filed two additional cases based on the same allegations.  *Seidl v. Am. Century Cos., Inc.*, No. 08-8857 (DLC) (S.D.N.Y.); *Gamoran v. Neuberger Berman Mgmt. LLC*, Stipulation and Order of Dismissal filed May 19, 2009, No. 08-10807 (DLC) (S.D.N.Y.).  Plaintiff's lead counsel in this action, Hanly, Conroy, Bierstein, Sheridan,

court ruled that plaintiffs who owned shares in two mutual funds in the Vanguard fund complex could not establish that the funds' investments in four foreign companies engaged in the online gambling business proximately caused any injury to plaintiffs or the Vanguard funds.  The *Vanguard* court held that even assuming the mere purchase of publicly traded shares could violate U.S. law, any injury to plaintiffs or the Vanguard funds had been the result of independent intervening acts of third parties – the Department of Justice's decision to prosecute executives of foreign online gaming companies, and the accompanying publicity that caused other investors to sell their shares in the four companies.  *Id*. at 1.  The *Vanguard* court's holding, that there must be an injury resulting directly from the unlawful predicate act, is based on the leading Supreme Court decisions, *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258 (1992), and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), and is fully consistent with the decisions in the Ninth Circuit applying those precedents.  It should be followed here and the RICO claim should be dismissed with prejudice.

Plaintiff's RICO claims are defective on two other grounds that the *Vanguard* court did not need to reach.  First, the Complaint does not plead predicate acts.  Plaintiff's claims are based on investments in "illegal gambling businesses."  The relevant provision, 18 U.S.C. § 1955(b)(1)(i), defines an "illegal gambling business" as one operated in "violation of the law of a State or political subdivision in which it is conducted."  While Plaintiff cites numerous press reports, settlements and plea agreements in cases involving Internet gambling companies, he does not identify the state or federal gambling laws that the two companies in question were allegedly violating during the relevant time so as to become "illegal gambling businesses" or the specific conduct amounting to a violation.  Moreover, Plaintiff's contention that mere passive ownership of publicly traded shares in an online gaming company constitutes "financing" and "owning" an illegal gambling business in violation of 18 U.S.C. §

Fisher & Hayes LLP, is also counsel to the plaintiffs in *Vanguard* and the two other cases.

1955 is erroneous. If accepted, it would render every person within U.S. jurisdiction who ever invested in an online gaming stock a felon. No court has ever adopted this view and the government has not advanced it in any proceeding or policy statement.

Second, Plaintiff has failed to allege facts that establish another key RICO element: that the Defendants have conducted the affairs of the Trust through a pattern of racketeering activity. Setting aside the specific investments on which the Complaint focuses, there is no question that the Trust's business and operations are entirely lawful and legitimate. The allegedly unlawful conduct was brief and isolated. It involved nearly contemporaneous decisions to invest in only two securities and an unspecified number of subsequent purchases of the same securities over the following months. These facts do not support a conclusion that Defendants have engaged in continuous and substantial violations of the criminal law or that they threaten to do so in the future, the key requirements of a "pattern." *See H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989).

As discussed more fully in the Memorandum of Points and Authorities in Support of the Motion to Dismiss filed by Defendants John A. G. Gavin and Eric H. Sussman ("Trustees Memorandum"), the Complaint should also be dismissed for independent reasons that do not require any analysis of substance of the RICO claim. All of the claims in the Complaint, whether under federal or state law, depend on the drop in the price of shares *owned only by the Fund and the Trust*, and any injury from the loss on those investments was incurred only by the Trust. All of Plaintiff's claims, no matter how styled, are therefore derivative. Since Plaintiff has neither made a demand on the Fund's Trustees nor adequately alleged facts establishing that a demand would be futile, the Court should dismiss the Complaint in its entirety.

**BACKGROUND**

The following facts are taken from the allegations in the Complaint, the public documents referenced in the Complaint and other public filings of which the Court may properly take judicial notice. [2]

The Fund is an open-end investment company, or mutual fund, registered with the Securities and Exchange Commission ("SEC").  It is one of three series of the Trust, which is a statutory trust organized under the laws of the State of Delaware. The other two series are the Causeway Global Value Fund and the Causeway Emerging Markets Fund.[3]  Each series, for all  practical purposes, is a separate investment company and has different investment objectives, as set forth in the Trust's Prospectus and Statements of Additional Information ("SAI").  RJN Ex. 1, page 7; Compl. ¶¶ 16, 17.

The Fund's investments are managed by CCM, an investment adviser registered with the SEC.  Compl. ¶ 19.  Sarah H. Ketterer and Harry W. Hartford are Chief Executive Officer and President, respectively, of CCM.  *Id.* ¶¶ 21, 22.  Together with Defendants James A. Doyle, Jonathan P. Eng and Kevin Durkin, they act as portfolio managers for the Trust.  *Id.* ¶¶ 23-25.  Defendant Turner Swan is President and Secretary of the Trust and a member of CCM, and Gracie V. Fermelia is Chief Compliance Officer of the Trust and Chief Operating Officer and a member of CCM. Defendant Mark Cone is CCM's Chief Marketing Officer and a Trustee of the Trust.

---

[2]    *See* CCM Defendants' Request for Judicial Notice ("RJN").  Apart from the complaint itself, "courts ordinarily examine [other sources] when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499 (2007), 168 L. Ed. 179 (2007).  *See also Metzler Invest. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (appropriate for district court to judicially notice issuer's "reported stock price history and other publicly available financial documents, including a number of [the issuer's] SEC filings").

[3]    There is no allegation that either the Global Value Fund or the Emerging Markets Fund held shares of PartyGaming or shares of NETeller or any other gambling-related company in its portfolio.

4

*Id.* ¶¶ 26, 27, 28.  Other than general assertions that individuals "exercised operational or managerial oversight over the portfolio holdings" or had "day-to-day management responsibilities," there are no allegations concerning the roles played by any individual CCM Defendant.  Defendants John A.G. Gavin and Eric H. Sussman are members of the Board of Trustees.  *Id*.  They are two of the four Trustees who are independent – "not interested" – within the meaning of the Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(19).  *See* SAI, RJN Ex. 1, page 73.

The investment decisions in question involve two companies based overseas and publicly traded on the London Stock Exchange.  The Complaint focuses on PartyGaming Plc.  PartyGaming's principal business was offering online poker to players around the world.[4]  PartyGaming shares were initially offered to the public through a Prospectus dated June 2005.  Compl. ¶ 40.

The Fund's purchases of PartyGaming shares were made on the open market, beginning "in or about April 2006," after the initial public offering.  Compl. ¶ 39.  The Complaint identifies two events in the summer of 2006 that caused the price of PartyGaming stock to decline.  One is the July 16, 2006 unsealing of a federal indictment against BetOnSports PLC, which the Complaint describes as "another unlawful Internet gambling business similar to PartyGaming."  Compl. ¶ 47.  The Complaint alleges that "after the public disclosures of the BetOnSports indictment, the share prices of publicly held gambling companies that had been taking bets from gamblers in the U.S., including PartyGaming and NETeller, "fell dramatically."  *Id.* ¶ 48.  The second event is the publicity concerning the arrest of the chairman of

---

[4]      *See* RJN Ex. 2, pages 132-133.  Although the PartyGaming Prospectus is cited in the Complaint, *see*  Compl. ¶ 41, the Complaint never mentions what is clear from the PartyGaming Prospectus: that PartyGaming's principal product is, and its business plan centers on, online poker, as opposed to online sports betting.  The distinction is significant in that many of the enforcement activities cited in the Complaint dealt with gambling on sporting events.  A leading judicial decision in the United States indicates that, unlike betting on sporting events, other forms of online gaming, such as poker, are not subject to the Wire Act, the principal federal statute used against Internet gambling. *In re Mastercard Internet Gambling Litig.*, 313 F.3d 257, 262-63 (5th Cir. 2002).

1   Sportingbet Plc on or about September 7, 2006.  *Id.* ¶ 50.  After the disclosure of this

2   arrest, the shares of PartyGaming and NETeller "fell further."  *Id.* ¶ 51.[5]

3         The Complaint then alleges that in October 2006, Congress passed legislation

4   containing the "Unlawful Internet Gambling Enforcement Act of 2006," ("UIGEA")

5   31 U.S.C. § 5361, *et seq.* (Compl. ¶ 55), which President Bush signed on October 13,

6   2006.  Compl. ¶ 55.  The UIGEA does not expressly outlaw any form of gaming or

7   gambling.  *See* 31 U.S.C. § 5361(b).  Instead, it attempts to cut off funds for these

8   activities by effectively making it unlawful for U.S. banks and other financial

9   institutions to process payments of the persons using online gambling services.  *See* 31

10  U.S.C. § 5364.  The Complaint acknowledges that "[a]t the time of the passage of the

11  UIGE, PartyGaming shut down its remaining illegal gambling operations in the U.S."

12  Compl. ¶ 55.  Subsequently, the Fund sold all its PartyGaming shares.  *Id.* ¶ 56.  The

13  Complaint alleges that, by that time, PartyGaming's share price had dropped 80

14  percent.  *Id*.  The Complaint concludes that "there is no other material cause for the

15  drop . . . other than the PartyGaming's loss of illegal US-based gambling revenue.  The

16  drop [in share price] was the direct, proximate, natural, probable and reasonably

17  foreseeable consequence of Defendant's actions in causing the Trust to invest in illegal

18  gambling companies."  Compl. ¶ 56.

19        The Complaint also alleges, in even more general terms, that the Trust, through

20  the Fund, began to purchase shares of NETeller, another foreign Internet gambling

21  related business, which had begun trading on the London Stock Exchange's

22  Alternative Investment Market two years earlier.  *Id*. ¶ 60.  The first purchases of

23  NETeller were made prior to "April 31, 2006," and there are no allegations of

24  _____

25  [5]      While the Complaint alleges that the business of BetOnSports and Sportingbet
26  are "similar to PartyGaming," their  names indicate that they offer online betting on
    sports events, conduct clearly addressed by the Wire Act.  18 U.S.C. § 1084.
27  BetOnSports and Mr. Carruthers were, in fact, charged with taking bets on sporting
    events.  RJN Ex. 3, pages 202-203, 212-220.  Mr. Dicks, who was apparently arrested
28  based on a sealed state court indictment in Louisiana, was released three weeks later
    and apparently was never convicted of anything.  RJN Ex. 4.

1    purchases after September 30, 2006.  Compl. ¶¶ 60, 61.  The Complaint does not

2    describe NETeller's business, other than to state that it was "taking bets from gamblers

3    in the U.S."  Compl. ¶ 73.

4         The Complaint alleges that all purchases of shares in PartyGaming and NETeller

5    (apparently even purchases after October 2006 when PartyGaming no longer did

6    business in the U.S.) violated 18 U.S.C. § 1955,[6] in that the purchases caused the Trust

7    to "finance" and "own" an illegal gambling business.  Compl. ¶¶ 67, 68.  The

8    purchases are alleged to constitute "the conduct of the affairs of the Trust through a

9    pattern of racketeering activity" in violation of 28 U.S.C. § 1962(c) (Compl. ¶ 72).

10   Defendants' agreement to make the investments is alleged to be the basis of a

11   conspiracy to violate Section 1962(c) in violation of Section 1962(d) (Compl. ¶ 76).

12   The Complaint alleges that, as a result of this conduct, "Plaintiff has been injured in his

13   property" and these injuries were proximately caused by the Defendants' acts.  Compl.

14   ¶¶ 77, 78.[7]

15        Plaintiff asserts the RICO claims both derivatively on behalf of the Trust,

16   Compl. ¶¶ 107-18, as well as individually and on behalf of a purported class of

17   individuals who owned the securities in the Fund during an undefined class period.

18   Compl. ¶¶ 131-36.  In addition, the Complaint alleges derivative causes of action under

19   state law for breach of fiduciary duty, negligence and waste (Compl. ¶¶ 119-30), and

20   direct claims for breach of fiduciary duty and negligence on behalf of Plaintiff and the

21   class.  Compl. ¶¶ 137-47.

22

23

24   _____

     [6]    This statute imposes criminal sanctions on "Whoever conducts, finances,
25   manages, supervises, directs or owns all or part of an illegal gambling business …."
     18 U.S.C. § 1955(a).

26   [7]    While Plaintiff never quantifies his injury (or the Trust's) it appears that during
27   the 2006 time period covered in the Complaint, he did not lose money.  During that
     year, the Fund's total return was approximately 26 percent.  RJN Ex. 1, page 9.  Thus,
28   Plaintiff's individual claim is not that he lost money, but that  he should have made
     more.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

In considering Defendants' Motion to Dismiss under Rule 12(b)(6), the Court need not accept the allegations in the Complaint uncritically.  The Supreme Court recently held that, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citation and internal quotation marks omitted), citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 147 L. Ed. 2d 929 (2007).  The factual content set forth in a complaint must "allow[] the court to draw the reasonable inference that the [D]efendant is liable for the misconduct alleged." *Id.*  Only well pleaded factual allegations count. *Id.*  Thus, "conclusory statements" are "not entitled to the assumption of truth." *Id.* at 1950.  Under these standards, the Complaint should be dismissed in its entirety.  Plaintiff's RICO claims fail because he cannot establish proximate cause, and because he has failed to allege either a predicate act or a pattern of racketeering, and the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims.  In the alternative, as discussed in the Trustees Memorandum, both RICO and state law claims should be dismissed for the entirely independent reason that they are derivative, and Plaintiff has neither made a demand, nor pleaded facts establishing that demand is excused.

**I.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER RICO**

To state a claim under the relevant RICO provision, 18 U.S.C. § 1962(c),[8] the Plaintiff must allege that Defendants conducted or participated "directly or indirectly in the conduct of [an] enterprise's affairs through a pattern of racketeering activity" *and* that he was "injured in his business or property by reason of" the violation. *See Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008).  This second requirement – of injury "by reason of" the violation of 1962(c) – imposes a

---

[8]      Plaintiff also alleges a conspiracy in violation of 18 U.S.C. § 1962(d), but this claim is dependent on a violation of Section 1962(c).  *See* Compl. ¶ 76.

1  "proximate cause" requirement that Plaintiff's alleged injuries be the direct result of

2  the alleged violations. *Holmes*, 503 U.S. at 265-68.

3        **A.     The Complaint Does Not Allege an Injury "By Reason Of" the**

4        **Alleged RICO Violations and Therefore Fails to State a Claim**

5        RICO allows a person to bring a civil claim only if he is "injured in his business

6  or property *by reason of* a violation of section 1962 of this chapter."  18 U.S.C.

7  § 1964(c) (emphasis added).  The Supreme Court has held that this statutory text

8  requires Plaintiff to show not only "but for," but also proximate causation.  *Holmes*,

9  503 U.S. at 265-68.  "When a court evaluates a RICO claim for proximate causation,

10 the central question it must ask is whether the alleged violation led directly to the

11 plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460-61 (2006).

12 *See Canyon County*, 519 F.3d at 972.  In the absence of any direct injury, a plaintiff

13 fails to state a claim under RICO.  *Holmes*, 503 U.S. at 268.[9]

14       Courts have analyzed the directness of an alleged injury in two ways.  One is by

15 examining the chain of events leading to the alleged injury.  Where intervening acts of

16 third parties are the direct cause, a plaintiff lacks standing.  Courts also examine

17 whether the plaintiff was an intended target or victim of the criminal activity.  These

18 principles, which were applied in *Vanguard*, require the dismissal of the RICO claims

19 in this case.

20       **1.     Any Injuries Resulted from Independent Intervening Acts of**

21       **Third Parties, and Not Defendants' Investment Decisions**

22       In *Vanguard*, the court considered allegations of injury and causation virtually

23 identical to those made here.  The defendants in *Vanguard* were alleged to have caused

24 two mutual funds to invest in publicly traded foreign stocks of online gambling

25

26 _____

27 [9]      Courts often address proximate cause in terms of standing, holding that, without
   any injury proximately caused by the alleged violation, a plaintiff lacks standing.  *See*,
   *e.g.*, *Marina Point Dev. Assoc. v. United States*, 364 F. Supp. 2d 1144, 1148-49 (C.D.
28 Cal. 2005).  This of course is a lack of statutory (rather than Article III standing) and
   hence is properly addressed through a 12(b)(6) motion. *Id.*

1   businesses.[10]   2009 WL 875220 at *1.  The *Vanguard* complaint alleged that these

2   investments violated 18 U.S.C. § 1955, the same statute used to allege the predicate

3   acts in this case.  *Id*.  As in this case, the *Vanguard* funds were alleged to have been

4   injured after government enforcement activity began and caused share prices of the

5   stocks to decline.  *Id*. at *1.

6        Relying on the Supreme Court's decisions in *Anza* and *Holmes* and appellate

7   decisions applying those cases, the *Vanguard* court found that plaintiffs did not have

8   standing to assert a RICO injury.  The court concluded that "proximate cause is lacking

9   here because the shareholders were not injured by the ownership of or investment in

10  the illegal gambling operations, but by the reaction of the stock price to the publicity

11  following the government's investigation of those operations."  *Id*. at *3, citing *In re*

12  *Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) (dismissing RICO

13  claims for lack of standing where "any losses to American Express were caused only

14  because the scheme itself was exposed and thus failed").  The court observed that "[a]n

15  injury created by the disclosure of a scheme or, similarly, by intervening actions (the

16  government investigation) does not give rise to RICO standing."  *Id*., citing *American*

17  *Express*.

18        In this case, the Complaint specifically identifies several events that allegedly

19  caused the drop in the share price of PartyGaming.  First, Plaintiff alleges that

20  PartyGaming shares fell in price after the arrests of executives of *other* companies

21  were announced in July and September.  Compl. ¶¶ 48, 51.  The Complaint also seems

22  to tie the drop in PartyGaming's share price to the enactment of UIGEA in October

23  2006.  The Complaint alleges that after the legislation passed, PartyGaming "shut

24  down its remaining illegal gambling operations in the U.S."  Compl. ¶ 55.  Overall, the

25  drop in PartyGaming share price is alleged to have been proportional to the loss in

26  revenues from U.S. operations, and the Complaint alleges there was "no other material

27  _____

28  [10]    It appears that the online gambling companies included at least one company
    that took bets on sporting events.  *See* 2009 WL 875220 at *1.

cause for the drop in PartyGaming's share price other than the PartyGaming's loss of illegal US-based gambling revenue."  Compl. ¶ 56.  The Complaint then offers this conclusion: "[t]hat drop was the direct, proximate, natural, probable and reasonably foreseeable consequence of Defendants' actions in causing the Trust to invest in illegal gambling companies." *Id.*

Of course, this conclusion is nonsense, and contradicted by other allegations in the Complaint.  Defendants' conduct did not cause the decline in the price of PartyGaming or NETeller.  According to the rest of the Complaint, the drop in PartyGaming (and NETeller) occurred as a result of a series of other events having nothing to do with Defendants or their investment decisions: the government's decision to bring (and publicize) charges against other companies, Congress' passage of the UIGEA, and PartyGaming's decision to change its business model, rather than fight the legal and political battle on U.S. regulation.  Overarching these events are the decisions by other shareholders whether to sell their own shares of PartyGaming and NETeller shares in response to these developments.  Any of these factors alone is sufficient to break the causal link between Defendants' investment decision and the RICO injury alleged.  *See Canyon County*, 519 F.3d 981 ("Where the violation is not itself the immediate cause of the Plaintiff's injury, proximate cause may be lacking."); *Marine Point Dev. Assoc.*, 364 F. Supp. 2d at 1148-49 (government decision to deny permit, although based at least in part on fraudulent statements made to the government, was intervening event that broke a causal link).

In some respects the causal link here is even more attenuated than in *Vanguard*.  In *Vanguard* it appears that the funds had invested in one or more of the companies that were the direct subject of the government actions at the time of the alleged injury (*i.e.* at the time of the drop in share price).  2009 WL 875220 at *1.  Here the Complaint specifically alleges that stock prices fell in reaction to events affecting *other* companies.  It was the investors' intervening assessment of the materiality and impact

11

1  of news about the other companies on the business of PartyGaming and NETeller that

2  affected the market price for these securities.

3  These various events in the causal chain introduce uncertainty and difficulty in

4  ascertaining damages caused by the alleged violations, particularly where the

5  Complaint alleges purchases at different times, including purchases after the share

6  prices dropped and after alleged illegal conduct ended.  Moreover, it is speculative to

7  assert that, absent the purchases of these securities, other investments may have fared

8  better.  These factors confirm that Plaintiff does not meet the proximate cause

9  requirement in RICO.  *See Anza*, 547 U.S. at 458, citing *Holmes*, 503 U.S. at 269-70;

10  *see also Sybersound Records, Inc. v. UAV Corporation*, 517 F.3d 1137, 1148-49 (9th

11  Cir. 2008) (difficulty of ascertaining amount of damages attributable to defendant's

12  wrongful conduct a factor).

### 2.    Neither Plaintiff Nor the Trust Was a Target or Victim of the Alleged Predicate Acts or RICO Violations

15  The *Vanguard* court also concluded that the plaintiffs could not meet the

16  proximate causation requirement for another reason, because neither plaintiffs nor the

17  Vanguard funds in which they invested were the targets or victims of alleged RICO

18  violations.  To the contrary, they were "the intended beneficiaries of the investments."

19  *Id.* at * 3.  Injuries conferring RICO standing "are generally limited to injuries incurred

20  by targets, competitors, and intended victims."  *Id.,* citing *Lerner v. Fleet Bank, N.A.*,

21  318 F.3d 113, 124 (2d Cir. 2003).  Put another way, the victims of a gambling scheme

22  are people who lose money gambling, or possibly legitimate gaming operations, not

23  people who buy shares in a company that makes money gambling.

24  Again, *Vanguard's* reasoning is supported by a straightforward application of

25  controlling precedent.  *See Anza,* 547 U.S. at 458 (holding the state was a direct victim

26  of mail and wire fraud violations based on filing of fraudulent tax returns and

27  underpayment of taxes and was in best position to sue); *Holmes*, 503 U.S. at 271-74

28  (holding the customers of broker-dealer driven into insolvency by stock manipulation

were not directly injured by predicate acts of stock manipulation; customers who had purchased manipulated stock may have standing).  *Cf. Anza*, 547 U.S. at 462 (Scalia, J., concurring) (finding it "inconceivable" that business competitors were within the "zone of interests" protected by RICO where violations consisted of fraud against state by filing of false tax returns).  Similarly, Plaintiff here, and all other shareholders of the Fund were, through the Fund's investments, the intended beneficiaries.  They could not also be the targets or victims of the predicate acts.

The direct victims of the illegal gambling business, who are the persons harmed by the illegal gambling activity, have more direct interests to pursue violations of anti-gambling laws. The existence of such plaintiffs is another factor weighing against finding of a direct injury to and standing for Plaintiff here.  *See Anza*, 547 U.S. at 460, citing *Holmes* 503 U.S. at 269-70; *Sybersound*, 517 F.3d at 1149 (existence of "more direct victims" defeats proximate cause if they can vindicate law).

### B.  Plaintiff Has Failed to Plead RICO Predicate Acts

Assuming that Plaintiff has alleged a direct injury and would have standing, directly or derivatively, to bring RICO claims, he nonetheless fails to state a claim because the Fund's purchases of shares in PartyGaming or NETeller do not constitute violations of 18 U.S.C. § 1955, the sole predicate acts alleged in the Complaint.  That section imposes criminal liability on anyone who "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business."

Section 1955 defines an illegal gambling business as one that "is a violation of the law of a State or political subdivision in which it is conducted."  18 U.S.C. § 1955(b)(1)(i); *see also United States v. Bala*, 489 F.3d 334, 340 (8th Cir. 2007) ("[T]he government must prove more than a violation of some state law by a gambling business.  *The gambling business itself* must be illegal . . . we must identify those criminal violations of state law that turn a legal gambling business into an 'illegal gambling business' that is itself a violation of state law.").  To use 18 U.S.C. § 1955 as a predicate act, a civil RICO plaintiff must identify specifically those state or federal

laws that form the basis of the alleged violation of 18 U.S.C. § 1955.  *In re Mastercard Int'l, Inc. Internet Gambling Litig.*, 132 F. Supp. 2d 468, 483 (E.D. La. 2001), *aff'd,* 313 F.3d 257 (5th Cir. 2002).

In the Complaint, Plaintiff merely recites the allegation that PartyGaming and NETeller are illegal gambling businesses.  The Complaint never describes the business of either PartyGaming or NETeller with any specificity, or explains why these businesses in fact violated the law of any state.[11]

Moreover, the Complaint itself acknowledges that PartyGaming could not have violated U.S. law after October 2006, when it stopped accepting bets from the U.S. Compl. ¶ 55.  These distinctions are important in a civil RICO case based on violation of carefully worded statutes concerning gambling.  *See In re Mastercard Int'l., Inc.*, 132 F. Supp. 2d at 481 (holding that failure to specify allegedly unlawful activity was grounds to dismiss a claim; "[P]leading such matters is critical" when claim depends on particular conduct).  The Complaint's listing of settlements and charges do not supply any particulars to establish that at the time of the investments either company in fact violated 18 U.S.C. § 1955.  Legal conclusions do not support a claim.  *See Iqbal*, 129 S. Ct. at 1949-50; *Bell Atl. Corp.*, 550 U.S. at 555.

Even assuming that some of PartyGaming and NETeller's business constituted an "illegal gambling business" within the meaning of 18 U.S.C. § 1955, nothing in the Complaint or the public record supports a conclusion that the Fund's passive ownership of shares would violate Section 1955.  None of the public pronouncements by government agencies and none of the prosecutions or settlements cited in the

---

[11]     While the Complaint alleges that NETeller and its chairman were prosecuted (Compl. ¶ 62), the information and official Department of Justice release for those proceedings indicate that NETeller was not identified as an illegal gambling business. RJN Exs. 5, 6.  Similarly, the December 2008 information against Mr. Dikshit (see Compl. ¶ 57) is not brought under Section 1955 but under the Wire Act.  RJN Ex. 7.  It also does not allege that PartyGaming was an "illegal gambling business."  Finally, the information concerning Mr. Dikshit does not allege unlawful conduct after October 2006, when PartyGaming stopped accepting customers from the United States. Compl. ¶ 55.

14

1  Complaint are based on, or even suggest that, mere purchases of securities through
2  public securities markets amount to criminal conduct.  For good reason: expanding the
3  statutory language "conducting, financing, managing, supervising, directing or
4  owning" to reach passive investors who buy publicly traded securities would be wholly
5  inconsistent with the history and text of Section 1955, and would render every investor
6  in Internet gambling stocks a felon.

7          Section 1955 was enacted as part of the Omnibus Crime Control Act of 1968.  It
8  was intended to target criminal enterprises and reach "only those persons who prey
9  systematically upon our citizens and whose syndicated operations are so continuous
10 and so substantial as to be of national concern."  H.R. Rep. No. 91-1549, 91st Cong. 2d
11 Sess., 2 U.S. Code Cong. & Admin. News at 4029 (1970).  Nothing in the Complaint
12 suggests that the Trust or Defendants were criminals "preying" on American citizens
13 through unlawful gambling.

14         Plaintiff alleges nonetheless that holding shares satisfies the "finance" and
15 "ownership" elements of § 1955.  But the secondary market purchases of PartyGaming
16 and NETeller long after these companies sold shares to the public did not "finance"
17 their operations.  Proceeds of the purchases went to other shareholders in transactions
18 over impersonal public markets.

19         Nor has Plaintiff alleged facts showing that the Fund ever "own[ed] all or part of
20 an illegal gambling business."  18 U.S.C. § 1955(a).  All he has averred is that the
21 Fund owned certain publicly traded securities issued by PartyGaming and NETeller.[12]
22 Securities are a form of personal property separate and distinct from the entity that
23 issues them and the business it conducts.  *See generally* Del. Code Ann. tit. 8, § 159
24 (2009) ("The shares of stock in every corporation shall be deemed personal property");

25

26 ────────────────────
   [12]    Indeed, were an indirect interest through ownership of securities in revenues or
27 profits from PartyGaming and NETeller a sufficient predicate for a violation of 18
   U.S.C. § 1955, then Plaintiff himself, who stood to benefit from the investments in
28 these securities, seemingly would be complicit by virtue of his ownership of Fund
   shares.

17 Willston on Contracts § 51:2 at 594 (4th ed. 2000) ("The fact that the entire capital may be invested in real estate does not change the character of the shares of the corporation as personal property. Even though the company may exist for the sole purpose of owning and dealing in real estate, its shares are nevertheless personal property."). The law has long recognized that ownership of corporate securities is not tantamount to ownership of the underlying business.[13] *Smith v. Hurd*, 12 Metc. 371, 385, 46 Am. Dec. 690 (Mass. 1847) ("Should all the stockholders join in a power of attorney to any one, he could not take possession of any real or personal estate, any security or chose in action; could not collect a debt, or discharge a claim, or release damage arising from any default; simply because they are not the legal owners of the property, and damage done to such property is not an injury to them.").

The conclusion that merely purchasing securities in secondary market transactions does not violate the statute is also consistent with other statements in Supreme Court and Ninth Circuit cases suggesting that some degree of active participation in the gambling business is required. *See, e.g., Sanabria v. United States*, 437 U.S. 53, 70 n.26 (1978) (stating that 18 U.S.C. § 1955 "proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor"); *United States v. Sacco*, 491 F.2d 995, 1002-03 (9th Cir. 1974) (en banc) (stating, in a case construing § 1955, that 18 U.S.C. § 1511, which uses "[t]he same language" as § 1955, "applies generally to persons who *participate* in the ownership, management, or conduct of an illegal gambling business…. The word 'participate' is the key to resolving the controversy…. The splitters depended upon the financial backing of [the proprietors] for their existence…. Each person, whatever his function, who plays an integral part in the maintenance of illegal gambling, conducts an 'illegal gambling business' and is included within the scope of § 1955.") (citation omitted, emphasis in original).

---

[13] As noted above at footnote 11, the government has not alleged that either company itself was an "illegal gambling business."

16

Drawing this distinction between the interest created by passively holding securities in a public company and participating in the ownership, management, or conduct of an illegal gambling business is fully consistent with the statutory purpose behind 18 U.S.C. § 1955 – to reach those who "prey" upon U.S. citizens. Accordingly, the allegations concerning the Trust's holding of shares in PartyGaming and NETeller does not allege a violation of 18 U.S.C. § 1955 and a predicate act under RICO.

C.   **The Complaint Fails to Allege That Defendants Conducted the Affairs of the Trust Through a "Pattern of Racketeering Activity"**

In order to allege a violation of Section 1962(c) (or a conspiracy to violate Section 1962(c)), the Plaintiff must allege that Defendants were conducting the affairs of the Trust through a pattern of racketeering activity. The Complaint fails to allege this key element. The Supreme Court has held that a pattern required proof of a "completed scheme involving repeated criminal conduct" over a substantial period of time, or criminal conduct that "by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 240-41. A pattern is not established "merely by proving two predicate acts." *Id.* at 236. "Continued criminal activity" is the key to the pattern requirement; sporadic and isolated violations do not form a pattern. *Durning v. Citibank, Int'l.*, 990 F.2d 1133, 1138 (9th Cir. 1993), quoting *H.J. Inc.*, 492 U.S. at 239. Courts examine the allegations concerning the alleged pattern to determine if they establish sufficient "continuity" either through showing a sufficiently long period of past conduct (closed-end continuity), or a threat of "continued conduct in the future" (open-end continuity). *See Steam Press Holdings, Inc. v. Haw. Teamsters & Allied Workers Union Local 996*, 302 F.3d 998, 1011 (9th Cir. 2002).

The Complaint fails to allege a pattern under either approach. First, there is no "open-end continuity." [14] Plaintiff does not allege continuing illegal conduct, and there

---

[14]   Purchases of PartyGaming after October 2006 when it ceased operations in the United States (*see* Compl. ¶ 55) would not be predicate acts as that company could not be considered an "illegal gambling business" after that point. There are no allegations of purchases of NETeller after September 30, 2006.

17

1   are no allegations of any continuing purchases of shares in these companies, or

2   purchases of other Internet gambling companies, or any allegations to suggest the

3   possibility of such purchases in the future.  There are no allegations of purchases of

4   NETeller after September 30, 2006, and any purchases of PartyGaming after October

5   2006, when it ceased accepting business in the United States, could not be predicate

6   acts as the company would not be an illegal gambling business.

7          The completed acts alleged in the Complaint are insufficient to allege closed-

8   end continuity.  While vague on this point, the Complaint indicates that the decisions

9   to invest in these two stocks were both made in or about April 2006.  Compl. ¶¶ 39, 61.

10   Although there were subsequent purchases, they essentially were all manifestations of

11   only two, nearly contemporaneous decisions, and these decisions resulted in the

12   alleged predicate violation: "ownership of an illegal gambling business" in violation of

13   18 U.S.C. § 1955.  This limited conduct does not support a pattern.  *See Durning*, 990

14   F.2d at 1139 (numerous mailings of a single fraudulent document, although each

15   potentially separate predicate acts, do not create a pattern).  Even if the Complaint's

16   vague allegations of duration are read to their outer temporal limits, the pattern of

17   racketeering activity consists of the purchase of only two stocks, confined to a period

18   of less than a year, or considerably less if the post-October 2006 PartyGaming

19   purchases are excluded.  "Predicate acts extending over a few weeks or months and

20   threatening no future criminal conduct" do not satisfy the continuity requirement of a

21   pattern.  *H.J. Inc.*, 492 U.S. at 242; *see Wisdom v. First Midwest Bank*, 167 F.3d 402,

22   407 (8th Cir. 1999) (10-month period too short to establish "closed-end pattern").

23   *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992) (reviewing

24   cases and finding no case holding continuity requirement by conduct lasting less than a

25   year); *cf. Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995) (holding that a

26   one-year period is not a "hard and fast, bright line rule"; showing of continuity over a

27   thirteenth-month period could satisfy the requirement).  In short, "Congress was

28   concerned in RICO with long-term criminal conduct."  *H.J. Inc.*, 492 U.S. at 242.

18

1   Nothing in the Complaint suggests that any Defendant was engaged in anything
2   remotely within the scope of this concern or the reach of the statute.

3        Since Plaintiff lacks standing to bring claims under RICO and he has failed to
4   allege RICO predicate acts or a pattern of racketeering activity, his RICO claims
5   should be dismissed with prejudice.  *See Marion Point Dev. Assoc.*, 364 F. Supp. 2d at
6   1147.[15]  Because Plaintiff posits subject matter jurisdiction based on the allegations of
7   the federal RICO claims (Compl. ¶ 31), the Court should decline to exercise
8   supplemental jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367(c).

9   **II.   PLAINTIFF'S CLAIMS ARE DERIVATIVE AND MUST BE**
10           **DISMISSED FOR FAILURE TO PLEAD DEMAND FUTILITY**

11       In addition to the defects in Plaintiff's RICO claims, the Complaint should be
12   dismissed in its entirety on the independent grounds that the claims alleged are wholly
13   derivative, and Plaintiff has failed to make demand on the Board of Trustees or allege
14   reasons for not doing so.  These arguments are set forth in detail in the Trustees
15   Memorandum at Part II.A, pages 7-18.  The CCM Defendants fully adopt those
16   arguments and incorporate them herein by reference.

**CONCLUSION**

17
18       Based on the foregoing, the Complaint should be dismissed.

19                                          K&L GATES LLP
20

21   Dated:  June 26, 2009              By:  /s/ Kevin S. Asfour
22                                           Michael J. Quinn
                                             Kevin S. Asfour
23                                           Attorneys for Defendants Causeway
                                             Capital Management LLC, Sarah H.
24                                           Ketterer, Harry W. Hartford, James A.
                                             Doyle, Jonathan P. Eng, Kevin Durkin,
25                                           Turner Swan, Gracie V. Fermelia and
                                             Mark Cone
26

27   ---
[15]     The conspiracy claim under Section 1962(d) should be dismissed as a result of
28   the failure to state a substantive claim under Section 1962(c).  *See Howard v. Am.
     Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).