Crystal G. Howard (SBN 224627)
SIMMONS BROWDER GIANARIS
ANGELIDES & BARNERD LLC
100 N. Sepulveda Blvd., Suite 1350
El Segundo, California 90245
Telephone: 310-322-3555
Facsimile: 310-322-3655
choward@simmonsfirm.com

Thomas I. Sheridan, III (Admitted *Pro Hac Vice*)
Andrea Bierstein (Admitted *Pro Hac Vice*)
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
Telephone: 212-784-6400
tsheridan@hanlyconroy.com
abierstein@hanlyconroy.com

Joseph A. Aughtman, Esq. (Admitted *Pro Hac Vice*)
Scarlette M. Tuley, Esq. (Admitted *Pro Hac Vice*)
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Post Office Box 4160
Montgomery, AL 36104
Telephone: 334.269.2343
jay.aughtman@beaslyallen.com
scarlette.tuley@beasleyallen.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN H. WODKA,<br><br>Plaintiff,<br><br>- against -<br><br>CAUSEWAY CAPITAL MANAGEMENT LLC, *et al.*,<br><br>Defendants,<br><br>- and -<br><br>CAUSEWAY CAPITAL MANAGEMENT TRUST,<br><br>Nominal Defendant. | CASE NO. CV09-02625 R (RCx)<br><br>PLAINTIFF'S CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS<br><br>[*FILED CONCURRENTLY WITH REQUEST FOR JUDICIAL NOTICE*]<br><br>DATE: SEPTEMBER 21, 2009<br>TIME : 10:00 A.M.<br>COURTROOM: 8<br>JUDGE: HON. MANUEL L. REAL |

August 24, 2009

## PLAINTIFF'S CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTIONS TO DISMISS

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iv

PRELIMINARY STATEMENT ........................................................................ 1

FACTS ............................................................................................................. 8

    The Parties ................................................................................................ 8

        Plaintiff............................................................................................ 8

        Nominal Defendant ........................................................................ 8

        Defendants .................................................................................... 10

    Defendants Made Unlawful Investments in Illegal Gambling

        Businesses .................................................................................... 11

        PartyGaming ................................................................................ 11

        NETeller ....................................................................................... 14

    Defendants' Investments Were Illegal and They Knew It ........................... 15

    Defendants' Racketeering Activities Injured Plaintiff.................................. 17

    Claims for Relief .................................................................................... 19

ARGUMENT ................................................................................................. 20

I.    PLAINTIFF HAS STATED CLAIMS UNDER RICO................................... 20

    A.    The Requirements of Sections 1962(c) and 1964(c) ....................... 20

    B.    Many of the Elements of a RICO Claim Are Uncontested ............... 20

    C.    Defendants Caused the Fund to Commit RICO Predicate Acts ......... 21

        1.    The Complaint Alleges That the Gambling Companies
                Violated State Law ............................................................. 21

        2.    The Complaint Alleges That Defendants Violated
                § 1955 ............................................................................. 22

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

D.    Plaintiff Was Injured in His Property by Reason of
Defendants' RICO Predicate Crimes ............................................ 26

    1.    Plaintiff Has Alleged "But-For" Causation Under
*Sedima* ..................................................................................... 26

    2.    Plaintiff Alleges Proximate Cause Under *Holmes* ................. 27

    3.    This Court Should Follow *Holmes* and *Bridge* and
Reject the Decision in *McBrearty* ........................................... 31

    4.    Plaintiff Need Not Be the Intended Victim of the RICO
Activity ........................................................................................ 32

    5.    Government Law Enforcement Was Not a Superseding
Intervening Cause ..................................................................... 34

II.    THE COMPLAINT SUFFICIENTLY ALLEGES A RICO PATTERN THROUGH
OPEN-ENDED AND CLOSED-ENDED RICO CONTINUITY .................................. 39

III.    THE TRUSTEES MAY BE LIABLE NOTWITHSTANDING THE FUND'S
DECLARATIONS OF TRUST .............................................................................. 44

IV.    PLAINTIFF HAS PROPERLY PLEADED HIS DERIVATIVE CLAIMS,
INCLUDING THE FUTILITY OF MAKING A DEMAND ON THE BOARD OF
TRUSTEES ....................................................................................................... 47

A.    The Standards for Pleading Demand Futility ...................................... 47

B.    The Trustees Face an Irreconcilable Conflict of Interest .................... 48

C.    Demand is Excused Under *Aronson* ................................................... 51

    1.    The Trustees are Neither Disinterested Nor
Independent Because They Face a Substantial
Likelihood of Criminal and Civil Liability ............................ 51

    2.    Demand is Excused Because the Trustees' Violations
of RICO are Not Valid Exercises of Business Judgment ......... 55

3.      The Trustees Cannot Automatically Be Deemed
"Independent" Under Delaware Law ....................................... 56

D.      Demand Is Also Excused Under *Rales* ............................................. 57

V.   PLAINTIFF HAS PROPERLY PLEADED DIRECT CLAIMS IN THE
ALTERNATIVE TO HIS DERIVATIVE CLAIMS ............................................. 61

VI.   PLAINTIFF HAS STATED CLAIMS FOR BREACH OF FIDUCIARY DUTY AND
NEGLIGENCE ........................................................................................... 63

VII.   PLAINTIFF HAS STATED A CLAIM FOR WASTE ............................................. 64

VIII.  IF THE COMPLAINT IS INSUFFICIENT, LEAVE TO AMEND SHOULD BE
GRANTED ............................................................................................... 65

CONCLUSION ............................................................................................... 65

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford,*
554 F. Supp. 2d 538 (D. Del. 2008)................................................................45

*Aetna Ins. Co. v. Boon*, 95 U.S. 117 (1877) .................................................34

*Agency Rent-A-Car, Inc. v. Gateway Industries, Inc.*, 1980 WL 3040 (Del.
Ch. 1980)........................................................................................................64

*Allwaste v. Hecht*, 65 F.3d 1523 (9th Cir. 1995)...............................40, 41, 42, 43

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) .........................31, 32, 34, 35

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ...................................................passim

*Associated General Contractors of California, Inc. v. California State
Council of Carpenters*, 459 U.S. 519 (1983)................................................28

*Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003) ...........................................32

*Barber v. Jefferson County Racing Ass'n, Inc.*, 960 So.2d 599 (Ala. 2006) ...........12

*BCCI Holdings (Luxembourg), S.A. v. Khalil*, 214 F.3d 168 (D.C. Cir. 2000) .......32

*Belova v. Sharp*, 2008 WL 700961 (D. Or. 2008)............................................45

*Boyle v. United States*, 129 S. Ct. 2237 (2009) ................................................20, 22

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)................................................47, 48

*Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131 (2008) .......29, 31, 32, 36

*California Architectural Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466
(9th Cir.1987).................................................................................................42, 43

*City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425 (2d Cir. 2008),
*cert. granted*, 129 S. Ct. 2159 (May 4, 2009)...............................................passim

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)......................................48

*Delta Star, Inc. v. Patton*, 76 F. Supp.2d 617 (W.D. Pa. 1999)...............................64

*Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003).................................31

-iv-

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

1  *DeSimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007) .............................46, 55

2  *Diaz v. Gates*, 420 F.3d 897 (9th Cir.2005) ............................................6, 32, 33

3  *Durning v. Citibank, Int'l*, 990 F.2d 1133 (9th Cir. 1993).........................44

4  *East Hampton Dewitt Corp. v. State Farm Mut. Auto. Ins. Co.*, 490 F.2d 1234

5     (2d Cir. 1973) ......................................................................................................35

6  *Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999) ....................44, 45

7  *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996).............................34

8  *Farr v. NC Machinery Co.*, 186 F.3d 1165 (9th Cir. 1999) .....................35

9  *Fed. Deposit Ins. Corp. v. Henderson*,849 F. Supp. 495 (E.D. Tex. 1994).............55

10 *Feldman v. Cutaia*, 2006 WL 920420 (Del. Ch. Apr. 5, 2006)...............55

11 *Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 131 Cal. Rptr.2d 885 (Cal.

12    App. 2 Dist., 2003) ....................................................................................63

13 *Guttman v. Huang*, 823 A.2d 492 (Del. Ch 2003) .............................46, 53

14 *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989)...........40, 42, 43, 44

15 *Hollander v. Breeze Corporations, Inc.*, 26 A.2d 507 (N.J. Ch. 1941) ...............64

16 *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) ...............passim

17 *Ikuno v. Yip*, 912 F.2d 306 (9th Cir. 1990).................................................40

18 *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795 (7th Cir. 2001) ..........60

19 *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395 (2d Cir. 1994) .................38, 39

20 *In re Baxter Intern'l, Inc. Shareholders Litig.*, 654 A.2d 1268 (Del. Ch.

21    1995).....................................................................................................54

22 *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009) ......54

23 *In Re CTC Communications Group, Inc.*, 2007 WL 760389 (Bankr. D. Mass.

24    2007)....................................................................................................45

25 *In re Freeport-McMoran Sulphur, Inc. Shareholder Litig.*, No. A. 16729,

26    2005 WL 1653923 (Del. Ch. June 30, 2005)....................................48

27 *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963 (Del. Ch. Aug. 20, 2007).........55

28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO MOTIONS TO DISMISS**

*In re Mastercard Internet Gambling Litig.*, 313 F.3d 257 (5th Cir. 2002) ..............21

*In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873 (D. Md. 2005)...........................56

*In re National Auto Credit, Inc. Shareholders Litigation*, 2003 WL 139768
   (Del. Ch. Jan. 10, 2003) .......................................................................................55

*In Re Nuveen Fund Litigation*, Nos. 94 C 360, 94 CV 5416, 1996 WL
   347012 (N.D. Ill. June 11, 2006) ........................................................................59

*In re Sagent Tech., Inc.*, 278 F. Supp. 2d 1079 (N.D. Cal. 2003) ...........................45

*In Re The Brown Schools*, 368 B.R. 394 (Bankr. D. Del. 2007)..............................45

*In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp.2d 267 (S.D.N.Y.
   2006).....................................................................................................................60

*In re Verestar, Inc.*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006)....................................45

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006) ...................46, 55

*IT Group, Inc. v. D'Aniello*, 2005 WL 3050611 (D. Del. 2005).............................45

*Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90 (1991) ..........................................47

*Kohls v. Duthie*, 791 A.2d 772 (Del. Ch. 2000)......................................................55

*Krantz v. Prudential Invs. Funds Mgmt. LLC*, 305 F.3d 140 (3d Cir. 2002)...........50

*Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973)..............................................47

*Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000)......................................................61

*Larsen v. Lauriel Invs., Inc.*, 161 F. Supp.2d 1029 (D. Ariz. 2001) .......................44

*Lerman v. Joyce Intern., Inc.*, 10 F.3d 106 (3d Cir. 1993).......................................37

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003).........................................32

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) ..................................................45

*McBrearty v. Vanguard Group, Inc.*, 2009 WL 875220 (S.D.N.Y. Apr. 2,
   2009), *appeal pending*, No. 09-1444 (2d Cir. Apr. 8, 2009) ........................passim

*McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001) ........................................................60

*MDS Investments, L.L.C. v. State*, 138 Idaho 456, 65 P.3d 197 (Id. 2003)..............13

*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002)...................................32

-vi-

*Metro Communication Corp. BVI v. Advanced Mobilecomm Techn., Inc.*, 854 A.2d 121 (Del. Ch. 2004)..................................................................................46

*Michelson v. Duncan*, 407 A.2d 211 (Del. 1979)..........................................64

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) .................................................................................................................45

*Newcal Industries, Inc. v. Ikon Office Solutions*, 513 F.3d 1038 (9th Cir. 2008)..........................................................................................................32, 37

*Pension Committee of Univ. of Montreal Pension Plan v. Banc of Amer. Secs., LLC*, __F.3d__, 2009 WL 1587870 (2d Cir., June 9, 2009).....................33

*Pierce v. Lyman*, 1 Cal. App. 4th 1093, 3 Cal. Rptr. 2d 236 (Cal. App. 2 Dist., 1991)..............................................................................................63

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993).................................48, 51, 57

*Resolution Trust Corp. v. Hays*, Civ. A. No. SA-92-CA-0653, 1993 WL 302150 (W.D. Tex.) ......................................................................................55

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ............................................21

*Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir. 1987) ...................61

*Ryan v. Gifford*, 918 A.2d 341, 358 (Del. Ch. 2007) ..........................passim

*Sanabria v. United States*, 437 U.S. 53 (1978) ..........................................23

*Sanders v. Wang*, 1999 WL 1044880 (Del. Ch. Nov. 10, 1999)..................52

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)...................20, 26, 62

*Smith v. Hurd*, 12 Metc. 371, 385, 46 Am. Dec. 690), 1847 WL 3949 (Mass. 1847)............................................................................................................25

*Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635 (9th Cir. 1988) .........61

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir.1996) ..................37

*Steam Press Holdings, Inc. v. Haw. Teamsters & Allied Workers Union Local 996*, 302 F.3d 998 (9th Cir. 2002) ..................................................44

*Steiner v. Meyerson*, 1995 WL 441999 (Del. Ch. July 19, 1995) ...............65

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

1  *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783 (S.D.N.Y. 1997)......56

2  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008) ...............32

3  *United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999)..............................................22

4  *United States v. Bridges*, 493 F.2d 918 (5th Cir. 1974) ..........................................23

5  *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001) ................................................12

6  *United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976)..............................................23

7  *United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989).......................................44

8  *United States v. O'Brien*, 131 F.3d 1428 (10th Cir.1997).........................................22

9  *United States v. Sacco*, 491 F.2d 995 (9th Cir. 1974) ..............................................24

10  *United States v. Torres*, 68 Fed. Appx. 807 (9th Cir. 2003) ...................................22

11  *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006)................................................12

12  *White v. Panic*, 783 A.2d 543 (Del. 2001) ..............................................................64

13  *White v. Roper*, 901 F.3d 1501 (9th Cir. 1990) ...........................................34, 35, 37

14  *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277 (11th Cir. 2006).........................32

15  *Wood v. Baum*, 953 A.2d 136 (Del. 2008) ........................................................54, 61

16  *Zisawasser v. Cole & Cowan, Inc.*, 164 Cal. App.3d 417, 210 Cal. Rptr. 428

17    (Cal. App. 6 Dist., 1985) .......................................................................................49

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

**Federal Statutes and Rules**

15 U.S.C. § 80a-2 ...................................................................... 56

18 U.S.C. § 1084 ....................................................................... 22

18 U.S.C. § 1955 ................................................................ passim

18 U.S.C. § 1961(1)(B) ........................................................ 4, 15

Fed. R. Civ. P. 14(a)(2) .............................................................. 65

Fed. R. Civ. P. 23.1 ................................................................... 47

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ......... 4

Unlawful Internet Gambling Enforcement Act of 2006 (the "UIGE"), 31

   U.S.C. § 5361 *et seq.* ....................................................... 18, 37

**State Statutes**

720 ILCS 5/28-1(a)(12) .............................................................. 12

Del. Code Ann. Tit. 12, § 3801(d) ............................................... 56

I.C. 35-45-5-2(c) ....................................................................... 12

LSA-R.S. 14:90.3 ....................................................................... 12

M.C.A. 23-5-112(18)(e)-(19) ...................................................... 12

N.R.S. 463.016425 ..................................................................... 12

New York State Penal Law § 225.00 ..................................... 6, 12, 14

O.R.S. § 167.109 ....................................................................... 12

RCWA 9.46.240 ......................................................................... 12

S.D.C.L. 22-25A .......................................................................... 12

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

**Other Authorities**

57A Am.Jur.2d, Negligence § 790, p. 701 (1989) .................................................... 37

C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*,
Congressional Research Service (Updated February 27, 2006) ............................ 13

H.R. Rep. No. 91-1549, 91st Congr. 2d Sess., 2 U.S. Code Cong. & Admin.
News at 4029 (1970) ............................................................................................ 24

Restatement (Second) of Torts §§ 440 ................................................................... 40

Restatement (Second) of Torts § 441(1) ................................................................ 38

S. Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93, 129
(1979) .................................................................................................................... 51

T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 (2d
ed.1994) ................................................................................................................. 37

W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of
Torts § 41 (5th ed.1984) ................................................................................. 38, 40

1

**PRELIMINARY STATEMENT**

2   Plaintiff is an investor in a mutual fund. Defendants – the fiduciaries

3   responsible for managing the fund – unlawfully caused the fund to acquire large

4   ownership stakes in illegal off-shore gambling entities at a total cost exceeding $75

5   million. The illegal gambling businesses and their principals have since forfeited to

6   the U.S. almost $650 million in criminal proceeds. Their founders have pleaded

7   guilty to criminal offenses subjecting them to significant fines and sentences. The

8   mutual fund lost tens of millions of dollars as a result of Defendants' illegal

9   "investments." Plaintiff sues to recover these losses and for forfeiture of the

10  compensation that these faithless fiduciaries paid to themselves.

11  Defendants ask this Court to dismiss the complaint on the ground that this

12  case is an "audacious" and "meritless" attempt to second-guess "legitimate

13  investment decisions."[1] However, the central premise of Defendants' arguments –

14  that they made lawful investments in legitimate companies – is demonstrably false.

15  Beginning in early 2006, Defendants purchased and held substantial ownership

16  positions in two illegal gambling businesses: PartyGaming Plc ("PartyGaming")

17  and NETeller Plc ("NETeller"). PartyGaming was formed in Gibraltar to illegally

18  exploit the Internet gambling market in the U.S. In April 2009, PartyGaming agreed

19  with the United States Department of Justice ("DOJ") to forfeit $105 million in

20  criminal proceeds because its principal business (constituting almost 90% of its

21  revenue) violated a host of federal criminal statutes, including 18 U.S.C. § 1955

22  (illegal gambling) ("§ 1955"). One of its founders, Anarug Dikshit, recently pleaded

23  guilty to a felony count of illegal gambling in connection with operating

24  PartyGaming and agreed to personally forfeit $300 million and face a possible two-

25  year prison sentence. The founders of NETeller, Stephen Lawrence and John

26

27  [1] Notice of Motion and Motion to Dismiss of Causeway Capital Management LLC
    *et al.*; Memorandum of Points and Authorities ("Causeway MTD") at 1.

28

-1-

1    Lefebvre, were arrested by the FBI on January 15, 2007. They were charged with
2    conspiracy to violate various anti-gambling laws, including § 1955. NETeller
3    admitted criminal wrongdoing and forfeited $136 million in criminal proceeds.
4    Lawrence and Lefebvre also pleaded guilty to various felonies in connection with
5    operating NETeller, including § 1955, and agreed to personally forfeit an additional
6    $100 million. Clearly, these were not "legitimate" businesses.

7          Defendants pretend that their "investment" decisions were lawful and that
8    Plaintiff's complaint is based on mere hindsight. To the contrary, the illegality of
9    the gambling companies' principal operations was well-established long before
10   Defendants made their first "investments" in 2006. For example, in 2003, the DOJ
11   issued public warnings that such companies were criminal organizations -- and
12   cautioned the public that supporting such criminal organizations *was itself a crime.*
13   The DOJ had prohibited Citibank and PayPal from processing financial transactions
14   for off-shore Internet gambling. The federal government had even seized millions
15   of dollars that such illegal gambling companies had paid the Discovery Channel and
16   other media for advertising. There was also a long history of successful
17   prosecutions of principals of similar offshore entities that had been widely reported
18   in major newspapers worldwide. All this was public knowledge before Defendants
19   made their "investments."

20         Defendants were well aware of the illegality of the businesses in which they
21   invested. PartyGaming and NETeller had expressly disclosed in their prospectuses
22   that they derived almost all of their revenue from gamblers in the U.S. and that law
23   enforcement authorities in the U.S. considered their activities to be criminal. For
24   example, PartyGaming's prospectus (a copy of which is included in Defendants'
25   motion papers) stated:

26         the US Department of Justice considers that companies offering online
27         gaming to US residents are in violation of existing US federal laws
28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

1   [and] state gaming laws [which] can serve as a predicate offence for
2   liability under federal statutes.

3   Request for Judicial Notice in Support of Motion to Dismiss of Defendants
4   Causeway Capital Management LLC *et al.* ("Causeway RJN") Exhibit 2 at 47.[2]

5   Defendants acted in deliberate defiance of the U.S. criminal laws. Defendants
6   even *increased* their ownership positions in the illegal offshore gambling
7   companies *after* the U.S. government commenced highly-publicized enforcement
8   efforts against such companies. They purchased millions of additional shares *after*
9   the government started arresting principals of off-shore gambling companies and
10   Defendants' initial investments began to plummet. Such intentional wrongdoing, in
11   the face of ongoing law-enforcement efforts, demonstrates not only an arrogant
12   defiance of our nation's criminal laws, but also a contempt for the interests of
13   investors, like Plaintiff, who had entrusted Defendants with their savings.

14   This case thus presents a stark example of asset managers abdicating their
15   responsibilities to investors while taking for themselves over $41 million per year in
16   fees from the portfolios they mismanaged. Like other notorious examples of Wall
17   Street greed and irresponsibility, Defendants' conduct here goes beyond the merely
18   reckless. It was criminal.

19   Defendants argue that because the stock of the illegal gambling businesses
20   was publicly traded on a foreign exchange, this Court should regard those
21   businesses as "legitimate." That is nonsense. The federal criminal code defines
22   these companies as "illegal gambling businesses." Just because they issued shares
23   of stock on a foreign exchange does not give them license to engage in criminal
24   activities in the U.S. That the shares were only listed on a foreign exchange (even
25   though almost 90% of their revenues was from U.S. gamblers) actually highlights
26
27   [2] For consistency, all citations to exhibits are to the internal page numbers of the
28   exhibits.

-3-

the illegality. To evade the reach of the U.S. criminal justice system, the off-shore gambling companies did not offer their shares for sale to, or for the benefit of, persons in the U.S. Nor did they sell shares to members of the public in any jurisdiction. Rather, the shares were only made available to "certain institutional and professional investors who are not US persons." (Causeway RJN Ex. 2 at 18) Accordingly, Defendants had to go out of their way and purchase shares overseas in order to circumvent U.S. law.

Thus, when Defendants assert that the complaint should be dismissed because it fails to allege that their illegal investments were "too risky" or "inconsistent with the Fund objectives, in light of the Fund's overall portfolio,"[3] they miss the point. As the United States Attorney for the Southern District of New York stated in connection with the prosecution of one of the illegal gambling companies in which Defendants invested, "[s]upporting illegal gambling is not a business risk, it is a crime." (Causeway RJN Ex. 6 at 4)

Section 1955 of the U.S. criminal code provides that whoever "finances … or owns all or part of an illegal gambling business" is guilty of a felony. The off-shore gambling companies were "illegal gambling businesses" as that term is defined in § 1955. By causing the mutual fund they controlled to purchase shares in illegal gambling businesses, Defendants caused the mutual fund to "finance" and "own part" of such businesses in violation of § 1955.

A violation of § 1955 is a predicate crime under 18 U.S.C. § 1961(1)(B), a provision of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"). Therefore, by purchasing shares in illegal gambling businesses – repeatedly and over a significant period of time – Defendants conducted the mutual fund's affairs through a pattern of racketeering activity.

---

[3] John A. G. Gavin and Eric H. Sussman's Notice of Motion and Motion to Dismiss; Memorandum of Points and Authorities ("Trustees MTD") at 24.

-4-

1   Plaintiff brings this action under RICO to recover the losses that he and
2   countless other mutual fund investors suffered as the direct and foreseeable result of
3   Defendants' unlawful investments. Because Defendants' unlawful conduct most
4   directly injured the mutual fund, Plaintiff asserts each of his substantive claims
5   derivatively on behalf of the mutual fund. Plaintiff also pleads, in the alternative,
6   direct claims for relief. Plaintiff brings his direct claims both individually and as a
7   class action on behalf of all others similarly situated. In addition, Plaintiff asserts
8   common law claims for breach of fiduciary duty, negligence, and waste.

9   Defendants argue that Plaintiff's RICO injuries were not proximately caused
10   by their wrongdoing. They claim that the investment losses resulted not from the
11   unlawful investments but through the "intervening acts" of law enforcement in
12   prosecuting the illegal gambling companies. Defendants are mistaken. RICO's
13   proximate cause requirement is satisfied when racketeering activity creates or
14   increases the risk of a particular harm and is a substantial factor in causing that
15   harm. Even if another force intervenes prior to injury, a racketeer cannot escape
16   liability if the intervening force was reasonably foreseeable or part of the risk that
17   the racketeering activity created. That is true here because law enforcement not only
18   is a foreseeable consequence of violating the criminal laws, it is an inherent part of
19   the risk of criminal activity.

20   Defendants also contend that there is no proximate cause because Plaintiff
21   was not the "intended victim" of Defendants' racketeering. Whether a plaintiff's
22   injury was proximately caused by a defendant's wrongful conduct does not depend
23   the defendant's intent. This is because the touchstone of proximate cause analysis is
24   foreseeability of harm – not intent to harm. While it may be true that intended
25   victims are usually also foreseeable victims for proximate cause determinations, it
26   does not logically follow that only intended victims are foreseeable. Defendants'
27   argument that a RICO plaintiff must be the "intended victim" of racketeering
28

-5-

1  activity contradicts an established line of binding precedent from the Supreme
2  Court, starting with *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992).
3        Defendants rely primarily on a decision of a federal district court in New
4  York in *McBrearty v. Vanguard Group, Inc.*, 2009 WL 875220 (S.D.N.Y. Apr. 2,
5  2009), *appeal pending*, No. 09-1444 (2d Cir. Apr. 8, 2009). *McBrearty* is contrary
6  to controlling Supreme Court authority. It was wrongly decided and misapplied
7  Second Circuit precedent. The Ninth Circuit has also explicitly rejected the faulty
8  reasoning on which *McBrearty* is based. *Diaz v. Gates*, 420 F.3d 897, 901 (9th Cir.
9  2005) (proximate cause "is generous enough to include the unintended, though
10  foreseeable, consequences of RICO predicate acts").
11        Defendants say that the complaint does not adequately allege an "illegal
12  gambling business" because specific state gambling laws have not been identified
13  in connection with the complaint's allegations that Defendants violated § 1955.
14  However, the illegal gambling companies themselves have admitted that their
15  primary operations were criminal activities under § 1955, which requires violations
16  of state anti-gambling laws. The principals of PartyGaming and NETeller have also
17  acknowledged that their activities violated, at the very minimum, New York Penal
18  Code § 255.05. The DOJ has consistently taken the position that the companies'
19  activities violated § 1955 and various state anti-gambling laws. Courts that have
20  accepted the guilty pleas of the companies' principals also concur on this point.
21  This Court may also take judicial notice that PartyGaming and NETeller's activities
22  violated virtually every state's gambling laws. *See* footnote 4 below. The only
23  people that still deny that PartyGaming and NETeller were illegal gambling
24  businesses within the meaning of § 1955 are, apparently, Defendants.
25        Defendants argue that there was no RICO "pattern" because the unlawful
26  conduct was "brief and isolated." RICO, however, requires only two predicate acts
27  within a ten-year period. Defendants here committed what were most likely
28

-6-

1   hundreds of predicate acts during a twelve-month period by separately purchasing
2   tens of millions of shares in two different illegal gambling companies. This is more
3   than sufficient to establish "closed-ended" RICO continuity. Moreover, the
4   complaint also sufficiently alleges "open-ended" continuity because Defendants'
5   ownership and financing of illegal gambling businesses was of a continuing nature,
6   and it would have continued longer but for the government's enforcement efforts.
7   The cessation of racketeering following government enforcement does not break
8   RICO continuity.

9         Finally, Defendants seek to bar any inquiry into the legality of their conduct
10  in this derivative action. They argue that a demand on the nominal defendant's
11  board of trustees was not excused. Their argument should be rejected for two
12  independently sufficient reasons.

13        First, demand is excused where, as here, corporate officers and directors have
14  engaged in the criminal acts alleged in the complaint. The law does not assume the
15  "independence" of a board that seeks to deny mutual fund shareholders redress for
16  injuries resulting from the criminal acts of the fund's managers. This is particularly
17  true when most of the significant facts establishing Defendants' guilt are
18  indisputable matters of public record. Any burden to the fund from allowing the
19  litigation to proceed would be *de minimus* compared with the potential recovery to
20  investors, which could exceed $300 million.

21        Second, Defendants have structured and operated the Causeway family of
22  mutual funds in a way that creates an inherent conflict of interest between the
23  various funds managed by defendant Causeway Capital Management LLC
24  ("CCM"). These funds, including the fund in which Plaintiff invested, are not
25  separate entities. Instead, all the funds are each a "series" of a single Delaware
26  statutory trust and represented by the *same* board of trustees. Defendants use the
27  fees paid by Plaintiff's fund (which are subject to forfeiture in this litigation) to
28

1   subsidize the expenses and operations of the other funds managed by CCM.
2   Accordingly, there exists an irreconcilable conflict of interest between Plaintiff's
3   fund and the other Causeway funds with respect to the outcome of this litigation.
4   The trustees are therefore disqualified from determining, on behalf of Plaintiff's
5   fund, whether to halt the prosecution of Plaintiff's claims.

6       For these and the other reasons set forth below, Defendants' motions should
7   be denied in their entirety.

8   **FACTS**

9       The following facts are drawn from the Verified Class Action and Derivative
10   Complaint ("Complaint" or "Cpl.") and facts of which the Court may take judicial
11   notice.

12   **The Parties**

13       *Plaintiff*

14       Steven H. Wodka ("Plaintiff") is a resident of the State of New Jersey. In
15   2004, he purchased shares in nominal defendant Causeway Capital Management
16   Trust (the "Trust"), through its Causeway International Value Fund (the "Fund"),
17   for investment purposes as part of his IRA portfolio. He still owns such shares.
18   (Cpl. ¶ 12) He sues derivatively on behalf of the Trust with respect to the Fund.
19   (Cpl. ¶ 13) Alternatively, he seeks to represent a class of investors in the Trust (the
20   "Class") who first invested in the Fund before July 17, 2006 and still owned their
21   shares after July 17, 2006 (the "Class Period"). (Cpl. ¶ 14)

22       *Nominal Defendant*

23       The Trust is a statutory trust organized under the laws of Delaware, and it has
24   its principal place of business in California. (Cpl. ¶ 15) Its activities affect interstate
25   commerce, and it is an "enterprise" within the meaning of RICO. (Cpl. ¶¶ 34-35)
26   The Trust is a "series" mutual fund, which means that it has two or more portfolios
27   of securities, each offering a separate series, or class of stock, to investors. The

28   -8-

investors of each portfolio do not participate in the investment results of any other portfolio and must look solely to the assets of their portfolio for most purposes, including redemption and capital appreciation. Each separate portfolio is generally referred to as a "fund." (Cpl. ¶ 16) The Trust offers three portfolios to the investing public, including (a) the Fund; (b) Causeway Global Value Fund (the "Global Fund"); and (c) Causeway Emerging Markets Fund (the "Emerging Markets Fund"). These three portfolios are not separate legal entities. Rather, the investors in all three portfolios own different series of shares in the same legal entity – the Trust. (Cpl. ¶ 17) Defendants made all of the Trust's investments in illegal gambling through the Fund portfolio. None were made through the Global Fund or the Emerging Markets Fund. (Cpl. ¶ 18)

The trustees of the Trust are charged with separate and independent fiduciary duties to the investors in the Fund as well as to the investors in the two other funds that constitute the Trust: the Emerging Markets Fund and the Global Fund. (Cpl. ¶ 90) However, the interests of the investors in the Global Fund and the Emerging Markets Fund are in conflict with those of the investors in the Fund with respect to the claims in this litigation. This is because the fees paid to CCM by the Trust, and allocated by Defendants to the Fund, subsidize the two other funds. For example, the fees that the Fund paid to CCM (and which are subject to forfeiture in this litigation) were used by CCM to cover the entire organization costs of the Global Fund and the Emerging Markets Fund. (Cpl. ¶ 91) Thereafter, for the fiscal year ended September 30, 2008, the Trust paid approximately $34 million in fees to CCM that Defendants allocated and charged to the Fund. The Emerging Markets Fund and its shareholders were responsible for only $334,000 in fees. Of that amount, 20% (or $70,000) was subsidized by the fees that Defendants allocated and charged to the Fund instead of to the Emerging Markets Fund. (Cpl. ¶ 92)

The Fund also subsidized 100% of the management fees for which the Global

Fund was responsible. (Cpl. ¶ 92) The Global Fund is 47% percent owned by Defendant Sarah H. Ketterer, who is the Chief Executive Officer and co-founder of CCM and the portfolio manager of the Fund. (Cpl. ¶ 21) The Global Fund should have – but did not – pay its share of CCM's management fees because Defendants instead allocated and charged the entirety of the Global Fund's management fees to the Fund. In addition, the Fund also subsidized approximately 66% of the Global Fund's expenses other than management fees. (Cpl. ¶ 92)

Of the total fees that the Trust pays to CCM for managing all three funds that compose the Trust, 98% is allocated to the Fund. Were Plaintiff to prevail in this litigation, CCM would be liable to forfeit all of the fees it has received from the Fund from the time that CCM first caused the Fund to purchase shares in illegal gambling businesses. In that event, the subsidy in favor of the other two funds would cease to exist, and the other two funds would be liable to pay to CCM the amounts subsidized by the Fund. (Cpl. ¶ 93)

***Defendants***

Defendants are the individuals and entities responsible for causing the Trust to make the illegal investments that caused Plaintiff's injuries. (Cpl. ¶ 4) Each is a person employed by or associated with the Trust (Cpl. ¶ 36), and each had operational or managerial control over the Trust. (Cpl. ¶ 37)

Defendant Causeway Capital Management LLC ("CCM") is an investment management company that controls the Trust and its three fund portfolios. CCM is the investment advisor to the Trust and selects and appoints the Trust's executives and its entire board of trustees. CCM also serves as the investment advisor to all three of the Trust's fund portfolios. CCM derives its revenue from fees paid by the Trust. Those fees are allocated among the three portfolios of the Trust at the discretion of the executives, principals and trustees who control CCM and the Trust, some of whom are named as defendants in the Complaint. At all relevant times,

-10-

1  Defendants allocated to the Fund – and not to the Global Fund or the Emerging
2  Markets Fund – virtually all of the fees the Trust paid to CCM. (Cpl. ¶ 19)

3       The remaining Defendants are the individuals and entities responsible for
4  causing the Trust to make the illegal investments that caused Plaintiff's injuries.
5  (Cpl. ¶¶ 4, 21-27) Each is a person employed by or associated with the Trust (Cpl.
6  ¶ 36), and each had operational or managerial control over the Trust. (Cpl. ¶ 37)

7  **Defendants Made Unlawful Investments in Illegal Gambling Businesses**

8       ***PartyGaming***

9       PartyGaming is a Gibraltar-based company founded with seed capital from a
10 pornography empire that crumbled under the weight of lawsuits alleging deceptive
11 trade practices. (Plaintiff's Request for Judicial Notice ("PRJN") Exhibit 2) In June
12 2005, PartyGaming made an initial public offering ("IPO") of its stock, which was
13 listed on the London Stock Exchange. In the prospectus that it issued in connection
14 with its IPO, PartyGaming disclosed that "in many countries, including the United
15 States, the Group's activities are considered to be illegal by relevant authorities." In
16 the same prospectus, PartyGaming disclosed that it "generates most of its revenues
17 from customers in the U.S. (approximately 87 per cent. in the first quarter of
18 2005)." (Cpl. ¶ 40; *see* Causeway RJN Ex. 2 at 14, 47)

19      The shares of PartyGaming were not offered for sale to, or for the benefit of,
20 persons in the U.S. (Causeway RJN Ex. 2 at 3) Nor were they sold to members of
21 the public in any jurisdiction. Rather, they were only made available to "certain
22 institutional and professional investors who are not US persons." (*Id.* at 18) This
23 was apparently an attempt to evade the reach of the U.S. criminal laws. Because
24 shares of PartyGaming were unavailable in the U.S. and were not listed to trade
25 domestically through American Depository Receipts ("ADRs") or otherwise,
26 Defendants had to act overseas to purchase them.

27      In or around April 2006, Defendants acquired over 15 million shares of
28

-11-

PartyGaming. (Cpl. ¶ 39; *see also* PRJN Ex. 12) By that time, it was well-established that gambling businesses operating outside the U.S. violated federal and state criminal laws when they take wagers from gamblers in the U.S. over the Internet. *See, e.g., United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001); *United States v. Gotti*, 459 F.3d 296, 340 (2d Cir. 2006) (upholding a conviction under Section 1955 predicated on a violation of New York Penal Law § 225.00); *see also* PRJN Exs. 2-5. Indeed, on June 11, 2003, the DOJ issued a public warning letter reminding the public that "Internet gambling and offshore sportsbook operations that accept bets from customers in the United States violate Sections 1084, 1952, and *1955* of [Title] 18 of the United States Code, each of which is a Class E felony. Additionally, pursuant to [18 U.S.C. § 2], any person or entity who aids or abets in the commission of any of the above-listed offenses is punishable as a principal violator of those statutes." (Cpl. ¶ 65 (emphasis added); PRJN Ex. 1)

The Complaint alleges that the companies in which Defendants invested "violated the laws of one or more of the United States." (Cpl. ¶ 70) This Court may take judicial notice that Internet gambling is illegal in virtually every one of the United States.[4]

---

[4] All 50 states have anti-gambling laws. *See* C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research Service (Updated February 27, 2006) at Ex. A. At least eight states have explicit prohibitions of Internet gambling. *See* 720 ILCS 5/28-1(a)(12) (Illinois); I.C. 35-45-5-2(c) (Indiana); LSA-R.S. 14:90.3 (Louisiana); M.C.A. 23-5-112(18)(e)-(19) (Montana); N.R.S. 463.016425 (Nevada); O.R.S. § 167.109 (Oregon); S.D.C.L. 22-25A (South Dakota); RCWA 9.46.240 (Washington). States with general prohibitions against gambling have often clarified, through caselaw or attorney general opinion, that the general laws prohibit Internet gambling. *See, e.g., United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) (upholding conviction under N.Y. Penal Law § 225.00); *Barber v. Jefferson County Racing Ass'n, Inc.*, 960 So.2d 599 (Ala. 2006) (Internet gambling fits within definition of "slot machine" under Ala. Code § 13A-12-20); Fla. Atty. Gen. 95-70 (1995), 1995 WL 698073 (Florida does not make an exception for gambling over the Internet); *MDS Investments, L.L.C. v. State*, 138 Idaho 456, 466, 65 P.3d 197

-12-

1    In the "risk factors" section of the PartyGaming Prospectus, investors were
2    specifically warned that

3        any action by US authorities that succeeds in prohibiting or materially
4        restricting PartyGaming from offering online gaming in the US would
5        have very serious consequences for the Group and could result in
6        investors losing all or a very substantial part of their investment.

7    (Causeway RJN Ex. 2 at 46)

8    The prospectus then elaborated on the risk of government enforcement in
9    considerable detail:

10       The US Department of Justice considers that companies offering
11       online gaming to US residents are in violation of existing US federal
12       laws . . . .

13       Online gaming may violate state law and violations of *state gaming*
14       *laws can serve as predicate offence of liability under federal statutes.*
15       *At least seven states have specifically outlined online gaming. Many*
16       *other states prohibit all gaming ... .*

17       There are criminal and civil sanctions for breach of these federal and
18       state prohibitions, which include the possibility of significant fines,
19       injunctions, claims for damages and imprisonment of relevant
20       individuals (such as directors), as well as the repayment of losses
21       suffered by US residents.

22   (*Id.* at 47 (emphasis added))

23   Shortly after PartyGaming's IPO in June 2005, but before Defendants caused
24   the Trust to first purchase shares in PartyGaming, major media sources widely
25   reported that PartyGaming was an illegal gambling business. (Cpl. ¶ 43; PRJN Exs.

26

27   (Id. 2003) (Idaho law is broad enough to include personal computers which can be
     used to connect to the Internet to gamble).

28

-13-

3-5) For example, on June 26, 2005, *The New York Times* reported that, for PartyGaming, the "potential illegalities aren't just a secret hidden in its business plan – they are the centerpiece of its business plan." (Cpl. ¶ 42; PRJN Ex. 2)

There is no question that PartyGaming was, in fact, an illegal gambling business. On December 16, 2008, one of the co-founders of PartyGaming, Anarug Dikshit, pleaded guilty in the United States District Court for the Southern District of New York to engaging, through PartyGaming, in illegal Internet gambling in, among other places, New York. He agreed to forfeit $300 million to the U.S. government and now faces a possible two-year sentence. (Cpl. ¶ 56; Causeway RJN Ex. 7; PRJN Ex. 10)

In April 2009, PartyGaming agreed with the United States Attorney for the Southern District of New York to forfeit $105 million in criminal proceeds. PartyGaming admitted that its principal business during the time that Defendants owned their investments violated a host of federal criminal statutes, including § 1955. (PRJN Ex. 8; Ex. 9 at "Statement of Facts" ¶ 12)

### *NETeller*

NETeller first traded on the London Stock Exchange's Alternative Investment Market beginning in April 2004. Like PartyGaming, NETeller disclosed to potential investors in its April 8, 2004 prospectus that its operations violated U.S. federal and state gambling laws. (Cpl. ¶ 60; PRJN Ex. 7) Nevertheless, from approximately January 2006 through December 2006, Defendants acquired over 1.2 million shares of NETeller.

Like PartyGaming, NETeller was an illegal gambling business. On January 1, 2007, the United States filed criminal charges against NETeller founder Stephen Lawrence. (Causeway RJN Ex. 5). The Information charged him with conspiracy to violate various gambling-related laws, including § 1955 and New York State Penal Law § 225.00. The government also proceeded against NETeller itself. (Cpl. ¶ 62)

-14-

On January 15, 2007, NETeller's founders, Stephen Lawrence and John Lefebvre, were arrested and charged with conspiracy to violate various anti-gambling laws, including § 1955. Lawrence and Lefebvre pleaded guilty to various felonies in connection with operating NETeller, including § 1955. They also agreed to personally forfeit an additional $100 million. (Causeway RJN Exs. 5 & 6 at 4)

When Defendants first purchased NETeller, its share price was approximately $14. After the arrests of Lawrence and Lefebvre, trading in NETeller's shares was suspended, having last traded on January 15, 2007 at approximately $3.25 per share. (PRJN Exs. 15 & 16)

On July 17, 2007, NETeller admitted criminal wrongdoing, including violating § 1955. NETeller agreed to forfeit $136 million in criminal proceeds as part of a Deferred Prosecution Agreement. (Cpl. ¶ 63; PRJN Ex. 11 at 2; Ex. 11 at "Statement of Facts" ¶ 14) After agreeing not to further violate U.S. criminal laws or conduct any additional illegal gambling business in the U.S., NETeller resumed trading on July 25, 2007, at approximately $1.20 per share. (PRJN Ex. 11 at 2-3, ¶ 5; PRJN Exs. 15 & 16)

**Defendants' Investments Were Illegal and They Knew It**

Under § 1955, whoever "finances ... or owns all or part of an illegal gambling business" is guilty of a felony. (Cpl. ¶ 66) One who purchases stock of a gambling business finances and becomes a part owner of such business. Thus, each time Defendants caused the Trust to purchase stock of a gambling business that they knew was taking wagers from gamblers in the U.S., Defendants caused the Trust to finance and to become an owner of an illegal gambling business in violation of § 1955. (Cpl. ¶¶ 6-7, 67, 68)

A violation of § 1955 is a predicate crime under RICO. 18 U.S.C. § 1961(1)(B). By causing the Nominal Defendants to violate § 1955 repeatedly and over a significant period of time, Defendants conducted the affairs of the Nominal

1   Defendants through a pattern of racketeering in violation of § 1962(c). (Cpl. ¶ 8)

2        Nor was it any secret that the companies Defendants were investing in were

3   illegal gambling businesses. Before Defendants purchased ownership positions in

4   PartyGaming or NETeller, news media (and the companies themselves) had widely

5   reported that PartyGaming and NETeller were illegal gambling businesses. (Cpl.

6   ¶ 65; PRNJ Exs. 2-5). There were numerous reports of law enforcement actions

7   against illegal Internet gambling businesses and those who aided and abetted them.

8   (Cpl. ¶ 65; PRNJ Ex. 5) The DOJ had prohibited Citibank and PayPal from

9   processing financial transactions for them. (Causeway RNJ Ex. 2 at 49; PRJN Ex. 4

10  at 52). The federal government had even seized millions of dollars that the illegal

11  gambling companies paid the Discovery Channel and other media for advertising.

12  (Cpl. ¶ 65; Causeway RJN Ex. 2 at 50) Moreover, both PartyGaming and NETeller

13  had disclosed that their principal businesses violated the laws of the U.S. (Cpl. ¶45;

14  Causeway RJN Ex. 2 at 46-50; PRJN Ex. 7)

15       Defendants' conduct demonstrates that they were well aware of the legal

16  problems with PartyGaming and NETeller. Defendants saw their initial investments

17  in PartyGaming and NETeller plummet after U.S. government stepped up its

18  enforcement efforts in July 2006, but Defendants purchased millions of additional

19  shares of those companies in a misguided attempt to "double down" on their losing

20  "investments." In fact, Defendants purchased *more* shares *after* the U.S.

21  government commenced its crackdown than they did *before* the first arrests. (Cpl.

22  ¶¶ 48-54; PRJN Ex. 12)

23       CCM claims that before it makes an investment, it conducts thorough,

24  company-specific fundamental analysis, including extensive external and internal

25  research, company visits, and proprietary quantitative valuations. Moreover,

26  Causeway's board of trustees "oversee the actions of the Investment Advisor and …

27

28

-16-

1   review the actions of the Trust's officers … ."[5] Accordingly, each Defendant knew,

2   or was reckless in not knowing, that the companies in which the Trust invested

3   were taking bets from gamblers in the U.S. (Cpl. ¶¶ 44, 58, 64, 73)

4   **Defendants' Racketeering Activities Injured Plaintiff**

5   Between January and March 2006, Defendants had caused the Trust, through

6   the Fund portfolio, to purchase 46,312 shares of NETeller. (Cpl. ¶ 61; PRJN Ex.

7   12.1) Between April and June 2006 Defendants caused the Trust to purchase almost

8   16 million shares of PartyGaming in multiple transactions at a cost of

9   approximately $34 million. (Cpl. ¶ 45; PRJN Ex. 12.2)

10   On June 1, 2006, a U.S. grand jury indicted London-based BetOnSports Plc

11   ("BetOnSports") – another unlawful Internet gambling business similar to

12   PartyGaming – for racketeering, mail fraud and running an illegal gambling

13   enterprise. The indictment was filed under seal, so investors did not learn about it

14   until July 16, 2006 when BetOnSports' Chief Executive Officer, David Carruthers,

15   was arrested. On April 1, 2009, Carruthers pleaded guilty to illegal gambling

16   activity with a penalty of up to 33 months in prison. (Cpl. ¶ 47)

17   After the BetOnSports indictment, the share prices of publicly held gambling

18   companies that had been taking bets from gamblers in the U.S. – including

19   PartyGaming and NETeller – fell dramatically. (Cpl. ¶ 48; PRJN Exs. 6, 14-16)

20   After learning of the enforcement actions and the substantial losses caused by their

21   illegal investments, Defendants did not cease their illegal activities. Instead,

22   Defendants caused the Trust to purchase additional shares of PartyGaming. (Cpl.

23   ¶ 49; PRJN Ex. 12.3)

24   On or about September 7, 2006, Peter Dicks, the Chairman of another one of

25   PartyGaming's competitors, Sportingbet Plc, was arrested in New York. (Cpl. ¶ 50)

26

27   [5] John A. G. Gavin and Eric H. Sussman's Request for Judicial Notice in Support of
Motion to Dismiss ("Trustees' RJN") Exhibit 3 at 29.

28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

After the Dicks arrest, the share prices of publicly held gambling companies that had been taking bets from gamblers in the U.S. – including PartyGaming and NETeller – fell further. (Cpl. ¶ 51) Defendants still did not cease their illegal activities; instead, they caused the Trust to purchase additional shares of PartyGaming. (Cpl. ¶ 52; PRJN Ex. 12.3) By September 30, 2006, Defendants had caused the Trust to purchase a total of 23,257,081 shares of PartyGaming. (Cpl. ¶ 52; PRJN Ex. 12.3) As the losses caused by their illegal activities mounted, Defendants caused the Trust to purchase additional shares of PartyGaming, finally accumulating approximately 35,454,565 shares between October and December 2006. (Cpl. ¶ 54; PRJN Ex. 12.)

Defendants also caused the Trust to continue to purchase additional shares of NETeller after the law enforcement efforts began. By September 30, 2006, Defendants had caused the Trust to purchase 1,203,112 shares of NETeller. (Cpl. ¶ 61)

As part of a broad-based effort to put a stop to illegal Internet gambling, the United States passed legislation in October 2006 that gave law enforcement authorities an additional tool to enforce existing criminal statutes against the illegal gambling businesses. That law, known as the Unlawful Internet Gambling Enforcement Act of 2006 (the "UIGE"), 31 U.S.C. § 5361 *et seq.*, was passed by Congress in September 2006 and signed into law by the President on October 13, 2006. The UIGE made it more difficult for illegal gambling businesses to move money out of the U.S. By its terms, the UIGE did not make any gambling activity illegal that had previously been legal. 31 U.S.C. § 5361(b). It only affected conduct that was already prohibited by some other statute, such as § 1955.

After enactment of the UIGE, PartyGaming ceased taking bets from gamblers in the U.S. Only thereafter did Defendants finally cause the Trust to sell its shares in PartyGaming. By that time, PartyGaming's share value had plummeted over 80%

1    – a drop that corresponds to its loss of illegal revenue from the U.S. There is no
2    other material cause for the drop in PartyGaming's share price other than
3    PartyGaming's loss of illegal U.S.-based gambling revenue. (Cpl. ¶ 56) A similar
4    share price drop occurred with respect to NETeller, whose share price dropped from
5    approximately $14 to $3 per share during the time that Defendants held its stock.
6    (PRJN Exs. 14-16)

7         In its SEC filings, Defendants admitted that the Fund suffered "significant"
8    losses relating to PartyGaming and NETeller. Defendants even highlighted the
9    magnitude of such losses in the commentary on the first page of one of the filings.
10   (Cpl. ¶ 59; PRJN Ex. 12, March 31, 2007 Form N-CSRS at 2; September 30, 2007
11   Form N-CSR at 11) These losses were the direct, proximate, natural, probable and
12   reasonably foreseeable consequence of Defendants' actions in causing the Fund to
13   invest in illegal gambling businesses – whose value was based on illegal revenue
14   that disappeared when the U.S. government enforced the law. (Cpl. ¶ 56). As a
15   result of such losses, Plaintiff and the Trust have been injured in their business and
16   property. (Cpl. ¶¶ 75, 77, 78, 79, 113)

17   **Claims for Relief**

18        The First through Fifth Claims are brought by Plaintiff derivatively on behalf
19   of the Trust for violations of RICO, negligence, breach of fiduciary duty, and waste.
20   The Sixth through Ninth Claims are brought as individual claims on behalf of
21   Plaintiff and a class of other investors in the Fund for violations of RICO,
22   negligence, and breach of fiduciary duty. The derivative and direct claims are
23   pleaded alternatively.

24

25

26

27

28

ARGUMENT

**I.   PLAINTIFF HAS STATED CLAIMS UNDER RICO**

**A.    The Requirements of Sections 1962(c) and 1964(c)**

Pursuant to § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." § 1962(c). Thus, to establish a RICO violation under § 1962(c), a plaintiff must allege and prove four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

In civil cases, RICO plaintiffs must also satisfy the requirements of 18 U.S.C. § 1964(c) (("§ 1964(c)"), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962" has the right to "recover threefold the damages he sustains." § 1964(c). Therefore, under § 1964(c), a civil RICO claimant must show: (1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's "business or property," and (3) that such injury was "by reason of" the substantive RICO violation.

In applying these requirements, the Supreme Court had said that RICO must be "read broadly" and "liberally construed to effectuate its remedial purpose." *Sedima*, 473 U.S. at 497-98  (internal citations omitted). *See also Boyle v. United States*, 129 S. Ct. 2237, 2246-47 (2009) (rejecting narrow construction "in favor of the clear but expansive text of the statute").

**B.    Many of the Elements of a RICO Claim Are Uncontested**

The Complaint alleges that the Trust is an "enterprise" whose activities "affect interstate or foreign commerce." (Cpl. ¶¶ 34-35) Defendants do not dispute the sufficiency of these allegations. Nor do Defendants deny that the Complaint

-20-

1   satisfies the association requirement of § 1962(c) by its allegations that each of the
2   Trust's investment advisors, sub-advisors, chief investment officers, portfolio
3   managers, and trustees are "persons employed by or associated with the enterprise."
4   (Cpl. ¶¶ 4-7, 19-30) The Complaint alleges that each of the Defendants exercised
5   managerial or operational control over the Trust, *see Reves v. Ernst & Young,* 507
6   U.S. 170, 185 (1993), and that they "conducted the affairs of" the Trust by causing
7   the Trust to purchase the stock of illegal gambling businesses. Plaintiff has thus
8   satisfied the "conduct" requirement. (Cpl. ¶ 19-30, 37)

9       **C.    Defendants Caused the Fund to Commit RICO Predicate Acts**

10          *1.    The Complaint Alleges That the Gambling Companies Violated*
11                 *State Law*

12          Defendants object that the Complaint fails to cite each of the individual state
13   laws that the gambling businesses violated or to explain how PartyGaming and
14   NETeller violated them. (Causeway MTD at 13-14) The Complaint alleges that the
15   companies in which Defendants invested "violated the laws of one or more of the
16   United States." (Cpl. ¶ 70) Specifically, the Complaint alleges that PartyGaming,
17   NETeller and their principals have admitted – in guilty pleas in federal court and in
18   non-prosecution agreements with the DOJ – that the companies were, in fact, illegal
19   gambling businesses as defined in § 1955. The Complaint even identifies one of the
20   specific state laws PartyGaming and NETeller violated: Article 225 of the New
21   York State Penal Law. (Cpl. ¶¶ 40-46, 56, 60-63, 65, 70). No greater specificity is
22   required by Rule 8(a)(2) of the Federal Rules of Civil Procedure. This Court may
23   also take judicial notice that Internet gambling is illegal in virtually every one of the
24   United States. *See* footnote 4 above.

25          Defendants rely in *In re Mastercard Internet Gambling Litig.,* 313 F.3d 257
26   (5th Cir. 2002), to support their argument that PartyGaming and NETeller were not
27   illegal gambling businesses. (Causeway MTD at 5 n.4) This is a gross misreading
28   of that case. *In re Mastercard* concerned a suit by gamblers to recover their

-21-

gambling losses from credit card companies that processed their losing bets. The case was based on 18 U.S.C. § 1084, and the court held that a gambling company must run a sportsbook to violate § 1084. The present case is not based on § 1084; it is based on § 1955. The Complaint adequately alleges that PartyGaming and NETeller violated § 1955, which is confirmed by the public record of the proceedings against them. (PRJN Exs. 8-11; Causeway RJN Exs. 5-7)

### 2.   The Complaint Alleges That Defendants Violated § 1955

Under § 1955, whoever "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business" is guilty of a felony. Under the plain meaning of those words, one who purchases stock of such a company "owns ... part" of the company and "finances" the company.

The crime of illegal gambling under § 1955 is one of general intent. *United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999), *citing United States v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir.1997). *Accord United States v. Torres*, 68 Fed. Appx. 807 (9th Cir. 2003). The Complaint alleges that Defendants knew PartyGaming and NETeller accepted bets from persons in the U.S. (Cpl. ¶¶ 40-46; 60-61, 73)

Thus, each time the Defendants caused the Trust to purchase stock of a gambling business, knowing that the business was taking wagers from gamblers in the U.S., they caused the Trust to violate § 1955. And the violation continued as long as the Trust continued to own any such stock. TIS

Defendants contend that owning stock of the illegal gambling businesses cannot violate § 1955. (Causeway MTD at 13) They argue that § 1955(b)(1) should be read to exclude owning or financing *public* companies. (Causeway MTD at 15; Trustees MTD at 23)  But there is no basis to resort to a narrowing construction when the statute itself is neither unclear nor ambiguous. *See Boyle*, 129 S. Ct. at 2246-47 (2009). Nor is there any basis in the language or purpose of the statute to distinguish between illegal gambling businesses that are closely held and those

whose shares are publicly traded. To the contrary, "the legislative history ... indicates that § 1955 was aimed at *large scale* gambling businesses," *United States v. Bridges*, 493 F.2d 918, 922 (5th Cir. 1974) (emphasis added), which suggests that public companies (which tend to be larger than private companies) are *more* likely, rather than less likely, to be within the scope of the legislative purpose of stamping out large-scale illegal gambling operations.[6]

Defendants argue that § 1955 requires active involvement in the gambling business at issue. (Causeway MTD at 16-17) Financing and owning are both inherently passive. Thus, two of the six types of conduct referred to in § 1955 do not require active involvement in the illegal gambling business. In *United States v. Hawes*, 529 F.2d 472, 481 (5th Cir. 1976), the court of appeals rejected virtually the same argument made by Defendants here, saying, "We are unable to agree with this strained interpretation of an 'illegal gambling business.' Even upon a strict construction of the statutory language ... we find no requirement that defendants must themselves engage in the act of illegal gambling." This Court may also take judicial notice that Defendants were not strictly passive investors. Defendants voted by proxy at the NETeller annual meeting on May 11, 2006. (PRJN Ex. 13)

*Sanabria v. United States*, 437 U.S. 53, 70 n.26 (1978), cited by Defendants, does not require active, as distinguished from passive, participation in the illegal gambling operation for liability to attach. In that case the Supreme Court said, "[n]umerous cases have recognized that [§ 1955] proscribes any degree of

---

[6] *See also* H.R. Rep. No. 91-1549, 91st Congr. 2d Sess., 2 U.S. Code Cong. & Admin. News at 4029 (1970), which indicates that § 1955 was intended to target enterprises that "prey systematically" on citizens and whose operations are "continuous and [ ] substantial." Publicly-traded companies are more likely than private companies to have continuous and substantial operations, and the Complaint alleges that the activities of PartyGaming and NETeller were both continuous and substantial. In addition, they both "preyed systematically" on U.S. citizens – which Defendants facilitated by providing financial support.

-23-

1  participation in an illegal gambling business, except participation as a mere bettor."
2  *Id.* Ownership and financing are forms of participation expressly listed in the
3  statute, and the Trust's participation in PartyGaming and NETeller was not as a
4  mere bettor.

5  Nor does *United States v. Sacco*, 491 F.2d 995, 1002-03 (9th Cir. 1974),
6  support Defendants' interpretation. In that case, the Court said that "[e]ach person,
7  whatever his function, who plays an integral part in the maintenance of illegal
8  gambling, conducts an 'illegal gambling business' and is included within the scope
9  of § 1955. The sole exception is the player or bettor." Ownership and financing
10  were both expressly identified by Congress as functions that play an integral part in
11  maintaining an illegal gambling business. Nothing in any case or in any legislative
12  history even remotely suggests that Congress intended to exempt "passive"
13  ownership or financing of illegal gambling businesses from the scope of § 1955. On
14  the contrary, an exception for passive ownership or financing would eviscerate the
15  statute, since ownership and financing are inherently passive. Indeed, Defendants'
16  interpretation would effectively exonerate the participant in the illegal gambling
17  business who is most culpable: the owner.

18  Defendants also argue that the Complaint does not sufficiently allege
19  "ownership" in an illegal gambling business because Defendants merely purchased
20  "shares." (Causeway MTD at 15-16) A corporation is owned by its shareholders.
21  The argument that an individual could own 100% of the shares of an illegal
22  gambling company without being regarded as an "owner" – merely because he
23  merely owned "shares" – borders on the frivolous. To support their argument,
24  Defendants cite authority saying that physical shares of stock may be considered
25  "personal property." (*Id.*) Just because a share of stock is personal property,
26  however, does not alter the fact that it represents an "ownership" interest in a
27  corporation. Defendants also cite *Smith v. Hurd*, 12 Metc. 371, 385, 46 Am. Dec.
28

690), 1847 WL 3949 (Mass. 1847), but that decision merely states that a shareholder in a company does not own property held by that company. Section 1955, however, does not proscribe ownership of the assets of an illegal gambling company; rather, it proscribes ownership of the illegal gambling business itself. The only way to "own" all or part of PartyGaming or NETeller is to own their stock, which is what Defendants caused the Trust to do.

Defendants choose to ignore important words in the statute. The statute prohibits ownership of "all or part" of an illegal gambling business. Congress contemplated that there might be fractional owners of such a business, such as partners, limited partners, or shareholders. Congress might have prohibited ownership of "X% or more" of, or "a controlling interest in," an illegal gambling business. It did not do so because it manifestly intended to prohibit *any* ownership percentage.

Defendants say that holding shares does not "finance" the business. (Causeway MTD at 15). This too is incorrect. The issuance of shares of stock is one of the ways businesses raise money or capital, which is the essence of finance. Purchasing shares of a company – even in the secondary market – increases or maintains the value of the shares and thus the capital valuation of the company. This makes it easier for the company to borrow debt at lower interest. It is a form of financing.

Defendants argue that if their actions were illegal, that would "render every investor in Internet gambling stocks a felon." (Causeway MTD at 15). This is not so, for three reasons. First, not all Internet gambling companies violate U.S. law by taking bets from gamblers in the U.S. There is nothing illegal about investing in Internet gambling companies that confine their activities to countries where those activities are legal. For example, now that PartyGaming has withdrawn from the U.S. market, there is no prohibition on purchasing or owning its stock.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS

1      Second, the shares of PartyGaming and NETeller were offered only to

2  institutional investors outside the U.S., and neither was listed to trade domestically

3  through ADRs or otherwise. (Management RJN Ex. 2 at 18) Their shares were not

4  traded within the U.S. precisely because the companies were illegal gambling

5  businesses and thus sought to avoid subjecting themselves to jurisdiction in the U.S.

6  Therefore, there has never been any danger that unwitting individual investors in

7  the U.S. would be rendered felons.

8      Third, liability under § 1955 requires proof of knowledge that the gambling

9  company is taking wagers from gamblers in the U.S. Where, as here, sophisticated

10  institutional investors purchase stock in illegal Internet gambling companies

11  knowing that those companies derive most of their revenue from the U.S. market,

12  their conduct does indeed violate § 1955.

**D.    Plaintiff Was Injured in His Property by Reason of Defendants' RICO Predicate Crimes**

*1.    Plaintiff Has Alleged "But-For" Causation Under* Sedima

      In *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497 (1985), the Supreme Court explained that damages from any injury caused under RICO must "flow from the commission of the predicate acts." Thus, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation." *Id.* at 496. As the Court explained, "the compensable injury necessarily is the harm caused by [alleged] predicate acts ... for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Id.* at 497. This requirement is referred to as "but-for" causation. As made clear later in *Holmes*, but-for causation in this context is a very low hurdle, encompassing every harm that can be attributed directly or indirectly to the consequences of the RICO violation. 503 U.S. at 265-66.

      Plaintiff has alleged "but-for" causation because the injury of which he

-26-

1    complains (*i.e.,* the investment losses) flows from the predicate acts (*i.e.,* unlawful
2    investment in illegal gambling businesses). But for Defendants' unlawful
3    investments in illegal gambling businesses, Plaintiff would not have suffered
4    investment losses.

5         Defendants argue that Plaintiff suffered no injury at all because the Fund
6    increased in value during 2006. (Causeway MTD at 7 n. 7) However, the Fund lost
7    a dollar for every dollar lost from investment in the illegal gambling businesses.
8    Defendants cannot escape liability for losing money on unlawful investments
9    because they made money on separate, unrelated investments. If anything,
10   Defendants' argument *increases* Plaintiff's damages. If Defendants had not
11   squandered investors' money investing in illegal gambling businesses – and instead
12   included it in lawful investments – they would have earned a return comparable to
13   what they actually earned on their other investments.

14         2.    *Plaintiff Alleges Proximate Cause Under* Holmes
15        In *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992), the Supreme
16   Court focused on § 1964(c)'s requirement that the claimed injury be "by reason of"
17   a defendant's RICO violation. While recognizing that this language could be read to
18   allow a plaintiff to recover simply upon a showing that defendant's predicate act
19   was a "but-for" cause of plaintiff's injury, the Court held that the language was not
20   intended to be read so broadly. Specifically, the Court held that a plaintiff must be
21   able to show that the violation was not only a "but-for" cause of the injury, but also
22   the "proximate" cause, which requires "some direct relation between the injury
23   asserted and injurious conduct alleged." *Id.* at 268. The Court emphasized that its
24   "use of the term 'direct' should merely be understood as a reference to the
25   proximate-cause enquiry." *Id.* at 268 & 272 n.20.

26        In *Holmes*, the defendant manipulated the share price of certain companies.
27   Broker-dealers purchased shares in the companies with their own funds. When the
28
                                        -27-

1   stock manipulation was uncovered, the share prices of the companies dropped. This
2   caused the broker-dealers to incur huge losses. The losses rendered the broker-
3   dealers insolvent and unable to meet their obligations to their customers. The
4   Securities Investor Protection Corporation ("SIPC") was forced to advance nearly
5   $13 million to cover the claims of the customers of the insolvent broker-dealers.
6   SIPC then sued the stock manipulators under RICO to recover the amounts that it
7   paid to the customers.

8       The parties that were directly injured by the manipulation in *Holmes* were the
9   broker-dealers, not their customers or SIPC. Moreover, unlike here, the plaintiff's
10  injury in *Holmes* was purely a result of the injury suffered by third parties (the
11  insolvent broker-dealers). The Supreme Court held that the indirect injuries suffered
12  by SIPC and the customers of the insolvent broker-dealers (*i.e.*, the non-payment of
13  obligations having nothing whatsoever to do with the stock manipulation) were too
14  remote to support a claim by SIPC under RICO. Such injuries generally are
15  considered too indirect to support proximate cause because, in contrast to the
16  injuries suffered by Plaintiff here, they flow "merely from the misfortunes visited
17  upon a third person by the defendant's acts." *Id.* at 268.

18      The *Holmes* Court cautioned that, in the RICO context, "the infinite variety
19  of claims that may arise make it virtually impossible to announce a black letter rule
20  that will dictate the result in every case." 503 U.S. at 272 n.20, *quoting Associated*
21  *General Contractors of California, Inc. v. California State Council of Carpenters,*
22  459 U.S. 519, 536 (1983). Instead, questions of RICO proximate causation are
23  resolved by weighing three factors: (1) whether it will be difficult to ascertain the
24  amount of plaintiff's damages attributable to defendant's wrongful conduct as
25  distinct from other, independent, factors; (2) whether the court would be forced to
26  adopt complicated rules apportioning damages to obviate the risk of multiple
27  recoveries; and (3) whether there are more directly injured victims who could be
28

-28-

counted on to vindicate the law as private attorneys general. *Holmes*, 503 U.S. at 269-70. Most recently, in *Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131, 2144 (2008, the Supreme Court reaffirmed its commitment to determine proximate cause using the *Holmes* factors.

In *Holmes*, each of those factors weighed against a finding of proximate cause. In the present case, as in *Bridge,* all three factors militate in favor of a finding of proximate cause.

First, attributing damages to Defendants' wrongful conduct here presents no difficulty. Although a decline in the price of a particular stock in theory might be attributable to a combination of several factors, such is not the case here. The share prices of the illegal gambling companies dropped in proportion to the loss of their U.S.-based revenues when the criminal laws they were violating were enforced. There is no other factor that could reasonably be blamed for the price drops. Indeed, as Defendants admit, the broader market for international equity securities of the kind in which the Fund invested was rising during the relevant time period.

Moreover, because Plaintiff does not allege injury that merely flows from the "misfortunes visited upon a third person" by Defendants' racketeering, the complicated attribution problems that plagued the *Holmes* plaintiff are avoided. In *Holmes*, for example, it would have required pure speculation to determine how much of a role the defendant's stock manipulation played in rendering the broker-dealers insolvent as compared with other factors. *See Holmes*, 503 U.S. at 273.

Even if there were other causes that contributed to Plaintiff's injuries -- which there were not – liability may still be imposed if Defendants' predicate acts were "a substantial factor that caused the loss." *City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425, 439, 442-43 (2d Cir. 2008), *cert. granted*, 129 S. Ct. 2159 (May 4, 2009). "A contrary rule would effectively require that a plaintiff's injury be caused by only one source, and, as this is often not the case, it would operate to

-29-

1    insulate from liability defendants who scheme with others in violation of RICO."
2    *Id.* Here, even if there were some other cause that contributed to the stock price
3    decline, its contribution would have been immaterial.

4         Second, there will be no need to adopt complicated rules apportioning
5    damages because there is no danger of multiple recoveries in this case. Assuming
6    Plaintiff is permitted to sue derivatively on behalf of the Trust, there will be no need
7    for Plaintiff to proceed with his individual shareholder claims. The judgment will
8    be paid to the mutual funds, and as a result, the mutual fund investors will be fully
9    compensated.[7] Moreover, because Plaintiff's injuries do not merely flow from the
10   injury of a more directly injured third person, as was the case in *Holmes*, there is no
11   threat here of multiple recoveries for what is essentially the same injury. There is no
12   other group of plaintiffs that could have standing to recover Plaintiff's damages
13   from these particular defendants. Any other plaintiff group could only recover
14   separate, non-duplicative damages. *Smokes-Spirits.Com*, 541 F.3d at 443
15   (possibility of other plaintiffs with separate damages does not sever proximate
16   causation under *Holmes*).

17        Third, there is no party more directly injured by the RICO violation or with a
18   greater incentive to vindicate the law than the Trust on behalf of which Plaintiff
19   sues derivatively. Vindication of the law therefore weighs heavily in favor of
20   allowing Plaintiff to pursue these claims. The *Holmes* Court noted that a liquidating
21   trustee suing on behalf of the defunct broker-dealers would have been a proper
22   plaintiff. 503 U.S. at 273. While this was *dicta*, it strongly supports the view that
23   Plaintiff has standing here to bring his RICO claims.

24        Defendants argue that "direct victims" of the illegal gambling business may

25   _____
     [7] If, for any reason, Plaintiff is not permitted to pursue his claims derivatively, then
26   there would be no potential for double recoveries if he pursues his individual claims
27   because there would be no possibility of Defendants being required to pay twice for
     the same injury.
28

1   "pursue violations of anti-gambling laws" (Causeway MTD at 13), and they assert

2   that only gamblers and possibly legal gambling companies can qualify as direct

3   victims. (*Id.* at 12) Defendants' argument lacks merit because the same racketeering

4   activity may foreseeably cause different kinds of injuries to different plaintiffs.

5       For example, in *Smokes-Spirits.Com*, the Second Circuit held that even

6   though the primary target of defendants' tax fraud was the State of New York, the

7   City of New York could still sue under RICO: "Although the State may also seek to

8   sue to vindicate the law, the City should not have to rely on the State to enforce the

9   RICO laws, where the City's injury in the form of lost taxes is no less direct than

10  any comparable injury of the State." *Smokes-Spirits.Com*, 541 F.3d at 443. Here, as

11  in *Smokes-Spirits.Com*, "[Plaintiff's] injury in the form of [investment losses] is no

12  less direct than any comparable injury of [gamblers or competitors]." 541 F.3d at

13  444. *See also Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) (each

14  plaintiff suffered its own separate economic harm).

15          3.   *This Court Should Follow* Holmes *and* Bridge *and Reject the*
16               *Decision in* McBrearty

17      Defendants argue that there is no proximate cause and rely almost

18  exclusively on the *McBrearty* decision. The *McBrearty* court, however, refused to

19  analyze the facts of this case using the *Holmes* factors. The court dismissed the

20  *Holmes* factors as mere "policy considerations" that "underlie the adoption of the

21  proximate cause test," 2009 WL 875220, at *2 (emphasis added), rather than as

22  factors to be used in determining whether proximate cause has been alleged in a

23  particular case. Put another way, the district court first concluded that there was no

24  proximate cause – using factors other than the *Holmes* factors – and then refused to

25  analyze the facts in light of the *Holmes* factors on the ground that it did not consider

26  them to be part of the proximate cause analysis. This was error. In *Holmes, Anza v.*

27  *Ideal Steel Supply Corp.,* 547 U.S. 451 (2006), and *Bridge*, the Supreme Court

28  carefully weighed each of the *Holmes* factors to determine whether proximate cause

-31-

1    had been alleged.

2          Consistent with *Holmes*, *Anza*, and *Bridge*, the Ninth Circuit has made clear

3    that the *Holmes* factors must govern RICO proximate cause determinations. *See,*

4    *e.g., Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1147-49 (9th Cir.

5    2008); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168-69 (9th Cir. 2002). In

6    *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008), the

7    district court dismissed RICO claims on grounds other than the *Holmes* factors, and

8    the Ninth Circuit reversed and remanded for the trial court to determine proximate

9    cause using the *Holmes* factors. *Id.* at 1055. *Accord, Williams v. Mohawk Indus.,*

10   *Inc.,* 465 F.3d 1277, 1288 (11th Cir. 2006).

11             *4.    Plaintiff Need Not Be the Intended Victim of the RICO Activity*

12         Relying principally on *McBrearty*, Defendants argue that proximate cause

13   does not exist unless the plaintiff was a target or intended victim of the

14   racketeering. (Causeway MTD at 12-13) In *Anza*, the Supreme Court reversed the

15   Second Circuit because that Court's focus on the defendant's intention "does not

16   accord with *Holmes*." 547 U.S. at 460. Consistent with *Anza*, the Ninth Circuit has

17   specifically rejected the approach followed in *McBrearty* because the standard of

18   proximate cause under *Holmes* "is generous enough to include the unintended,

19   though foreseeable, consequences of RICO predicate acts." *Diaz v. Gates*, 420 F.3d

20   897, 900-01 (9th Cir. 2005) (*en banc*). *Accord Baisch v. Gallina*, 346 F.3d 366 (2d

21   Cir. 2003) ("Where a racketeering enterprise intends no specific harms to any

22   particular individual, but causes harm by the creation of substantial risk of harm,

23   the victim injured by the enterprises then may have RICO standing"); *BCCI*

24   *Holdings (Luxembourg), S.A. v. Khalil*, 214 F.3d 168, 174 (D.C. Cir. 2000).

25         The *McBrearty* court, relying on *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113,

26   124 (2d Cir. 2003), stated that "foreseeability ... is generally limited to 'targets,

27   competitors, and intended victims' of RICO violations." 2009 WL 875220, at *3.

28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO MOTIONS TO DISMISS**

1   We submit that the *McBrearty* court has misinterpreted *Lerner*. While it is of course
2   true, as *Lerner* noted, that "the reasonably foreseeable victim of a RICO enterprise
3   will often be, unsurprisingly, the type of victim the RICO statute seeks to protect,"
4   318 F.3d at 121 n.6, that does not mean that a plaintiff must be an intended victim
5   to bring a RICO suit. Foreseeability remains the standard, and that standard defines
6   a far broader group of potential plaintiffs than an "intent to harm" test urged by
7   Defendants. *See Diaz*, 420 F.3d at 900-01.

8       It is also irrelevant that Plaintiff and the Fund may have been intended, in
9   part, to benefit from Defendants' illegal acts. (Causeway MTD at 12-13) The issue
10  is what harm Defendants reasonably could have foreseen – not what they may have
11  intended. Defendants' RICO predicate acts created a substantial and foreseeable
12  risk that the investments in illegal gambling businesses would be lost when the
13  government enforced the criminal statutes that the companies were violating.
14  Defendants' racketeering therefore proximately caused Plaintiff's injuries.[8]

15

16

---

17  [8] Although, as we argue in the text, Defendants' intention is not controlling, we also
18  note that there is no basis in the record for the assertion that Defendants intended
19  only to benefit Plaintiff. Defendants have neither pleaded nor proved as a matter of
    law that their sole purpose was to benefit Plaintiff. Even assuming, *arguendo*, that
20  Defendants were motivated in part by an intention to earn income and capital gains
21  for the fund and its investors, it nevertheless remains true that, as investment
22  advisors and managers, they were motivated primarily by self-interest because they
    would receive higher management fees and attract additional capital if they were to
23  increase the net asset value of the Fund. *See, e.g., Pension Comm. of Univ. of
    Montreal Pension Plan v. Banc of Amer. Secs., LLC*, 2009 WL 1587870 (2d Cir.,
24  June 9, 2009), at *2 (finding proximate cause in a securities case in connection with
25  fraudulent increase of fund's net asset value, which was intended to inflate the asset
    managers' fees). Put another way, Defendants sought to make money for
26  themselves by gambling with Plaintiff's retirement money, and any intention they
27  may have had to benefit Plaintiff was strictly incidental to their primary goal of
    enriching themselves.
28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

5.      *Government Law Enforcement Was Not a Superseding Intervening Cause*

Relying on *McBrearty*, Defendants argue that government law enforcement was an "intervening" cause that breaks the chain of proximate causation. (Causeway MTD at 9-12; Trustees MTD at 23) However, *McBrearty* failed to apply well-established legal principles relating to superseding intervening causes.

Certain intervening events – also called "superseding causes" – may sever the causal nexus between a defendant's wrongdoing and a plaintiff's injury for liability purposes. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 836-37 (1996) ("'The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a *later* cause of *independent origin that was not foreseeable*'") (emphasis added)), *quoting* 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 (2d ed.1994); 57A Am.Jur.2d, Negligence § 790, p. 701 (1989).

For a later cause to supersede the original cause, it must be independent of the original cause. As the Supreme Court long ago explained,

The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. *It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster.*

*Aetna Ins. Co. v. Boon*, 95 U.S. 117, 130 (1877) (emphasis added).

For a cause nearer in time to be an "independent" cause – or, to use the terminology of *Anza*, for it to be "entirely distinct" so as to cut off liability, 547 U.S. at 458 – it must be neither foreseeable nor part of the risk created by the defendant's wrongful act. The Ninth Circuit has explained: "[C]ourts are quite generally agreed that [foreseeable] intervening causes ... will not supersede the

-34-

defendant's responsibility ... . Courts look to the original foreseeable risk that the defendant created." *White v. Roper*, 901 F.2d 1501 (9th Cir. 1990) (internal quotations omitted). *Accord Farr v. NC Machinery Co.*, 186 F.3d 1165, 1168-69 (9th Cir. 1999), *citing* Restatement (Second) of Torts §441(1); *East Hampton Dewitt Corp. v. State Farm Mut. Auto. Ins. Co.*, 490 F.2d 1234, 1240 (2d Cir. 1973), *quoting* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 44, p. 281 (5th ed.1984) (hereinafter "Keeton").

The *McBrearty* court improperly treated government enforcement as if it had been "entirely distinct" from the RICO violations. *McBrearty*, 2009 WL 875220, at *2, *quoting Smokes-Spirits.Com*, 541 F.3d at 441, *quoting Anza*, 547 U.S. at 458. This is error. The law enforcement that precipitated the investment losses of which Plaintiff complains was not "entirely distinct" from the RICO violations. To the contrary, it was the original foreseeable risk that Defendants knowingly created when they made the illegal investments.

The *McBrearty* court erred by failing to recognize that the risk of government enforcement, and the concomitant loss of revenue for the gambling companies, was not merely within the scope of the risk created by Defendants' conduct. It was, in fact, the single most obvious risk associated with these illegal investments. The illegality of Internet gambling in the U.S. was well established. The risk of prosecution (and resulting investment loss) had been painstakingly spelled out in the prospectuses of the gambling businesses; it had been widely publicized in the news media, and Defendants were aware of it. When they chose to gamble other people's heard-earned retirement money by investing it in illicit off-shore criminal enterprises, Defendants knowingly took a risk that they would lose the money when the government enforced the criminal laws. That is *precisely* what happened. Therefore, law enforcement action cannot be considered a superseding intervening cause that absolves Defendants of liability.

The *McBrearty* court's analysis not only misapplies the common law principles relating to superseding intervening causes, it effectively (though not explicitly) requires that a plaintiff's injury be caused by only one source. All that is required to establish proximate causation, however, is that the racketeering activity (*i.e.,* the illegal investments) be "a substantial factor that caused the loss." *Smokes-Spirits.Com,* 541 F.3d at 442. Law enforcement played a role in the injury of which Plaintiff complains because it shut down the primary source of revenue for the illegal gambling businesses. This is insufficient to sever proximate causation, however, because the risk of loss due to law enforcement was part of the foreseeable risk that Defendants' racketeering acts created and was not "entirely distinct" from them. That risk of loss would not have existed if Defendants had not engaged in racketeering.

*McBrearty's* error is also demonstrated by comparing it with *Bridge.* In *Bridge,* the Supreme Court determined, by weighing the *Holmes* factors, that the plaintiffs' injuries were "direct" even though there were several intervening events between the defendants' RICO violations and the plaintiffs' injuries. Similarly, in *Smokes-Spirits.Com,* the City of New York claimed that it lost tax revenue because the defendants failed to report to New York State sales of cigarettes to non-distributors (*i.e.,* consumers) within the State of New York. The City was injured because it did not receive information about the sales from State authorities; that, in turn, cost the City tax revenues because it made it less likely that the City would collect taxes from consumers who had purchased the cigarettes but failed to voluntarily pay the required taxes. The Court held, however, that "the fact that the cigarette purchasers may be partially to blame – either because they were not aware of their reporting duties or because … they were intentionally hiding the fact of their purchases – does not defeat proximate causation." 541 F.3d at 442.

Plaintiff submits that, as a matter of law, enforcement of criminal statutes is

an inherently foreseeable risk of criminal activity because no reasonable jury could conclude that enforcement of the criminal laws was unforeseeable. Even if that risk were not foreseeable as a matter of law, this Court should not resolve the affirmative defense of superseding intervening cause against Plaintiff on a motion addressed to the pleadings under Fed. R. Civ. P. 12(b)(6). Typically, a jury decides such issues of causation. *See White v. Roper*, 901 F.3d 1501, 1506 (9th Cir. 1990) (reversing district court's dismissal of the complaint and holding that question of proximate cause should have been left for the jury to determine foreseeability); *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir.1996). *See generally*, Restatement (Second) of Torts §§ 440; Keeton § 44.

The question whether proximate cause has been shown is an issue of fact for the jury unless reasonable people could not differ. For example, in *Newcal Indus., Inc.*, 513 F.3d 1038, 1055, the Ninth Circuit held that open questions relating to a determination of RICO proximate cause under the *Holmes* factors were "factual questions, which [the court] cannot resolve on a Rule 12(b)(6) motion ... ." Similarly, in *Lerman v. Joyce Intern., Inc.*, 10 F.3d 106 (3d Cir. 1993), then Circuit Judge Alito reviewed a RICO proximate cause challenge under a "clearly erroneous" standard. If the issue of superseding intervening cause is not resolved in Plaintiff's favor as a matter of law, then at a minimum it presents a fact question that should not be resolved on a motion to dismiss.

Defendants also argue that the drop in PartyGaming and NETeller's share price resulted from (a) law enforcement efforts directed against companies other than PartyGaming and NETeller; (b) passage of the UIGE; and (c) PartyGaming's decision to "change its business model." (Causeway MTD at 10-11) This misapprehends Plaintiff's factual allegations concerning injury. PartyGaming and NETeller shares plummeted when the government began vigorously enforcing the criminal laws because 80% to 90% of the companies' revenues were from their

-37-

1     illegal U.S.-based operations. Their share prices dropped to reflect the loss of that
2     revenue. (Cpl. ¶ 74) Contrary to Defendants' unsupported factual assertion,
3     government law enforcement was directed at *all* illegal Internet gambling
4     companies; it is immaterial that the first enforcement actions were against
5     companies other than PartyGaming and NETeller. The threat of government
6     enforcement was directed at the entire industry, and the market reacted accordingly.
7     Similarly, the UIGE was not a separate intervening cause; rather, it was just one
8     aspect of the law enforcement crackdown alleged in the Complaint. Finally,
9     PartyGaming's decision to "change its business model" is a euphemism for "shut
10     down its illegal gambling activity under threat of prosecution." Thus, all of
11     Defendants' purported "intervening" events are merely different aspects of the same
12     thing: reasonably foreseeable law enforcement.
13          Relying on *McBrearty*, Defendants argue that injuries resulting from the
14     mere "exposure" or "disclosure" of a scheme do not satisfy RICO proximate cause.
15     *McBrearty* based its ruling on *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395
16     (2d Cir. 1994). In *American Express*, shareholders brought a RICO action against
17     officers and directors of American Express for a decline in the price of its stock.
18     The decline occurred following the disclosure of a secret scheme by American
19     Express's officers and directors to defame a competitor. The Court held that there
20     was no proximate cause in part because it was the "exposure" of the predicate acts
21     (not the acts themselves) that allegedly caused the plaintiff's harm. 39 F.3d at 400.
22          Of course, applying the three *Holmes* factors, the Court also noted that the
23     defamed party (not the plaintiffs) was the party most directly injured by the
24     defamation; that the defamed party was in the best position to vindicate the law; and
25     that there was a potential for duplicative recoveries. *Id.* at 401. In addition, there
26     could have been countless reasons why American Express's stock price went down
27     having nothing whatsoever to do with the investing public learning that American
28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

Express had tried to defame a competitor. Considered in light of the actual facts of the case, *American Express* does not establish any general rule barring RICO claims where the plaintiff's injury follows the "exposure" of wrongdoing. The reference to "exposure" was by way of explaining that plaintiffs' alleged stock loss was neither the "foreseeable" consequence, nor the "necessary result," of the defamation, but instead was a speculative, indirect and collateral consequence of the publicity surrounding exposure of the alleged racketeering. *Id.* at 400.

It would have been contrary to the express admonition of *Holmes*, 503 U.S. at 272 n.20, for the Second Circuit to create a bright-line rule barring a finding of proximate causation in cases involving injuries resulting from the "exposure" or "disclosure" of a scheme – and the court did not do so. The result in *American Express* is consistent with *Holmes* with respect to the unique facts of that case.

In any event, *American Express* has no application to this case. The injuries alleged here do not arise from the "exposure" or "disclosure" of a secret scheme or from "reputational harms" resulting from negative publicity concerning the illegality of Defendants' investments. There was no secret scheme to be exposed or disclosed. And there was no disclosure or exposure of any such scheme. The activities of the illegal gambling companies were open and notorious and well-known to those, such as Defendants, who purchased their securities. What happened here was not an unpredictable collateral consequence of "exposure" of previously secret wrongdoing. It was the readily foreseeable consequence of enforcement of the criminal laws.

## II. THE COMPLAINT SUFFICIENTLY ALLEGES A RICO PATTERN THROUGH OPEN-ENDED AND CLOSED-ENDED RICO CONTINUITY

Defendants are the trustees, investment advisers, and executives of the Trust and therefore occupy managerial or operational positions with respect to the illegal investments alleged in the Complaint. (Cpl. ¶¶ 71, 109) Defendants conducted the Trust's affairs through a pattern of racketeering activity in violation of 18 U.S.C.

-39-

1   § 1962(c) (§ 1962(c)") by causing the Trust, repeatedly and within a ten-year

2   period, to purchase shares of "illegal gambling businesses" as that term is defined in

3   § 1955. (Cpl. ¶¶ 38, 69, 70, 110, 111).

4          RICO predicate acts must involve a certain degree of continuity, either open-

5   ended or closed-ended, in order to constitute a pattern. *H.J. Inc. v. Northwestern*

6   *Bell Tel. Co.,* 492 U.S. 229, 239, 241-42 (1989). "A party alleging a RICO violation

7   may demonstrate continuity over a closed period by proving a series of related

8   predicates extending over a substantial period of time." *Id.* at 242. Open-ended

9   continuity, by contrast, focuses on the future, "whether the *threat* of continuity is

10  demonstrated." *Id.* (emphasis in original). The Court clarified that such threat could

11  either be "implicit or explicit." The Court emphasized that Congress intended a

12  "flexible" approach in determining whether a RICO pattern has been demonstrated.

13  *Id.* at 238-39. Defendants argue that Plaintiff has failed adequately to allege either

14  open-ended or closed-ended continuity, but the facts alleged in the Complain

15  establish *both* types of continuity and sufficiently plead a pattern of racketeering

16  activity.

17         Here, Plaintiff has alleged "open-ended" continuity because Defendants

18  purchased and continued to purchase millions of shares of PartyGaming and

19  NETeller even after it was clear that they were illegal, and after the government

20  commenced its crackdown. (Cpl. ¶¶ 39-54; 60-65) They did not sell shares of either

21  company to comply with the law, but only when their financial losses grew

22  catastrophic. (Cpl. ¶ 56) Defendants now continue to insist that they made

23  "legitimate" investment decisions and did nothing wrong. (Causeway MTD at 1;

24  Trustees MTD at 23-24) Defendants also likely committed hundreds of racketeering

25  predicates during a twelve-month period, which a jury could determine established

26  a regular way of doing business. *See Allwaste v. Hecht,* 65 F.3d 1523, 1529 (9th

27  Cir. 1995); *Ikuno v. Yip,* 912 F.2d 306, 308 (9th Cir. 1990) (finding open-ended

28

-40-

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS

1  continuity based on only two predicate acts over twelve months). Given
2  Defendants' unrepentant attitude; and given the continued existence of illegal
3  gambling companies that continue to generate hundreds of millions of dollars in
4  illegal U.S.-based revenue and that continue to look for additional capital sources,
5  Defendants' racketeering threatens repetition even if they have currently sold their
6  shares in PartyGaming and NETeller. *See, e.g., Allwaste*, 65 F.3d at 1529 (because
7  "there was nothing to suggest that [defendants] would not [commit additional
8  predicate acts]" there was open-ended continuity); *Ikuno*, 912 F.2d at 309 ("there is
9  no evidence that [the defendant] would have stopped [filing false annual reports] if
10  [the company] had not ceased to do business"); *United States v. Busacca*, 936 F.2d
11  232, 238 (6th Cir.1991) ("lack of a threat of continuity of racketeering activity
12  cannot be asserted merely by showing a fortuitous interruption of that activity such
13  as by an arrest, indictment or guilty verdict"). Here, there is every reason to infer
14  that Defendants would have continued their racketeering indefinitely if U.S.
15  government enforcement efforts had not forced the illegal gambling businesses to
16  cease violating U.S. law. Moreover, because illegal gambling companies other than
17  PartyGaming and NETeller remain in business, continue to generate hundreds of
18  millions of dollars in illegal U.S.-based revenue, and continue to seek access to
19  public investment financing,[9] there is a threat of continued wrongdoing.

20

21  [9] PokerStars, for example continues to defy U.S. law and still generates most of its
22  revenue from the U.S. *See* PokerStars.Com Website, "US Players FAQs" at
http://www.pokerstars.com/poker/real-money/usplayerfaq/. The company had
23  retained HSBC and Dresdner Kleinwort in connection with a potential $3 billion-
24  dollar public offering. *See* Dominic Walsh, *PokerStars prepares $3bn float*, Times
Online, June 1, 2006. (www.business.timesonline.co.uk). Other illegal gambling
25  companies, such as Doyle's Room, left the U.S. market in 2006 but recently re-
26  entered illegally. Still others, such as FullTilt, never left. In June 2009, the DOJ
asked certain banks to freeze funds from payment providers that are still processing
27  financial transactions for offshore illegal gambling businesses currently operating in
the U.S. *See* Dominic Walsh and Robert Lindsay, *US action provides boost to*
28
-41-

1      Defendants also argue that there is no "closed-ended" RICO pattern because

2  they invested in only two illegal gambling businesses. (Causeway MTD at 18) The

3  Supreme Court has clarified that even a single scheme can establish continuity. *H.J.*

4  *Inc.*, 492 U.S. at 240; *see also Allwaste*, 65 F.3d at 1528. Here, Defendants likely

5  made hundreds of illegal purchases. Defendants asked this Court to take judicial

6  notice of the *McBrearty* decision. An affidavit submitted by one of the defendants

7  in that action demonstrates that an asset manager attempting to accumulate large

8  ownership positions in PartyGaming did so in blocks of approximately 120,000

9  shares per transaction. (Affidavit of Neil M. Ostrer, dated October 27, 2008, filed in

10  *McBrearty v. Vanguard,* No. 08-CV-7650(DLC) (S.D.N.Y.) Docket #54 (available

11  on PACER) at ¶ 7 (600,000 shares were purchased in five separate transactions)) If

12  Defendants acted in a manner consistent with the practice followed by the asset

13  manager in *McBrearty*,[10] it would have taken over 300 separate transactions for

14  Defendants to accumulate the ownership positions that they did.

15      Without disclosing to the Court the dates when they actually purchased and

16  sold the illegal gambling stocks, Defendants object that the Complaint fails to

17  allege racketeering that lasted twelve months. (Causeway MTD, at 18) Even if this

18  were so (and, as demonstrated below, it is not), that would not be dispositive. In

19  *Allwaste*, the Ninth Circuit cautioned that "courts should not erect artificial barriers

20  – metaphysical or otherwise – as a means of keeping RICO cases off the federal

21  dockets." 65 F.3d at 1529, *citing California Architectural Bldg. Prod. v. Franciscan*

22  *Ceramics*, 818 F.2d 1466, 1469 (9th Cir.1987) (continuity requirement satisfied

23  with predicate acts that spanned five months even if all predicate acts were related

24

*online poker specialists*, Times Online, June 11, 2009.

25  [10] This is likely because the average daily trading volume of PartyGaming in 2006

26  was less than 3 million shares a day. (PRJN Ex. 14) Asset managers commonly

27  accumulate ownership through a series of separate transactions spread over time to
    avoid driving up share price through larger purchases.

28

-42-

1    to a single criminal episode). Accordingly, the court noted that although a twelve-
2    month period generally sufficed to establish "closed-ended" continuity, "a bright
3    line, one-year rule would undermine *H.J. Inc.'s* principle that flexibility rather than
4    rigidity should govern the application of RICO. 65 F.3d at 1528. Indeed, a rigid
5    twelve-month floor might create a "safe harbor" whereby a racketeer could freely
6    engage in criminal conduct for eleven months.
7         In any event, the Complaint alleges that Defendants began acquiring
8    ownership stakes in NETeller "beginning in 2006" and prior to April 30, 2006 (Cpl.
9    ¶¶ 60-61) Defendants' SEC filings confirm that they owned shares during the
10   quarter ended March 31, 2006 – which means they could have purchased as early as
11   January 2006. (PRJN Ex. 12.1) Defendants' SEC filings also confirm that the Trust
12   held at least 1.2 million shares of NETeller as of their filing for the period ending
13   September 30, 2006. (PRJN Ex. 12.3) This means that they could have purchased
14   and held shares in NETeller until December 2006. Although PartyGaming began
15   complying with U.S. law sometime in October 2006 when it withdrew from the
16   U.S. market, NETeller continued to violate U.S. law until its founders were arrested
17   by the FBI on January 15, 2007. (Cpl. ¶ 62; PRJN Ex. 11; Causeway RJN Exs. 5 &
18   6) Because the Complaint establishes that Defendants potentially engaged in
19   racketeering during the twelve-month period from January to December 2006 – and
20   likely committed over 300 separate predicate acts during that time – Plaintiff
21   satisfies "closed-ended" continuity. *See, e.g., Allwaste*, 65 F.3d at 1528 (although
22   the complaint "failed to specify the dates of the first and last alleged predicate acts
23   … [the plaintiff] could show that the predicate acts occurred … as much as thirteen
24   months … and, therefore would have satisfied the continuity requirement");
25   *California Architectural Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1469
26   (9th Cir.1987) (continuity requirement satisfied with predicate acts that spanned
27   five months).
28

-43-

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

1      Defendants' reliance on *Durning v. Citibank, Int'l*, 990 F.2d 1133, 1138 (9th

2  Cir. 1993) is misplaced. That case involved mail fraud in connection with a single

3  misleading document. Defendants attempt to read *Durning* as establishing a

4  requirement of multiple schemes, but at least one district court in this Circuit has

5  rejected that interpretation as contrary to the Supreme Court's decision in *H.J. Inc.*,

6  492 U.S. at 239. *Larsen v. Lauriel Invs., Inc.*, 161 F. Supp.2d 1029, 1040 (D. Ariz.

7  2001). *See also United States v.Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (*en banc*)

8  (nearly simultaneous shooting and killing of three people to effect a single goal

9  constituted more than one predicate act of racketeering activity and sufficiently

10  established a pattern). Similarly inapposite is *Steam Press Holdings, Inc. v. Haw.*

11  *Teamsters & Allied Workers Union Local 996*, 302 F.3d 998, 1011 (9th Cir. 2002).

12  That case involved activity specifically related to a single labor strike, which

13  inherently was a one-time event lacking continuity.

## III.   THE TRUSTEES MAY BE LIABLE NOTWITHSTANDING THE FUND'S DECLARATIONS OF TRUST

16      The defendant trustees (but not Mark Cone or the other Defendants) (the

17  "Trustees") argue that they are immunized from RICO liability by an exculpatory

18  provision in Section 8.1 of the Declarations of Trust (the "Declarations") of the

19  Trust. (Trustees MTD, at 19-22) There are two independently sufficient reasons

20  why this argument should be rejected.

21      First, contractual exculpation is an affirmative defense that the Trustees must

22  plead and prove. It may therefore not be raised in the context of this motion to

23  dismiss. In *Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999), a case relied

24  upon by Defendants, the Delaware Supreme Court stated that "the shield from

25  liability provided by a certificate of incorporation provision adopted pursuant to

26  8 Del. C. Sec. 102(b)(7) is in the nature of an affirmative defense" and

27  "[d]efendants seeking exculpation under such a provision will normally bear the

28  burden of establishing its elements." *Id.* at 1223-1224.

-44-

Thus, in *Belova v. Sharp*, 2008 WL 700961, *8 (D. Or. 2008), the court, applying Delaware law, determined that the plaintiff who asserted claims against the board of directors in connection with backdated stock options was excused from making a demand prior to bringing suit. The defendants argued that they were shielded from liability because of an exculpatory provision in the company's charter. The court held that "the defendants' argument constitutes an affirmative defense that will not dispose of a matter at the pleading stage." *Id.*, citing *Emerald Partners*, 726 A.2d at 1223-24. *Accord, Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538 (D. Del. 2008); *In Re The Brown Schools*, 368 B.R. 394 (Bankr. D. Del. 2007); *In Re CTC Communications Group, Inc.*, 2007 WL 760389 (Bankr. D. Mass. 2007); *IT Group, Inc. v. D'Aniello*, 2005 WL 3050611 (D. Del. 2005). In *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001), a case cited by defendants, the Delaware Supreme Court reinforced its ruling in *Emerald Partners* by again stating that exculpatory provisions adopted pursuant 8 Del. C. Sec. 102(b)(7) are in the nature of affirmative defenses.[11]

Second, there is no such thing as a contract that can exculpate a party for liability under RICO. Any contract purporting to do so would be contrary to public policy and void. *Cf. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) ("in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy").

---

[11] Defendants' reliance on *In re Verestar, Inc.*, 343 B.R. 444, 471-75 (Bankr. S.D.N.Y. 2006), *In re Sagent Tech., Inc.*, 278 F. Supp. 2d 1079, 1095 (N.D. Cal. 2003) and *Malpiede*, 780 A.2d at 1093, is misplaced. Those cases say that an exculpatory provision can be raised on a motion to dismiss only if a complaint "unambiguously and solely assert[s] only a due care claim." *Malpiede*, 780 A.2d at 1093. That is not the case here.

-45-

1    In any event, the Declarations do nothing more than exculpate the Trustees
2    for simple negligence; they do not and, as a matter of public policy, cannot insulate
3    the Trustees from liability for more serious wrongs. The Complaint alleges that the
4    Trustees knowingly conspired and actually conducted the affairs of the Trust
5    through a pattern of racketeering. Such acts are *per se ultra vires* and therefore
6    constitute, among other things, bad faith, gross negligence, willful misfeasance,
7    reckless disregard of duty, and violation of Defendants' duty of loyalty. *See*
8    *DeSimone v. Barrows*, 924 A.2d 908, 934-35 and n.89 (Del. Ch. 2007) (consciously
9    causing corporation to violate law is director misconduct), *citing In re Walt Disney*
10   *Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) ("A failure to act in good faith
11   may be shown ... where [a] fiduciary acts with intent to violate applicable positive
12   law."); *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch 2003) ("[O]ne cannot
13   act loyally as a corporate director by causing the corporation to violate the positive
14   laws it is obliged to obey."); *Metro Communication Corp. BVI v. Advanced*
15   *Mobilecomm Techn., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) (under Delaware law,
16   "a fiduciary may not choose to manage an entity in an illegal fashion, even if the
17   fiduciary believes that the illegal activity will result in profits for the entity"); S.
18   Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93, 129 (1979) ("Bad
19   faith may preclude application of the business judgment defense where directors
20   knowingly violate a statute or comparable expression of public policy, even if such
21   a violation is undertaken in the corporation's best interests").

22   Defendants object that the Complaint does not contain specific allegations
23   that the Trustees knew about the unlawful investments or that the government
24   would enforce the laws against the illegal gambling companies in which they
25   invested. The detailed allegations in Paragraphs 40-43, 46-54 and 60-65 in the
26   Complaint are more than sufficient to establish the requisite knowledge.

27   In any event, even if the Trustees lacked actual knowledge, the Complaint

-46-

alleges that they were reckless (Cpl. ¶¶ 44, 58, 64, 73, 99), which is the legal equivalent of actual knowledge. *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1301 (2d Cir.1973) (*en banc*). As part of their responsibilities, the Trustees have a duty to "oversee the actions of the Investment Advisor and . . . review the actions of the Trust's officers ... ." (Trustees' RJN Ex. 3 at 29). Given their duty of oversight, the Trustees cannot evade liability based on a plea of actual ignorance.

## IV. PLAINTIFF HAS PROPERLY PLEADED HIS DERIVATIVE CLAIMS, INCLUDING THE FUTILITY OF MAKING A DEMAND ON THE BOARD OF TRUSTEES

Plaintiff is excused from making a demand on the board of trustees for two independent reasons. First, the entire board of trustees has an irreconcilable conflict of interest between the Fund and the other funds that constitute the Trust with respect to the claims in this litigation. Second, the Complaint pleads, with the requisite particularity, facts that give rise to a "reasonable doubt" that the Trustees are disinterested or independent. *See Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

### A.    The Standards for Pleading Demand Futility

A derivative suit is an equitable device that allows shareholders to protect corporations from misfeasance and malfeasance by faithless directors and managers. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95-96 (1991). Fed. R. Civ. P. 23.1 requires that a derivative plaintiff plead that he made a pre-suit demand on the board of directors to commence the action or state with particularity the reasons why such efforts were not made. Here, Plaintiff has alleged that demand was not made because it would have been futile. Because the nominal defendant, the Trust, is a Delaware statutory trust, demand futility is governed by Delaware law. *Kamen*, 500 U.S. at 108-109.

Under Delaware law, when directors or trustees are alleged to have participated in the challenged transactions, demand may be excused under

*Aronsons*, 473 A.2d 805. Plaintiff must show only that "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* at 814. Demand may also be excused under *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), even if the directors or trustees were not involved in the challenged transactions. *See Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007). The Complaint satisfies both standards.

In considering demand futility, this Court should be mindful of the unique structure of mutual funds as distinguished from normal corporations. As the Supreme Court has explained:

> unlike most corporations, an investment company is typically created and managed by a pre-existing external organization known as an investment adviser ... . Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, *the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest.*

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984) (emphasis added). This conflict situation is particularly acute in the case of Causeway and its mutual funds.

## B.    The Trustees Face an Irreconcilable Conflict of Interest

The Trustees cannot determine whether to proceed with this litigation on behalf of the Fund while fulfilling their separate fiduciary duties to the Global Fund and the Emerging Markets Fund. Demand is excused because the Trustees have an irreconcilable conflict of interest with respect to the outcome of this litigation.

This common-sense rule is illustrated by *In re Freeport-McMoran Sulphur, Inc. Shareholder Litig.*, No. A. 16729, 2005 WL 1653923 (Del. Ch. June 30, 2005). In that case, plaintiffs were shareholders in Sulphur, Inc., which merged with an oil

1    and gas company called MOXY. The plaintiffs complained that the merger
2    exchange ratio was unfair to them. The court held, not surprisingly, that the
3    "Common Directors" who sat on the boards of both Sulphur, Inc. and MOXY had
4    conflicting loyalties and were "clearly interested" directors as a matter of law. *Id.*
5    The court reasoned that a "director is deemed interested whenever divided loyalties
6    are present." *Id., citing Rales*, 634 A.2d at 933. Therefore, the "directors who sat on
7    both Sulphur's and MOXY's boards ... were obviously conflicted by their dual
8    roles."

9        The Trustees here are interested as a matter of law because they are faced
10   with an even greater conflict than in *Freeport*. The Trustees owe duties of
11   undivided loyalty to the shareholders of all three series funds that make up the
12   Trust. Accordingly, they face an irreconcilable conflict because they cannot serve
13   the competing interests of all three funds. In particular, the fees that the Fund paid
14   to CCM from the time that Defendants first breached their fiduciary duties to
15   Plaintiff are subject to forfeiture in this action. *See Zisawasser v. Cole & Cowan,*
16   *Inc.*, 164 Cal. App.3d 417, 424, 210 Cal. Rptr. 428, 432 (Cal. App. 6 Dist., 1985).
17   Forfeiture of CCM's fees would adversely affect the shareholders of the Emerging
18   Market Fund and the Global Fund (of which defendant Sarah Ketterer owns 47%)
19   because those funds were and are subsidized by such fees. Were Plaintiff to prevail
20   in this litigation, the subsidies would cease and prior subsidies would be liable to
21   reallocation. (Cpl. ¶¶ 91-94) This presents an irreconcilable conflict of interest
22   between (a) the Fund and (b) the Global Fund and the Emerging Markets Fund with
23   respect to the outcome of this litigation. The Trustees are therefore disqualified
24   from determining, on behalf of the nominal defendant, whether to halt the
25   prosecution of Plaintiff's claims.

26       The Trustees attempt to refute the factual allegations in the Complaint
27   concerning the subsidy. (Trustees MTD at 14, n. 13) Although the Trustees assert
28

-49-

1    that the allegations in Complaint are "not accurate," they do not deny any of the
2    Complaint's material allegations. Instead, Trustees quibble whether the fees are
3    "allocated" or "calculated and paid separately." (*Id.*) Trustees, however *do not deny*
4    that the Fund pays at least 98% of the fees received by CCM. Whether management
5    fees and expenses are "allocated" or "calculated and charged" separately to the
6    Global Fund and Emerging Markets Fund, the Trustees also do not refute that such
7    fees and expenses have been completely or substantially waived in the past. The
8    result is that the Fund bears, in practice, nearly 100% of the fees that CCM receives,
9    and which CCM uses to provide office space, equipment and personnel for the
10   management of the all of the funds that comprise the Trust. (Trustees' RJN Exhibit
11   3 at 33) Were these fees to be forfeited, there would be nothing left to subsidize the
12   operations Global Fund and the Emerging Market Fund. They would have to start
13   paying their own way. Shareholders of the Global Fund and the Emerging Market
14   Fund would therefore expect their board of trustees – who happen to be the same as
15   the board of trustees for the Fund – to halt the prosecution of this litigation,
16   whatever its merits or benefits to the shareholders of the Fund.

17          Defendants say their practice is "legitimate" and prevalent. (Trustees MTD,
18   at 14-15.) Whether this is factually correct is irrelevant. The only relevant inquiry
19   here is whether the practice creates a conflict of interest for the board of trustees
20   with respect to the claims in this litigation. On this point, Defendants remain silent.

21          Defendants say that multiple board memberships "generally" would not
22   render a trustee interested "under the [ICA] *solely* as a result of this relationship."
23   (Trustees MTD at 15, *citing Krantz v. Prudential Invs. Funds Mgmt. LLC*, 305 F.3d
24   140, 143-44 (3d Cir. 2002)) (emphasis added) This is beside the point. The
25   definition of interested directors under the ICA does not determine whether demand
26   is futile in this litigation. Moreover, Plaintiff does not allege that the Trustees are
27   interested "solely" because of their multiple board memberships. The Trustees are
28

-50-

interested here because of they face an actual conflict of interest based on the particular claims in this litigation, the identity of the parties, and the way that Defendants have chosen to structure, manage and pay for the operations of the mutual funds they control.

Based on the foregoing, Plaintiff raises more than a "reasonable doubt" that Trustees are interested for demand futility purposes under *Aronson* and *Rales*. Based on Trustees' irreconcilable conflict of interest, that fact is a certainty.

## C.   Demand is Excused Under *Aronson*

As noted above, where, as here, the directors or trustees are alleged to have participated in the challenged transactions, demand is excused when "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. Meeting either prong excuses demand on the board. *Ryan,* 918 A.2d at 352. The Complaint in this case satisfies both prongs.

> *1.    The Trustees are Neither Disinterested Nor Independent Because They Face a Substantial Likelihood of Criminal and Civil Liability*

The Delaware Chancery Court's recent opinion in *Ryan v. Gifford,* 918 A.2d 341– a case not cited by Defendants – demonstrates why demand is excused in this case. In *Ryan,* the plaintiff filed a derivative action on behalf of Maxim Integrated Products, Inc. The plaintiff alleged that the members of Maxim's compensation committee, which included three members of the six then current members of Maxim's board of directors, had approved back-dated options for Maxim's chairman and CEO. The court held that the challenged conduct satisfied *Aronson*.[12] In particular, the directors had "a disabling interest for pre-suit demand purposes

---

[12] The court also held that *Rales* was satisfied, as we discuss below.

1    when 'the potential for liability is not a mere threat but instead may rise to a

2    substantial likelihood.'" *Ryan*, 918 A.2d at 355. The court noted that because

3    backdating options violated the express grant of power provided under a

4    shareholder-approved compensation plan, a "director who approves the backdating

5    of options faces at the very *least* a substantial likelihood of liability." 918 A.2d at

6    355. *See also Sanders v. Wang*, 1999 WL 1044880 (Del. Ch. Nov. 10, 1999).

7         The facts alleged in the present Complaint raise an even more compelling

8    case for demand futility. Instead of mere violation of a shareholder compensation

9    plan, Plaintiff here alleges that the Trustees were members of a RICO conspiracy,

10   that they breached their fiduciary duties, that they were negligent, and that they

11   committed waste.

12        Moreover, the *Ryan* court specifically noted that "[w]ere the board to pursue

13   a derivative suit, it might unearth facts that would subject directors to further civil

14   and criminal liability." 918 A.2d at 356, n.38. The threat of unearthing additional

15   facts that could expose the Trustees to criminal and civil liability is particularly

16   strong in this case. We note that arguably less culpable third-parties – including, for

17   example, The Discovery Channel – have been subject to large asset seizures by the

18   DOJ merely for taking advertising money from the gambling companies in which

19   Defendants invested. (Cpl. ¶ 65; Causeway RJN Exhibit 2 at 50) And the Trustees

20   cannot be indemnified for their personal financial liability under RICO or for other

21   serious wrongdoing because that would be contrary to public policy.

22        Even if the risk of prosecution were relatively small, the consequences if it

23   occurs are sufficiently severe that even a small possibility could be expected to

24   influence Defendants' decision whether to pursue civil litigation. In this respect, it

25   should be emphasized that the issue is not whether Defendants would in fact be

26   prosecuted. Rather, the issue is whether the possibility that the Trustees might face

27   criminal charges could affect their judgment in deciding whether to pursue this civil

28

-52-

1   litigation. To find that demand would be futile, this Court need only conclude that

2   Defendants would prefer not even to start down a road that could eventually lead

3   them to significant personal legal troubles.

4       Defendants warn about opening the floodgates of derivative suits because

5   excusing demand on the mere possibility that the Trustees face liability "would

6   apply in virtually every case." (Trustees MTD, at 15) Defendants also accuse

7   Plaintiff of blindly alleging that "directors could not be expected to sue

8   themselves." (Trustees MTD, at 18)

9       These concerns, however, do not apply here. The *Aronson* court cautioned

10  that the "*mere* threat of personal liability ... *standing alone*," is insufficient to

11  excuse demand. 473 A.2d at 815 (emphasis added). The court's purpose was to

12  avoid the "virtually automatic" incantation of director liability to make an end-run

13  around demand requirements. 473 A.2d at 814. Instead, the court sought to

14  approach demand issues "in a more balanced way." *Id. See also Rales,* 634 A.2d at

15  934 and 937 (declining to impose a stringent standard for demand futility that

16  would have required plaintiffs demonstrate 'reasonable probability of success on

17  the merits' because such a strict standard was deemed unnecessary to "deter strike

18  suits"); *Ryan,* 918 A.2d at 352 (demand requirement is used to "curb a myriad of

19  individual shareholders bringing potentially frivolous lawsuits" and to prevent

20  "strike suits"); *and Guttman* 823 A.2d at 500 ("if the demand excusal test is too

21  stringent, then stockholders may suffer as a class because the deterrence effects of

22  meritorious derivative suits on faithless conduct may be too weak"). This case,

23  however, is the antithesis of a strike suit.

24      The cases on which Defendants rely confirm that Delaware courts generally

25  decline to excuse demand only when they determine that a plaintiff's substantive

26  claims seem implausible or obviously lacking in merit. For example, in declining to

27  excuse demand in *Aronson*, the court specifically commented that the complaint, as

28

-53-

1  drafted, "may not even state a cause of action." 473 A.2d at 817. Such is not the
2  case here, where many of the facts establishing Defendants' liability are publicly
3  available and not subject to reasonable dispute.

4      For example, Defendants rely on *Wood v. Baum*, 953 A.2d 136 (Del. 2008).
5  The *Wood* court, however, began its analysis by emphasizing: "plaintiff has not
6  pled with particularity any claim based on fraudulent conduct. The Complaint does
7  not even purport to state a cause of action for fraud." 953 A.2d at 141.

8      Defendants' citation to *In re Baxter Intern'l, Inc. Shareholders Litig.*, 654
9  A.2d 1268 (Del. Ch. 1995), is likewise misplaced. In that case, the court declined to
10 excuse demand where the plaintiff accused the board of failing to oversee and stop
11 lower-level employees from overcharging the Veterans Administration. The court
12 specifically found no "red flags" that would have alerted the board to wrongdoing.
13 654 A.2d at 1271. The court not only doubted the strength of the plaintiff's claim,
14 but also viewed the board's failure of oversight as not arising to the level of
15 seriousness that should excuse demand.

16     Similarly, Defendants' reliance on *In re Citigroup Inc. S'holder Derivative*
17 *Litig.*, 964 A.2d 106, 124-25 (Del. Ch. 2009), is unavailing. In that case, the court
18 held the alleged red flags only suggested that the directors "made bad business
19 decisions." *Id.* at 128. The court distinguished allegations that establish nothing
20 more than a company taking on business risk from more serious allegations of
21 criminal conduct that would excuse demand. *Id.* at 130. Moreover, the court *did*
22 excuse demand with respect to plaintiffs' claim that the directors approved an
23 excessive compensation package for the departing CEO. *Id.* at 137-138. Plaintiff's
24 allegations here present a more compelling case for demand futility. Whereas the
25 *Citigroup* court was willing to excuse demand based upon the court's belief that a
26 compensation package was excessive, Plaintiff here alleges *per se ultra vires*
27 criminal acts that were improper as a matter of law.
28

-54-
**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

1    Delaware cases confirm that the Delaware courts will generally excuse

2    demand when they are satisfied that the underlying claims in a derivative action

3    have merit. *See, e.g., In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 994 (Del.

4    Ch. Aug. 20, 2007) (majority of directors were interested in considering a demand

5    because they were likely to face personal liability for serving on the board while the

6    company issued material misrepresentations to the SEC); *Feldman v. Cutaia*, 2006

7    WL 920420, at *1–2 (Del. Ch. Apr. 5, 2006) (demand excused where repurchase

8    caused capital impairment in violation of Delaware law); *In re National Auto*

9    *Credit, Inc. S'holders Litig.*, 2003 WL 139768 (Del. Ch. Jan. 10, 2003) (demand

10    futile where directors engaged in a *quid pro quo* exchange of favorable votes for

11    increased director fees); *Kohls v. Duthie*, 791 A.2d 772 (Del. Ch. 2000) (demand

12    excused where the largest holder of common stock sold shares to the company's

13    president at a discount without first offering the opportunity to the corporation).

14           2.    *Demand is Excused Because the Trustees' Violations of RICO*

15              *are Not Valid Exercises of Business Judgment*

16    As a matter of law, the Trustees could not possibly have exercised proper

17    business judgment in participating in a RICO conspiracy or approving the unlawful

18    investments alleged in the Complaint. *DeSimone v. Barrows*, 924 A.2d 908, 934-35

19    and n.89 (Del. Ch. 2007), *citing In re Walt Disney Co. Derivative Litig.*, 906 A.2d

20    27, 67 (Del. 2006). *See also Resolution Trust Corp. v. Hays*, Civ. A. No. SA-92-

21    CA-0653, 1993 WL 302150, *5 (W.D. Tex.); *cf. Fed. Deposit Ins. Corp. v.*

22    *Henderson*, 849 F. Supp. 495, 498 (E.D. Tex. 1994) (stating that to find adverse

23    domination, plaintiffs can show that directors engaged in wrongful conduct, which

24    includes "engaging in illegal activity").

25    Defendants rely on *infoUSA*, in arguing that allegations of *ultra vires* actions

26    do not automatically excuse a plaintiff from demand. However, the court in

27    *infoUSA* excused demand because majority of directors were likely to face personal

28    liability when the company issued material misrepresentations to the SEC.

-55-

3.    *The Trustees Cannot Automatically Be Deemed "Independent"
Under Delaware Law*

Defendants misconstrue Del. Code Ann. Tit. 12, § 3801(d) ("§ 3801(d)") and argue that the Trustees should automatically be considered disinterested and independent for the purpose of excusing demand. (Trustees' MTD, at 12-13) That section incorporates the definition of "interested person" set forth in Section 2(a)(19)(A) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2. The definition of "interested" directors is intended in these statutes to determine compliance with certain regulations, such as the required composition of boards for investment companies. *See, e.g.,* 15 U.S.C. § 80a-10. Section 3801(d) does not determine whether directors who face a conflict of interest or substantial likelihood of liability should be considered interested for purposes of demand futility.

Under Defendants' suggested interpretation of § 3801(d), a board of unaffiliated directors or trustees could claim to be "independent" no matter what the facts actually were — and notwithstanding even the most egregious self-dealing, conflict of interest, or *ultra vires* acts that were being challenged. Such an interpretation would effectively overrule *Aronson* and *Rales* and undermine the entire framework of determining demand futility under Delaware law. None of the authority that Defendants cite actually supports this remarkable proposition. In fact, the cases that Defendants cite *explicitly contradict* Defendants' interpretation of § 3801. For example, Defendants rely heavily on *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873, 879 (D. Md. 2005). That case explicitly rejects Defendants argument. *Id.* at 879 n. 11. The court explained that § 3801 was enacted in response to *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 795 (S.D.N.Y. 1997), which held that service on multiple boards with high compensation *in and of itself* could excuse demand. Section 3801(d) clarified that the *mere fact* of service on multiple boards with high compensation, *without more*, is insufficient to undermine a director's independence. Accordingly, the court held that "even if a

-56-

1    majority of the board is 'disinterested' and 'independent' within the meaning of [§

2    3801], demand will be excused if a majority of the board faces a substantial

3    likelihood of liability." 384 F. Supp. 2d at 879 n. 11.

4         Here, the Trustees are neither disinterested nor independent because the

5    substantial likelihood of criminal and civil liability they face creates a strong

6    "extraneous" influence that would so effectively "sterilize their discretion" so that

7    "they cannot be considered proper persons to conduct litigation on behalf of the

8    corporation." *Aronson*, 473 A.2d at 814. Therefore, demand is excused.

9    **D.    Demand Is Also Excused Under *Rales***

10        In *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993), the Delaware

11   Supreme Court held that where the subject of a derivative suit is not a business

12   decision of the board, plaintiffs seeking to establish demand futility must plead

13   particularized facts that create a "reasonable doubt" that a majority of the directors

14   are disinterested or independent. In establishing this standard, the *Rales* court

15   rejected defendants' proposal that the court create a rule that a plaintiff "must

16   demonstrate a reasonable probability of success on the merits." Instead, the court

17   held a less stringent standard requiring only that the "underlying claims have some

18   merit." *Rales,* 634 A.2d at 934, *citing Aronson*, 473 A.2d at 811-12. The court

19   reasoned that "a more stringent test" would not be necessary to "deter strike suits."

20   927 A.2d at 934 and 937. The more demanding standard, the court concluded,

21   would be an unwarranted impediment to beneficial derivative actions.

22        In *Ryan v. Gifford*, 918 A.2d 341, 355-56, the Delaware Chancery Court held

23   that backdating options, even assuming no board action, was "so egregious on its

24   face that board approval cannot meet the test of business judgment." Therefore,

25   demand was excused under *Rales. Id.* Likewise, here, the Trustees' violations of

26   RICO are so egregious on their face that board approval cannot meet the test of

27   business judgment.

28                                    -57-

1     Defendants argue that the red flags alleged in Paragraphs 40-43, 46-54 and
2     60-65 of Complaint do not establish a reasonable doubt that the Trustees either (a)
3     were aware of the illegal investments; or (b) could have "foreseen that such
4     businesses would be deemed illegal in the United States." (Trustees MTD at 16 and
5     20-22) The Trustees' protestations of ignorance cannot overcome the specific
6     allegations in the Complaint. The Trustees were supposed to be "watchdogs" (Cpl.
7     ¶ 30), and they had a duty to "oversee the actions of the Investment Advisor
8     and ... review the actions of the Trust's officers ... ." (Trustees' RJN Ex. 3 at 29). If
9     they really were ignorant, then they were necessarily reckless. Unlike many of the
10    cases relied upon by Defendants – which involved wrongdoing by a corporation in
11    an area that did not implicate the corporation's core activities – the *only* purpose of
12    the Fund was to invest money. The amounts invested in PartyGaming and NETeller
13    represented significant portion of the Fund's assets. Losses resulting from them
14    were mentioned on the *first page* of the Fund's report to shareholders for the period
15    ending March 1, 2007. (PRJN Ex. 12.5). Losses from PartyGaming alone were
16    blamed as a "significant detractor" in the entire fund's performance for the year
17    ending September 30, 2007. (PRJN Ex. 12.6)

18        Not only was the racketeering activity a significant portion of the Fund's core
19    business activity, the Complaint specifically alleges that Defendants repeatedly
20    purchased additional shares after the U.S. government commenced its law
21    enforcement crackdown because Defendants wanted to double down on their losses.
22    (Cpl. ¶ 49, 52, 54, 60-61) And, unlike the cases cited by Defendants where courts
23    denied that generalized media coverage in those instances were insufficient to
24    impute knowledge, publicly-available documents authored by Defendants
25    specifically identified the Fund as owning shares of PartyGaming and NETeller.[13]

26    _____
      [13] Thus, Defendants' reliance on *In re Mutual Funds Investment Litig.*, 384 F. Supp.
27    2d 873 (D. Md. 2005) is misplaced because that case did not involve wrongdoing
28    that implicated a significant portion of the company core activity. There were no

-58-

(PRJN Exs. 12.1-12.4) Defendants cannot claim ignorance of the contents of the Trust's own SEC reports.

The Trustees' protestations that they could not have known that the government would deem the investments to be illegal withers in light of the publicly available facts alleged in the Complaint. For example, the *New York Times* reported that illegal activity was the "centerpiece" of PartyGaming's business plan. (Cpl. ¶ 42; *see also*  PRJN Exs. 2-5). Moreover, PartyGaming and NETeller admitted in their prospectuses that the DOJ considered their operations to be illegal. (Cpl. ¶¶ 41, 60)

Under circumstances less compelling, courts have excused demand and considered corporate boards to be on notice of wrongdoing. *In re Nuveen Fund Litig.*, Nos. 94 C 360 and 94 CV 5416, 1996 WL 347012 (N.D. Ill. June 11, 2006) (applying Delaware law), for example, held that the mutual fund plaintiffs were excused from making a demand under *Rales*. Plaintiffs asserted claims against the fund's investment advisors and board of directors, claiming that the price structure of a rights offering violated the fund's articles of incorporation and were therefore *ultra vires*. The defendants argued that the plaintiffs' primary claims were directed against investment advisors who failed to inform the board of certain legal deficiencies in the rights offering. Nevertheless, the court held that making a demand on the board would have been futile because the directors breached their fiduciary duties to the fund by failing to note legal deficiencies in the price structure. This created a substantial likelihood of liability for them.

Other cases confirm that where, as here, corporations are accused of violating

---

publicly-available documents that specifically implicated the company in the wrongdoing. None of the directors were alleged to be directly involved in a conspiracy. Finally, none of the directors admitted to having direct "oversight" and "review" of the other defendants that engaged in the wrongdoing.  For similar reasons, the other cases cited by Defendants are inapposite.

-59-

1    laws, courts generally excuse demand on the board. For example, in *In re Veeco*
2    *Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267 (S.D.N.Y. 2006) (applying
3    Delaware law), the court excused the plaintiffs from making a demand where the
4    board failed to exercise appropriate attention to the company's noncompliance with
5    federal export control statutes. The court reasoned that the directors would be
6    subjected to a substantial likelihood of liability, which created a reasonable doubt
7    that they were disinterested.

8        Defendants deny that *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d
9    795 (7th Cir. 2001) supports Plaintiff. In *Abbott*, the Seventh Circuit reversed the
10   district court's refusal to excuse demand when the directors' failure to halt a
11   continuing pattern of noncompliance with Federal Drug Administration regulations
12   created a substantial likelihood of liability. Applying Delaware law, the court noted
13   that, as here, news reports had raised red flag warnings concerning the company's
14   regulatory violations.

15       Defendants also refer to *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001). Like
16   *Abbott*, *McCall* demonstrates why demand should be excused. In *McCall*, the Sixth
17   Circuit reversed the district court's dismissal of the complaint for failure to allege
18   demand futility. In reversing, the court held that the plaintiffs raised a reasonable
19   doubt of board disinterestedness by alleging that the company's senior management
20   devised schemes to improperly increase revenue and profit by violating Medicare
21   and Medicaid laws.

22       Defendants say that both *Abbot* and *McCall* are distinguishable because the
23   directors in those cases "were charged with direct oversight of the officers who
24   allegedly violated the law." (Trustees MTD at 22, n. 16) Plaintiff in this case,
25   however, presents an even *stronger* case for demand futility because the Trustees
26   were not merely *charged* with oversight. These "watchdogs" (Cpl. ¶ 30) have asked
27   this Court to take judicial notice that they, in fact, "oversee" and "review" the

28
**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

1  actions of the other Defendants. (Trustees' RJN Ex. 3, at 29) Moreover, the
2  Trustees here are charged with conspiracy in the wrongdoing – a strong claim
3  considering Defendants' actions in buying more shares of the illegal gambling
4  businesses after they learned of law enforcement activity against those companies.

5       Defendants reliance on *Wood v. Baum*, 953 A.2d 136 (Del. 2008), is
6  misplaced. The claims in *Wood* were premised on accounting irregularities about
7  which the board possessed no knowledge. Therefore, the "Court of Chancery
8  correctly concluded that there were no cognizable 'red flags' from which it could be
9  inferred that the defendants knew that [an accounting standard under] FAS 115 was
10 being improperly applied." *Id.* at 143.

11 **V.    PLAINTIFF HAS PROPERLY PLEADED DIRECT CLAIMS IN THE ALTERNATIVE
12         TO HIS DERIVATIVE CLAIMS**

13      Plaintiff has pleaded each of his substantive claims derivatively on behalf of
14 the Trust, and he would prefer to proceed with derivative claims only. However,
15 should this Court determine, at any time prior to final judgment, that Plaintiff
16 cannot proceed derivatively, he should be allowed to proceed against Defendants
17 based on his direct claims.

18      Plaintiff recognizes that in *Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000)
19 (applying Massachusetts law in a non-RICO context), the Ninth Circuit held that an
20 investor in a "series" mutual fund could not bring a direct claim for injuries
21 affecting only one series. Plaintiff also recognizes that a shareholder generally lacks
22 standing to bring an individual action under RICO to redress injuries to the
23 corporation. *See Sparling v. Hoffman Const. Co., Inc.,* 864 F.2d 635 (9th Cir. 1988);
24 *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 29 (1st Cir. 1987).

25      Nevertheless, plain language of RICO is that "[a]ny person injured in his
26 business or property by reason of a violation of section 1962" has the right to
27 "recover threefold the damages he sustains." § 1964(c). None of foregoing cases –
28 nor any of the cases cited in Trustees MTD at 7-11 – apply to the unique facts of

-61-

1    this case. Plaintiff seeks to proceed both derivatively and directly on behalf of a
2    separate class of mutual fund investors to redress racketeering by defendants who
3    controlled and managed the fund. In those other cases, the courts could fairly
4    assume that the rights of the plaintiffs would be adequately protected either by
5    direct actions by the corporations involved or by derivative actions on behalf of the
6    corporations. Those cases did not consider the situation that could arise here, in
7    which Plaintiff seeks to proceed derivatively but are prevented from doing so by
8    defendants seeking to avoid liability.

9        If Plaintiff is prevented from pursuing redress for his injuries either
10   derivatively or directly, RICO wrongdoing will go unpunished and RICO harm will
11   go uncompensated. That cannot be the right result. Consistent with Congress's
12   "express admonition that RICO is to be liberally construed to effectuate its remedial
13   purposes," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985) (citations
14   and quotation marks omitted), this Court should apply the proximate cause
15   requirement set forth in *Holmes* in such a way that plaintiffs injured by acts of
16   racketeering are not left without any remedy. This is particularly appropriate where
17   a more directly injured party (*i.e.*, the Trust) is dominated and controlled by those
18   accused of violating RICO. A straightforward application of the governing *Holmes*
19   factors leads to the proper result. In particular, the third *Holmes* factor (*i.e.*, whether
20   a more directly injured party can be "counted on to vindicate the law") would weigh
21   overwhelmingly in favor of allowing Plaintiff to proceed directly.

22       If Plaintiff is prohibited from proceeding derivatively on behalf of the Trust,
23   there is no doubt that Defendants will continue to fail to pursue investors' claims.
24   There is therefore a need to permit suit by shareholders to vindicate the law and
25   afford a remedy to those investors who suffered the ultimate injury. As long as this
26   can be done without double recoveries or resort to complex allocation rules to avoid
27   double recoveries, the third *Holmes* factor militates in favor of allowing investors
28

-62-

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

1   injured by Defendants' racketeering conduct to pursue direct claims. A contrary

2   rule would operate to insulate from liability defendants who scheme with others to

3   violate RICO.

## VI.   PLAINTIFF HAS STATED CLAIMS FOR BREACH OF FIDUCIARY DUTY AND NEGLIGENCE

6       The elements of a claim for breach of fiduciary duty are (i) the existence of a

7   fiduciary duty, (ii) a breach of that duty, and (iii) injury caused by the breach.

8   *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1102, 3 Cal. Rptr. 2d 236, 240 (Cal. App.

9   2 Dist., 1991). Defendants do not dispute that the Complaint alleges each of those

10  elements. Nor do Defendants dispute that Plaintiff has alleged each of the necessary

11  elements of a claim for negligence: (i) the existence of a duty of care, (ii) a breach

12  of that duty, (iii) legal or proximate cause and (iv) injury. *Friedman v. Merck &*

13  *Co.*, 107 Cal. App. 4th 454, 463, 131 Cal. Rptr.2d 885, 890 (Cal. App. 2 Dist.,

14  2003).

15      Defendants attempt to mischaracterize the Complaint as alleging mere

16  "improper investment" claims (Trustees MTD at 23-24), as if they were merely

17  accused of making an unwise business judgment. Based on this mischaracterization

18  of Plaintiff's RICO claims, the Trustees argue that Plaintiff fails to allege that the

19  investments were "too risky in light of the Funds' other holdings"; that the

20  investments were improper given the "inherent nature and expected performance of

21  the investment portfolio" and the "purposes" of the trust; or that Defendants

22  departed from the standard of care. All of these arguments are entirely beside the

23  point. The permissibility of investing in illegal gambling businesses is not a matter

24  of business judgment, for the same reason that it would not be a matter of business

25  judgment for professional asset managers to invest in a foreign drug cartel or to

26  lend money to a terrorist organization – despite potentially lucrative returns. Our

27  criminal laws prohibit it, and that is the beginning and end of the analysis.

28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**

## VII.  PLAINTIFF HAS STATED A CLAIM FOR WASTE

Defendants allege that the Complaint does not allege waste because there are no allegations that the Funds received consideration that was "disproportionately small" in exchange for the price, or even that they paid too much. (Trustees MTD at 24-25) Contrary to Defendants' argument, Plaintiff adequately pleads waste because using Trust assets to illegally purchase shares of unlawful gambling organizations constitutes a waste of assets. It is irrelevant, as contended by Defendants, that "growth of a mutual fund is an entirely proper corporate purpose." (Trustees MTD at 25) The relevant inquiry is how that growth is achieved. If growth is accomplished through violation of the criminal laws, it is improper. Thus, in *Michelson v. Duncan*, 407 A.2d 211 (Del. 1979), the Supreme Court of Delaware stated that "[t]he essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes." *Id.* at 217. Similarly, in *Delta Star, Inc. v. Patton*, 76 F. Supp.2d 617 (W.D. Pa. 1999), the court, applying Delaware law, found that the corporate plaintiff's former president committed corporate waste by awarding himself salary increases and bonuses that bore no reasonable relationship to his contributions to the financial performance of the company. If using corporate funds to pay an underperforming executive constitutes waste, so too does the purchase of toxic assets such as shares of stock in criminal organizations. *Cf. Hollander v. Breeze Corporations, Inc.*, 26 A.2d 507 (N.J. Ch. 1941); *Agency Rent-A-Car, Inc. v. Gateway Industries, Inc.*, 1980 WL 3040 (Del. Ch. 1980).

Defendants' reliance on *White v. Panic*, 783 A.2d 543 (Del. 2001), is misplaced. In that case, corporate assets were not used for an *ultra vires* purpose. The court merely declined to "weigh the 'adequacy' of consideration" for a lawful corporate transaction. *Id.* at 554. Here, Plaintiff does not ask this Court to "second guess" the business judgment of Defendants. Use of corporate proceeds in violation

-64-

of federal and state criminal laws requires no such second guessing. It is *per se ultra vires* and outside the realm of business judgment. For similar reasons, *Steiner v. Meyerson*, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995), is inapposite.

## VIII.  IF THE COMPLAINT IS INSUFFICIENT, LEAVE TO AMEND SHOULD BE GRANTED

If the Complaint is in any way insufficient, Plaintiff requests that he be afforded an opportunity to amend to cure any deficiency pursuant to Fed. R. Civ. P. 15(a)(2).

### CONCLUSION

For the foregoing reasons, Defendants' and Nominal Defendant's motions to dismiss should be denied.

Dated: August 24, 2009

Crystal G. Howard (SBN 224627)
SIMMONS BROWDER GIANARIS ANGELIDES &
BARNERD LLC
100 N. Sepulveda Blvd., Suite 1350
El Segundo, California 90245
Telephone: 310-322-3555
Facsimile: 310-322-3655
choward@simmonsfirm.com

and

Thomas I. Sheridan, III (*Admitted Pro Hac Vice*))
Andrea Bierstein (*Admitted Pro Hac Vice*)
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
Telephone: 212-784-6400
tsheridan@hanlyconroy.com
abrierstein@hanlyconroy.com

and

-65-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joseph A. Aughtman, Esq. (*Admitted Pro Hac Vice*))
Scarlette M. Tuley, Esq. (*Admitted Pro Hac Vice*))
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,
P.C.
218 Commerce Street
Post Office Box 4160
Montgomery, AL 36104
Telephone:  334.269.2343
jay.aughtman@beaslyallen.com
scarlette.tuley@beasleyallen.com

*Attorneys for Plaintiff*

-66-
**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTIONS TO DISMISS**