| | |
|---|---|
| 1 | Michael J. Quinn (SBN 198349) |
|   | *michael.quinn@klgates.com* |
| 2 | Kevin S. Asfour (SBN 228993) |
|   | *kevin.asfour@klgates.com* |
| 3 | |
| 4 | K&L GATES LLP |
|   | 10100 Santa Monica Boulevard |
|   | Seventh Floor |
| 5 | Los Angeles, California 90067 |
|   | Telephone: 310.552.5000 |
| 6 | Facsimile: 310.552.5001 |
| 7 | Attorneys for Defendants Causeway |
|   | Capital Management LLC, Sarah H. |
| 8 | Ketterer, Harry W. Hartford, James A. |
|   | Doyle, Jonathan P. Eng, Kevin Durkin, |
| 9 | Turner Swan, Gracie V. Fermelia and |
|   | Mark Cone |
| 10 | |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| STEVEN H. WODKA, individually, derivatively and on behalf of all others similarly situated, | | Case No. CV09-02625 R (RCx) |
| | Plaintiff, | **REPLY OF DEFENDANTS CAUSEWAY CAPITAL MANAGEMENT LLC, SARAH H. KETTERER, HARRY W. HARTFORD, JAMES A. DOYLE, JONATHAN P. ENG, KEVIN DURKIN, TURNER SWAN, GRACIE V. FERMELIA AND MARK CONE TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| - against - | | |
| CAUSEWAY CAPITAL MANAGEMENT LLC, SARAH H. KETTERER, HARRY W. HARTFORD, JAMES A. DOYLE, JONATHAN P. ENG, KEVIN DURKIN, TURNER SWAN, GRACIE V. FERMELIA, MARK CONE, JOHN A. G. GAVIN, and ERIC H. SUSSMAN, | | |
| | Defendants. | Date: September 21, 2009 |
| | | Time: 10:00 a.m. |
| - and - | | Courtroom: 8 |
| CAUSEWAY CAPITAL MANAGEMENT TRUST, doing business as CAUSEWAY INTERNATIONAL VALUE FUND, | | Assigned to Honorable Manuel L. Real |
| | Nominal Defendant. | |

DC-1362435-v4

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................1
    I.    THE COMPLAINT FAILS TO ALLEGE PROXIMATE CAUSE ...........1
    II.   THE COMPLAINT FAILS TO ALLEGE A PATTERN OF
        RACKETEERING ACTIVITY ................................................................9
        A.    Plaintiff Has Failed to Allege Predicate Acts ................................10
            1.    Plaintiff Has Failed to Allege the Existence of the
                  Underlying Illegal Gambling Business ...............................10
            2.    A Passive Investment in Publicly Traded Securities Does
                  Not Constitute Owning or Financing an Illegal Gambling
                  Business. .............................................................................10
        B.    The Complaint Fails to Allege a Pattern of Racketeering
            Activity ..........................................................................................11
CONCLUSION ................................................................................................................14

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allwaste Inc. v. Hecht*,
 65 F.3d 1523 ...................................................................................................1

*Anza v. Ideal Steel Supply Company*,
 547 U.S. 451, 458............................................................................................2

*In re Apple Computer Sec. Litigation*,
 886 F.2d 1109 ..................................................................................................9

*Basic, Inc. v. Levinson*,
 485 U.S. 224....................................................................................................8

*Bridge v. Phoenix Bond & Indemnity*,
 128 S.Ct. 2131 .................................................................................................4

*Diaz v. Gates*,
 420 F.3d 837 ...................................................................................................5

*East Hampton Dewitt Corp. v. State Farm Mutual Automobile Insurance Co.*,
 490 F.2d 1234 .................................................................................................5

*Exxon Co. U.S.A. v. Sofec, Inc.*,
 517 U.S. 830....................................................................................................5

*Farr v. N.C. Machinery Co.*,
 186 F.3d 1165 .................................................................................................5

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
 492 U.S. 229, 242-43 ............................................................................... 11, 13

*Holmes v. Securities Investor Protection Corp.*,
 503 U.S. 258.......................................................................................... *passim*

*Ikuno v. Yip*,
 912 F.2d 306 ...................................................................................................1

*Iqbal v. Ashcroft*,
 129 S.Ct. 1937..................................................................................................1

*Kowal v. MCI Communications Corp.*,
 16 F.3d 1271....................................................................................................8

*Krogman v. Sterritt*,
 202 F.R.D. 467 ................................................................................................9

*Marina Point Development Associate v. U.S.*,
 364 F.Supp.2d 1144 .....................................................................................3, 4

ii
**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Case 2:09-cv-02625-R -RC   Document 56   Filed 09/14/09   Page 4 of 18   Page ID #:955

*McBrearty v. Vanguard Group, Inc.*,
 2009 WL 875220 ..........................................................................................6, 7

*In re Mastercard Internet Gambling Litigation*,
 313 F.3d 257 ...................................................................................................7

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
 320 F.3d 920 ...................................................................................................8

*Teachers' Retirement System of La. v. Hunter*,
 477 F.3d 162 ...................................................................................................8

*White v. Roper*,
 901 F.2d 1501 .................................................................................................5

### FEDERAL STATUTES

Racketeer Influenced and Corrupt Organizations Act,
 18 U.S.C. § 1961 et seq..................................................................................1

Defendants Causeway Capital Management LLC, Sarah H. Ketterer, Harry W. Hartford, James A. Doyle, Jonathan P. Eng, Kevin Durkin, Turner Swan, Gracie V. Fermelia and Mark Cone (collectively, "Causeway Defendants") submit this Reply to the Opposition filed by Plaintiff Steven H. Wodka to their Motion to Dismiss the Complaint.[1]

## PRELIMINARY STATEMENT

This Reply by the Causeway Defendants addresses Plaintiff's arguments concerning his claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"). As set forth below, the Opposition fails to establish that the Complaint alleges either proximate cause, as required by leading Supreme Court decisions, or the predicate act and pattern elements of a RICO claim. Accordingly, Plaintiff's RICO claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Since these claims are the sole basis for federal jurisdiction, the Court should decline to exercise supplemental jurisdiction over the remaining claims.

Plaintiff's failure to make demand on the Fund's Board is an alternative basis for dismissal. As set forth in the Reply Brief filed today by John A. G. Gavin and Eric H. Sussman ("Trustee Defendants"), which the Causeway Defendants incorporate by reference herein, Plaintiff effectively concedes that his claims are derivative. However, he cannot plausibly argue that he is excused from making the demand required by Delaware law. Accordingly, the Complaint should be dismissed on these grounds as well.

## I.   THE COMPLAINT FAILS TO ALLEGE PROXIMATE CAUSE

In their initial Memorandum, the Causeway Defendants demonstrated that Plaintiff's RICO claims failed to meet the proximate cause requirement of direct injury

---

[1] Citations to the Opposition appear as "Opp. at ___. The Causeway Defendants' Memorandum in Support of Their Motion to Dismiss is cited as "Causeway Mem. at ___."

1

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

established in Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 273-74 (1992). Plaintiff's core counterargument – that the test for proximate cause under RICO is simply "foreseeability" – misstates the law and would read the direct injury requirement of Holmes out of the statutory scheme.

In Holmes, the Supreme Court unambiguously held that Congress adopted a "direct-injury limitation" as one of the requirements for proximate causation under RICO. 503 U.S. at 274. Under this limitation, only those directly injured by the predicate acts can establish proximate cause. The application of the direct-injury limitation to this case is illustrated by the Court's subsequent decision in Anza v. Ideal Steel Supply Company, 547 U.S. 451 (2006), cited throughout the Causeway Defendants' Memorandum. The facts in Anza closely parallel this case, but Plaintiff never addresses them.[2] Anza involved predicate acts of mail and wire fraud that concealed defendants' failure to collect state taxes from customers. The direct victim of this conduct was the State of New York, which lost tax revenues. The plaintiff, a business competitor of the defendants, although alleging real injury to business through loss of sales, suffered only indirectly as a result of the intended wrongful conduct. Anza, 547 U.S. at 458. In this case, where the predicate acts alleged concern an illegal gambling business, persons with losses due to illegal gambling are the direct victims and presumably can sue for a violation of RICO. Others, including investors such as the Trust, may ultimately be indirectly injured by the conduct constituting the predicate acts, or they may benefit from it, depending on the actions and reactions of third parties, including the government and other investors. But under RICO, allowing recovery by "secondary victims does, and should, run afoul of proximate causation standards." Holmes, 503 U.S. at 274.

The direct-injury test also considers whether other factors bring about the injury alleged. Plaintiff at first seemingly accepts this point, and he contends that the

---

[2] Plaintiff cites Anza for general legal propositions unmoored from the facts. See Opp. at 31, 32, 34, 35.

2

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

government "crackdown" on internet gambling directly caused the loss to the Fund. Opp. at 18-19. There are two holes in this argument. First, the alleged government crackdown was but an intermediate link in a chain of events that led to the alleged injury to the Trust through the decline in share price of securities it held. The next step involved the independent decisions of other investors made in response to the government action. The connection is even further attenuated. It is undisputed that no government action was taken against either PartyGaming or NETeller during the period in which the Fund held the shares of those companies. This fact is clearly alleged in the Complaint and discussed at some length in the Causeway Defendants' Memorandum. Compl. ¶¶ 47-50; Causeway Mem. at 5-6.[3] Any loss in the form of a decline in share price depends on the reaction of numerous investors in PartyGaming and NETeller assessing the impact of government action against other companies on the prospects for PartyGaming and NETeller. Plaintiff attempts to deal with this further attenuation by claiming it does not matter; government action against the two other internet gaming companies was sufficient cause to knock down the share price of PartyGaming and NETeller because it was part of enforcement against all internet gaming companies. Opp. at 38. But this argument only makes causation more diffuse and Plaintiff's argument more contradictory since the Complaint alleges that government enforcement was a series of events that began years before the Trust invested in the two companies in 2006. (See Compl. ¶ 65, alleging enforcement actions as far back as 1997.)

Second, Plaintiff fails to address in any respect a decision holding that intervening government action breaks the causal chain. Marina Point Development Assoc. v. U.S., 364 F. Supp. 2d 1144 (C.D. Cal. 2005). In Marina Point, discussed in

---

[3] The government action against NETeller was filed in January 2007. Compl. ¶ 62. As Plaintiff's own Exhibits confirm, the Trust held no NETeller shares as of December 31, 2006. See Plaintiff's Request for Judicial Notice ("PRJN") Ex. 12.4 at 5. PartyGaming was not the subject of government action until December 2008. Compl. ¶ 57.

the Causeway Defendants' opening Memorandum, this Court squarely addressed the causation issue. Citing Holmes and Ninth Circuit decisions, the Court dismissed RICO claims with prejudice, holding that "[i]t was governmental actions – specifically those of the Army Corps of Engineers [in not renewing Plaintiff's Clean Water Act permit] – that directly injured Plaintiff, thus breaking the causal link between [defendant] Steer's alleged actions [mail and wire fraud] and Plaintiff's alleged injury." Id. at 1148 (citations omitted).

Perhaps aware that his case does not satisfy the statutory direct causation requirement as defined by Holmes and Anza, Plaintiff attempts to import broad notions of common law causation such as "forseeability." Opp. at 32-36. But from among the "many shapes this concept took at common law," the Supreme Court selected as the test for RICO proximate cause a "direct relation between the injury asserted and the injurious conduct alleged." Holmes, 503 U.S. at 268. As a result, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza, 547 U.S. at 461. Notwithstanding plaintiff's erroneous suggestion to the contrary, Bridge v. Phoenix Bond & Indemnity, 128 S. Ct. 2131, 2142 (2008), did not *sub silentio* overrule Holmes and Anza, but dealt with the separate (and for present purposes entirely irrelevant) issue of whether to superimpose a reliance requirement on the federal mail and wire fraud statutes.[4]

---

[4] Bridge does not help Plaintiff's case on the direct injury point. In Bridge, the Court held that a plaintiff alleging predicate acts of mail and wire fraud need not prove he relied on the misstatements in those communications. 128 S. Ct. at 2139. This unremarkable holding, foreshadowed in Anza and Holmes, is entirely consistent with long-standing interpretation of these statutes. Plaintiffs met the proximate cause requirement because they were unquestionably directly injured by the fraudulent acts, which deprived them of the opportunity to obtain valuable property through foreclosure sales. As the Supreme Court noted, plaintiffs were the direct victims of, and the only identifiable persons injured by, the fraudulent scheme. 128 S. Ct. at 2144.

4

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

1    Nonetheless, relying on Diaz v. Gates, 420 F.3d 837, 900-01 (9th Cir. 2008) (en
2 banc), Plaintiff insists that foreseeability of the alleged injury is not only a necessary
3 but a sufficient showing for RICO proximate cause.  Opp. at 32.  But in Diaz, the
4 Ninth Circuit expressly stated it was not addressing the issue of RICO proximate
5 causation.  420 F.3d at 902, n.3.  Diaz addressed only whether the loss of employment
6 and employment opportunities could be injury to "business or property" under RICO,
7 and held that these types of injuries were foreseeable consequences of the alleged
8 predicate acts of witness tampering and falsification of evidence intended to convict
9 plaintiff falsely of crimes.  While the Diaz court observed that RICO's "by reason of"
10 language "incorporates a proximate cause standard which is generous enough to
11 include unintended though foreseeable consequences of RICO predicate acts," id. at
12 901, to satisfy Holmes and Anza, the injuries must still be directly caused by those
13 acts.  The Ninth Circuit did not address the direct-injury limitation and instead
14 expressly left the question of proximate cause open.
15    Relying on a series of non-RICO decisions, Plaintiff brushes aside the
16 significance of the intervening events leading to the alleged injury by claiming that all
17 of the events in the causal chain leading to the alleged injuries were "foreseeable."  See
18 Opp. at 34-36.  In particular, Plaintiff asserts that to cut off liability when a "cause
19 nearer in time" results in the injury, the subsequent cause "must be neither foreseeable
20 nor part of the risk created by defendants' wrongful act."  Opp. at 34.  None of the
21 cases Plaintiff cites in connection with this proposition is a RICO case,[5] and their lack
22 of application here is demonstrated by comparison with the Supreme Court's decision
23 in Holmes.  The Supreme Court held there was no proximate cause because the
24 insolvency of the broker-dealers – plainly a foreseeable event caused by the

---

[5]    Exxon Co. U.S.A. v. Sofec, Inc., 517 U.S. 830, 836-37 (1996) and Farr v. N.C. Machinery Co., 186 F.3d 1165, 1168-69 (9th Cir. 1999) are admiralty cases importing wholesale common law principles.  White v. Roper, 901 F.2d 1501 (9th Cir. 1990) is a civil rights action under Section 1983.  East Hampton Dewitt Corp. v. State Farm Mut. Auto Ins. Co., 490 F.2d 1234, 1240 (2d Cir. 1973) is a classic automobile negligence case.

5

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

1  defendants' manipulation and not by any third-party conduct – was an intervening
2  event that rendered plaintiff's loss, and even the losses of the broker's entirely
3  innocent customers, "indirect." 503 U.S. at 273.

4  Plaintiff's loose "foreseeability" proximate cause standard would open the
5  courthouse to a flood of RICO cases. Indeed, its application would have sustained
6  numerous cases the Supreme Court and other courts have dismissed for failure to state
7  a claim. For example in Holmes, it was plainly foreseeable that defendants'
8  manipulation could injure broker-dealers trading heavily in the manipulated shares,
9  causing insolvency and injury to customers.[6] Nonetheless, the Supreme Court held the
10 customers' injury was not sufficient to establish proximate cause. Similarly in Anza, it
11 was certainly foreseeable that a business that failed to charge customers required state
12 taxes would have a competitive pricing advantage over competitors that obeyed the
13 law. However, the Court found the injury to competitors not sufficiently "direct" so as
14 to satisfy the RICO proximate cause element.[7]

15 Plaintiff erroneously argues that Causeway's Motion relies "almost exclusively"
16 on McBrearty v. Vanguard Group, Inc., 2009 WL 875220 (S.D.N.Y. April 2, 2009),[8]
17 appeal pending, No. 09-1444 (2d Cir. April 8, 2009), then attempts to undermine that
18 decision alleging it ignored the policy considerations discussed in Holmes. Opp. at 31.
19 Plaintiff is wrong on all points. First, Causeway Defendants discussed McBrearty at

---

[6] In Holmes, the Court suggested that those directly defrauded by the RICO predicate acts of purchasing or holding of the manipulated securities likely would have satisfied the proximate cause requirement. 503 U.S. at 275-76.

[7] Likewise, in Marina Point, it was entirely foreseeable that the government would deny the Clean Water Act permit, but nonetheless, the Court found that intervening government action broke the causal chain. See 364 F. Supp. 2d at 1148. Contrary to Plaintiff's argument that proximate cause is an issue for the jury (Opp. at 37), Anza and Marina Pointe, among other cases, also demonstrate that courts dismiss complaints as a matter of law on motions to dismiss.

[8] In their initial Memorandum, the Causeway Defendants referred to this case as "Vanguard" to highlight that it was one of a number of identical cases plaintiff's counsel has brought against other mutual fund groups. For clarity, this Reply adopts "McBrearty."

some length because that decision, which dismisses a complaint essentially identical to the one filed in this case, contains a persuasive analysis of the proximate cause issue. But the Causeway Defendants' Motion relied on Supreme Court precedent and, where applicable, decisions of the Ninth Circuit. See Causeway Mem. at 9-13. Moreover, McBrearty expressly addressed the Holmes policy factors, finding that they supported dismissal of the complaint. 2009 WL 875220 at *11.

Those factors support dismissal here as well. The first factor, difficulty of determining damages, see Holmes, 503 U.S. at 269, is illustrated by Plaintiff's shifting and conflicting allegations of what the market knew when, and what was affecting share price. The Complaint alleges a variety of government actions, including both legislative and prosecutorial,[9] as well as the reactions of investors to news of other companies. Moreover, in the case of PartyGaming, the losses allegedly continued even though the company came into compliance with U.S. law. (Opp. at 28.) These factors, plus the speculative question on the performance of possible alternative investments, all of which were addressed in the Causeway Defendants' Memorandum, create great uncertainty in any attempt to determine damages. They are not the simple matter of arithmetic Plaintiff alleges. See Opp. at 38. These considerations also weigh against finding proximate causation under the second Holmes factor, which looks to issues of apportionment of damages among possible claimants. 503 U.S. at 269. Sorting out the loss incurred by the direct victims in this case, online gamblers, and perhaps lawful competitors, and apportioning the recovery would prove complex.

The third Holmes factor looks at the existence of "directly injured victims" who can sue to vindicate the law. 503 U.S. at 269-70. Here there are two potential plaintiffs, both injured gamblers and injured competitors. Indeed, as In re Mastercard Internet Gambling Litig., 313 F.3d 257 (5th Cir. 2002), demonstrates, those with losses

---

[9] The Opposition erroneously argues that decisions of prosecutors to bring individual cases and separate congressional action should be considered the same event. Opp. at 38.

7

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

in internet gambling in fact have brought litigation. There is no need to create another class of indirectly injured shareholder plaintiffs, particularly when their incentive to police allegedly unlawful activity is compromised by the prospect they will enjoy investment gains from the conduct.

Finally, even if the Court applied the pure foreseeability test urged by Plaintiff here, it would defeat rather than support his contentions on proximate causation. Plaintiff contends that the alleged injuries – the decline in the share prices of PartyGaming and NETeller – were foreseeable consequences of government enforcement action against other internet gaming companies. Opp. at 14-21; Compl. ¶ 56. Share prices allegedly fell following the announcement of the government actions. Without specifically alleging it, Plaintiff appears to be adopting the efficient capital markets hypothesis familiar from securities class actions: that share prices reflect information in the marketplace. See, e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 241-42 (1988). Disclosure of bad news caused share prices to fall.

But, given other facts alleged in the Complaint, this point contradicts Plaintiff's claim of direct injury. At numerous points in his Opposition, Plaintiff argues that everyone knew before the government acted in 2006 that internet gambling companies were inevitable targets of prosecution. See, e.g., Opp. 2; 15-17. According to the efficient market doctrine accepted in Basic, where a risk (indeed an inevitability, in Plaintiff's view) is fully known to the market, the market will have already discounted the stock price prior to the event. See, e.g. Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 n.1 (D.C. Cir.1994) ("in an efficient securities market all publicly available information regarding a company's prospects has been reflected in its shares' price"). The prices of internet gambling stocks, including PartyGaming and NETeller, should therefore already have reflected the risk of government enforcement action. The allegation that the shares declined in price, despite the alleged flood of

8

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

information in the marketplace, strongly indicates another cause.[10] Cf. Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 187 (4th Cir.2007) (plaintiffs inadequately pleaded loss causation stemming from allegation in third party's civil complaint because, inter alia, facts alleged in complaint had already been disclosed in prior public filings).  Alternatively, the drop in the stock prices demonstrates that the government actions were not reasonably foreseeable.  Cf. In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir.1989) ("Dramatic [stock] price movements in response to an optimistic statement would provide a strong indication that the statement itself was material...."); Krogman v. Sterritt, 202 F.R.D. 467, 47-78 (N.D.Tex.2001) ("in an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information.") (citations and internal quotation marks omitted).

   In sum, even if they can be characterized as violations of Section 1955, the Causeway Defendants' investment decisions did not cause any direct injury to Trust or Plaintiff, as required by Holmes and Anza.

## II. THE COMPLAINT FAILS TO ALLEGE A PATTERN OF RACKETEERING ACTIVITY

   Plaintiff has failed to allege two key RICO elements: that Defendants caused the Fund to commit a predicate act or that there is any plausible threat of continued or continuous racketeering activity by the Fund or Defendants sufficient to satisfy RICO's "pattern" requirement.[11]

---

[10] Perhaps in an effort to avoid the inherent contradiction between his foreseeability/inevitability arguments and the independent role of the market and other investors, Plaintiff tries to attribute the precise amount of the loss not to changes in share prices reflecting information in the market, but to the per share drop in revenue when PartyGaming stopped accepting U.S.-based poker players.  Compl. ¶ 56; Opp. at 38.  This strongly suggests a loss due to another cause: PartyGaming's decision, prior to any prosecution, to change its business.  As Plaintiff concedes, PartyGaming could continue to operate lawfully after its change.  Opp. at 25.

[11] Contrary to Plaintiff's suggestion, Opp. at 20, Defendants do not concede Plaintiff has established other elements of RICO.  The facts (as opposed to the legal conclusions) are accepted only for purposes of this Motion to Dismiss.

9

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

### A. Plaintiff Has Failed to Allege Predicate Acts

#### 1. Plaintiff Has Failed to Allege the Existence of the Underlying Illegal Gambling Business

Plaintiff has not adequately alleged that either PartyGaming or NETeller was deemed an illegal gambling business within the meaning of Section 1955 during the time the Trust owned shares. In particular, while the Opposition makes numerous general statements concerning "internet gambling," it fails to recognize the distinction between poker, PartyGaming's principal business, on one hand, and sports betting and other online gambling activities, on the other. The distinction is important: none of the prosecutions or public pronouncements by the government or prosecutions in the summer of 2006 target PartyGaming or online poker. Plaintiff expressly admits then that even under his flawed reading of Section 1955, after PartyGaming "shut down" its operations in the U.S. in October 2006 (Compl. ¶ 55), it would no longer have been a crime to own an interest in that company. Opp. at 25. The Complaint identifies no state laws that PartyGaming was violating during the relevant time period. It references only one statute in connection with NETeller, and then only in connection with a charge brought against its founder and operator (and not the company) after the Trust no longer owned this security. Compl. ¶ 63.[12]

#### 2. A Passive Investment in Publicly Traded Securities Does Not Constitute Owning or Financing an Illegal Gambling Business.

While Plaintiff cites numerous materials concerning the prosecution of operators of internet gambling companies under various statutes, he provides nothing to support an extension of Section 1955 to purchasers of publicly traded securities. This is not surprising. First, purchasing publicly traded shares over an impersonal exchange is not "financing." PartyGaming and NETeller received none of the money paid by the Trust

---

[12] NETeller's founder was not charged until January 1, 2007. By then the Fund no longer held shares in that company. See PRJN 12.4. The first charges relating to PartyGaming were not brought until December 2008, when nearly two years after the Fund sold its shares, one of the founders agreed to a plea. Compl. ¶ 56.

10

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

to purchase the securities and could not have used the sale proceeds to fund or finance their operations. Not surprisingly, there is no allegation in the Complaint that the proceeds of these open-market transactions reached either company. Plaintiff's speculation in the Opposition that the purchases maintained the value of shares and made it easier for the companies to borrow (Opp. at 25) is an impermissible attempt to amend the Complaint in an Opposition. Moreover, it only illustrates the remote relationship between the Defendants' conduct and any unlawful activity.

Second, as the Causeway Defendants discussed in their initial Memorandum, ownership of shares in a public company does not translate into ownership of the separate underlying businesses operated by that corporation.[13] Plaintiff's Opposition does not contest that there have been no prosecutions or even any government saber-rattling to the effect that holding a minority position in a company through securities that are lawfully traded on international exchanges amounts to a crime of any sort. Plaintiff catalogues numerous enforcement actions and government pronouncements about internet gambling (Compl. ¶ 65), but he offers nothing to suggest any state or federal government has ever expressed the view that ownership of publicly traded shares was unlawful.

B. The Complaint Fails to Allege a Pattern of Racketeering Activity

Plaintiff's Opposition also fails to acknowledge what he has alleged in his Complaint and the public record establishes: that Defendants held the investments in question for less than a year, and for a significant portion of that time PartyGaming had "shut down" its business in the United States. Compl. ¶ 55.

Under these circumstances, the Complaint fails to allege any plausible threat of continued criminal activity, the prerequisite of a pattern. RICO was intended to address the problem of "long-term criminal conduct." H.J. Inc. v. Northwestern Bell

---

[13] Here, as Plaintiff concedes (Opp. at 25), some of PartyGaming's businesses were unquestionably lawful in jurisdictions other than the United States. Accordingly, only some of PartyGaming's operations could have been considered an "illegal gambling business."

11

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Telephone Co., 492 U.S. 229, 239 (1989). Predicate acts over a few weeks or months "*threatening no future criminal conduct* do not satisfy this [pattern] requirement." Id. at 242 (emphasis added). Plaintiff attempts to argue that there were numerous predicate acts – that each additional purchase of shares was a new violation. Opp. at 41-42. In fact, there have been, at most, two acts. Even if the Trust can be found to have "owned" a part of an illegal gambling business, that ownership is a single act.[14] Unlike the mail and wire fraud statutes, where each mailing or wire communication may amount to a separate violation of those laws, Section 1955 proscribes certain types of relationships to an illegal gambling business. The ownership relationship, if it exists here, does not change even if the Trust increased its holding in the stock. It is a single act, measured in months. As Plaintiff admits in his Opposition in the case of NETeller, it is less than 12 months. Opp. at 43. In the case of PartyGaming, it is a shorter period, less than seven months between the outside dates of purchase, April 2006 at the earliest, and PartyGaming's decision to withdraw from the U.S. market in October 2006 (Compl. ¶ 55) which, as Plaintiff concedes, ended any conceivable prohibition on purchasing or owning its stock, even under Plaintiff's theory. Opp. at 25.

Courts plainly consider context beyond mere counting of mailings and months. As H.J. holds, the pattern element is concerned with discerning a threat of future, long-term criminal conduct. Where a plainly legitimate business engages in isolated conduct of relatively short duration, a pattern is not established. There is no doubt that the conduct here was isolated, limited and of short duration. As the public reports included in Plaintiff's papers indicate, even when combined, the Trust's holdings in PartyGaming and NETeller were two of approximately 80 securities in the portfolio and amounted to approximately 1.15 percent of the net assets of only one of three

---

[14] As discussed above, there can be no serious argument that public purchases of securities over impersonal public markets "finance" the allegedly illegal businesses.

12

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

1 funds.[15] Despite the availability for public scrutiny of the Fund's entire portfolio through quarterly, semi-annual and annual public reports filed with the SEC, Plaintiff has not identified any other instances of allegedly improper investing in the history of the Trust.

Plaintiff nonetheless makes baseless insinuations that the Causeway Defendants are primed to commit further "racketeering" acts. Opp. at 41. But there is simply no <u>factual</u> basis to suggest that making "illegal" investments for the Fund has become a "regular way of doing business." <u>H.J.</u>, 492 U.S. at 242-43. A pattern of racketeering requires a showing that the conduct has become a "regular way of doing business."[16] Since no facts are alleged providing a plausible basis to conclude that a pattern of racketeering activity exists, Plaintiff's RICO claim should be dismissed. <u>See</u> <u>Iqbal v. Ashcroft</u>, 129 S. Ct. 1937, 1950-51 (2009) (requiring complaint to plead facts to plausibly support elements of a claim).

///
///
///
///
///
///

---

[15] See PRJN Ex. 12.3, Causeway Capital Management Trust, Report for Period Ending September 30, 2006 at 9-10. Plaintiff has asked the Court to take judicial notice of these public filings. See PRJN Exh. 12.1-12.5. The filings are available online at the SEC's website, http://www.sec.gov.

[16] This distinguishes the instant case from <u>Allwaste Inc. v. Hecht</u>, 65 F.3d 1523, 1529 (9th Cir. 1995), in which the court found a pattern where allegations would establish that "extorting kickbacks had become [defendants'] regular way of doing business." Plaintiff's reliance on <u>Ikuno v. Yip</u>, 912 F.2d 306 (9th Cir. 1990) is similarly misplaced. There, the entire corporation was a sham. <u>Ikuno</u> illustrates the annual reports that were filed a year apart furthered an alleged scheme to operate a "phantom corporation" that engaged in unlawful commodities transactions. The filings stopped when the phantom corporation ceased operations.

13

**REPLY OF DEFENDANTS TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## **CONCLUSION**

Based on the foregoing reasons, the Complaint should be dismissed.

Respectfully submitted,

K&L GATES LLP

Dated:  September 14, 2009        By: /s/ Kevin S. Asfour
                                      Michael J. Quinn (SBN 198349)
                                         michael.quinn@klgates.com
                                      Kevin S. Asfour (SBN 228993)
                                         kevin.asfour@klgates.com

                                      Attorneys for Defendants Causeway Capital Management LLC, Sarah H. Ketterer, Harry W. Hartford, James A. Doyle, Jonathan P. Eng, Kevin Durkin, Turner Swan, Gracie V. Fermelia and Mark Cone